| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF HAWAII |

```
 3
     KIRK C. FISHER,               )  CIVIL NO. 11-00589 ACK-BMK
 4                                 )
              Plaintiff,           )  Honolulu, Hawaii
 5                                 )  April 9, 2012
          vs.                      )  11:09 a.m.
 6                                 )
     LOUIS KEALOHA, as an          )  1) Defendant City and County
 7   individual and in his         )  of Honolulu's amended motion
     official capacity as          )  for partial dismissal of
 8   Honolulu Chief of Police;     )  complaint
     PAUL PUTZULU, as an           )
 9   individual and in his         )  2) Defendant Louis Kealoha's
     official capacity as former   )  motion to dismiss partial of
10   Honolulu Acting Chief of      )  complaint filed
     Police; CINTY AND COUNTY OF   )  September 28, 2011
11   HONOLULU; HONOLULU POLICE     )
     DEPARTMENT and DOE            )
12   DEFENDANTS 1-50,              )
                                   )
13              Defendant.         )

14

15                   TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE ALAN C. KAY,
16               UNITED STATES DISTRICT COURT JUDGE

17   APPEARANCES:

18    For the Plaintiff:       TE-HINA ICKES
                               841 Bishop Street, Suite 2201
19                             Honolulu, Hawaii  96813

20    For the Defendants:      D. SCOTT DODD
                               Deputy Corporation Counsel
21                             City and County of Honolulu
                               530 S. King Street, Rm. 110
22                             Honolulu, Hawaii  96813

23    Official Court           GLORIA T. BEDIAMOL, RPR, RMR
      Reporter:                United States District Court
24                             P.O. Box 50131
                               Honolulu, Hawaii 96850
25
```

```
 1    Proceedings recorded by machine shorthand, transcript produced
      with computer-aided transcription (CAT).
 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Monday, April 9, 2012                          11:09 a.m.

2            THE CLERK:  Calling the case of Civil 11-00589

3    ACK-BMK, Kirk C. Fisher versus Louis Kealoha, et al.  This

4    hearing has been called for Defendant City and County of

5    Honolulu's amended motion for partial dismissal of complaint

6    and Defendant Louis Kealoha's motion to dismiss partial of

7    complaint filed September 28, 2011.

8            Counsel, your appearances for the record, please.

9            MS. ICKES:  Good morning, Your Honor.  Te-Hina Ickes

10   on behalf of Plaintiff Kirk Fisher.

11           THE COURT:  Good morning.

12           MR. DODD:  Good morning, Your Honor.  Scott Dodd on

13   behalf of Defendants City and County of Honolulu and Louis

14   Kealoha.

15           THE COURT:  What about Mr. Putzulu?

16           MR. DODD:  Mr. Putzulu was not served with a copy of

17   the complaint, so we do not have the authority to represent him

18   here today, Your Honor.

19           THE COURT:  Are the plaintiffs going to be pursuing

20   Mr. Putzulu?

21           MS. ICKES:  Yes, Judge.  We have had many difficulties

22   getting him served.  We have attempted through HPD, through the

23   City.  Because he no longer is employed by HPD or the City,

24   they are not accepting service for him, which is

25   understandable.  We have tried with two separate process

```
 1   servers to try track him down at his home, and it just seems,
 2   Judge, that he is evading service as his home is fenced in.
 3          We would like to pursue our claims against
 4   Mr. Putzulu.  It may come to an issue and may have to publish.
 5   As I understand it, there have been many, many efforts to
 6   obtain personal service on him, and it just has not been done.
 7          THE COURT:  Okay.  Well, Mr. Dodd, it's your motion.
 8   Please come up to the podium.
 9          MR. DODD:  Yes, Your Honor.
10          THE COURT:  These are not really partial motions to
11   dismiss; is that right?
12          MR. DODD:  They are entitled motions for partial
13   dismissal of the complaint.  They're aimed at specific claims
14   that were --
15          THE COURT:  They're aimed at all the claims for two
16   specific defendants, aren't they?
17          MR. DODD:  Your Honor, that may have happened that
18   when the motions were first formulated -- and I also apologize
19   the motions are both inadequately captioned.  The civil number
20   does not include Your Honor's initials, so we apologize about
21   that.  I think when they were initially framed, the idea was to
22   move for partial dismissal.  And then when they were ultimately
23   filed, it did appear that they were moving to dismiss all
24   claims pled against the defendants.
25          THE COURT:  Okay.
```

1          MR. DODD:  I apologize for that.

2          THE COURT:  Are both parties in agreement that the HPD

3    ought to be dismissed?

4          MS. ICKES:  Yes, Judge.

5          THE COURT:  I see HPD is not a separate legal entity

6    for sui juris purposes, so HPD is dismissed.

7          Please proceed, Mr. Dodd.

8          MR. DODD:  Okay, Your Honor.  I was hoping we might

9    see the written order on the court's other case involving

10   firearms, but I will proceed with our arguments in this motion.

11         THE COURT:  You are talking about Baker?

12         MR. DODD:  Baker.  Correct.

13         THE COURT:  This is a very separate situation.

14         MR. DODD:  I understand, Your Honor.  Understood.

15         In this case, first I would like to discuss the City's

16   motion.  And the basic argument under that is that it fails to

17   state a Monell type claim for municipal liability under Section

18   1983.

19         To make a municipal liability claim under that

20   section, the plaintiff must show that the municipal action was

21   taken with the requisite degree of culpability and must

22   demonstrate a direct causal link between the municipal action

23   and the deprivation of the federal rights.

24         If plaintiff were proceeding under a ratification

25   theory to establish municipal liability, the plaintiff would

1    have to show that the authorized policymaker or policymakers

2    approved the subordinate's decision and the basis for it and

3    thus requires knowledge of the alleged constitutional

4    violation.

5          Your Honor, we believe that plaintiff has not properly

6    pled a municipal liability claim under Monell because plaintiff

7    has not pled that the municipal action was taken with the

8    requisite degree of culpability and the causal link.

9    Plaintiff has alleged what appears to be a, for lack of a

10   better term, respondeat superior claim against the City and is

11   alleging a municipal liability claim under Section 1983.  And

12   the law is clear that that is not permitted.

13         Municipal liability claim under Monell is an entirely

14   different animal with different requirements.  We believe that

15   the complaint fails to state such a claim.

16         And the other -- under the Surplus Store and Exchange

17   case, 928 F.2d at 793, that's a Seventh Circuit case just for

18   persuasive authority, says the mere enforcement of state law on

19   the part of the local government in the absence of expressed

20   incorporation or adoption of state law into local regulations

21   has been found insufficient to sustain a federal action under

22   Section 1983.

23         So our argument, Your Honor, is that in this case,

24   since plaintiff does not allege any deliberate conduct on the

25   part of the City, nor any specific policy or custom that was

1    applied to plaintiff that was the cause of the alleged injury,

2    the claim is insufficient.  Plaintiff merely cites the action

3    of Acting Chief Putzulu and Chief Kealoha in enforcing state

4    and federal law.  We posit that this is insufficient to make

5    that a claim of municipal liability under Section 1983.

6            THE COURT:  Why?

7            MR. DODD:  Because it appears to be no more than a

8    respondeat superior claim.  The allegation --

9            THE COURT:  The chief of police doesn't have the

10   authority to make final policies?

11           MR. DODD:  It could, Your Honor, if that were under a

12   ratification theory.  Yes, the chief would be the final

13   decisionmaker.  But we believe that if you go under the chief's

14   motion to dismiss, we believe that that -- the claim against

15   the chief is also insufficient.  So a ratification theory would

16   not work against the City in this case either.

17           May I proceed to Kealoha's motion?

18           THE COURT:  Please.

19           MR. DODD:  Your Honor, we found in that case -- excuse

20   me a second.  I apologize, Your Honor.  We found the case most

21   closely related was the U.S. versus Hayes case, and that is 129

22   Supreme Court 1079.  In that case, the court noted that 18 USC

23   Section 922(g)(9) makes it unlawful for any person who has been

24   convicted in any court of a misdemeanor crime of domestic

25   violence to possess in or affecting commerce any firearm or

1   ammunition.  And that Section 921(a)(33) capital A, defines a

2   misdemeanor crime of domestic violence as having an element,

3   the use or attempted use of physical force or the threatened

4   use of a deadly weapon committed by a person in a domestic

5   relationship with the victim.

6         The Hayes case is analogous -- not exactly the same,

7   but it's analogous to the present case in that the court in

8   that case Hayes was convicted of a misdemeanor crime of

9   domestic violence.  He was then charged under 922(g)(9) and 924

10  (a)(2) of possessing firearms after having been convicted of

11  the misdemeanor domestic violence crime.

12        He moved --

13        THE COURT:  Well, the plaintiff contends that under

14  the harassment statute you could simply have slight touching,

15  and there was no use of force.

16        MR. DODD:  I understand the plaintiff's argument.  It

17  is our position that the domestic -- that the harassment -- the

18  crime of harassment under which plaintiff was convicted of the

19  two counts is a domestic violence crime.  And therefore that

20  his convictions for harassment meet the federal definition of a

21  crime of violence in that it involved the use or attempted use

22  of force.

23        The defendants maintain that if the statute itself,

24  HRS 134-7 did not bar plaintiff from owning or possessing

25  firearms, that the Lautenberg Amendment would bar him from

1   doing so.

2           THE COURT:  Let's stay first with the misdemeanor

3   definition of violence and force.  Again, it's the plaintiff's

4   position that harassment could include only slight touching.

5           MR. DODD:  I agree that is plaintiff's argument.

6           THE COURT:  So how do you get around that?

7           MR. DODD:  But I don't know if we can absolutely get

8   around it, but in Hayes, why I brought Hayes up, is that the

9   reason that Hayes rejected -- I'm sorry, the reason that the

10  Supreme Court rejected Hayes's arguments in that case is that

11  it said in that construing Section 922(g)(9) to exclude the

12  domestic abuser convicted under a generic use of force

13  statute -- and that's one that does not designate domestic

14  relationship as an element of the offense -- would frustrate

15  congress's manifest purpose.

16          Although the statute in the present case for

17  harassment -- I mean, it can be argued that it's only a slight

18  touch, it is our position that in this case it's clear that it

19  is a domestic violence crime.  That what plaintiff here was

20  convicted of was a domestic violence crime.

21          THE COURT:  But it would only be violence if there was

22  more than slight touching.

23          MR. DODD:  Yes.  And we're talking about the elements

24  of the offense, but we understand what actually happened was

25  that he -- what he was charged with --

1          THE COURT:  We don't have much of a record of what

2   actually happened.

3          MR. DODD:  Your Honor, at this point, you are correct.

4   We do not have that much of a record.  It's merely a motion to

5   dismiss.  It's not a motion for summary judgment.  But it was

6   our position that even without that portion of the record that

7   harassment is a domestic violence crime and thus he could be --

8          THE COURT:  Do you have any evidence?  I understand

9   this is a motion to dismiss, but do you have any evidence that

10  would show that there was force or violence in the underlying

11  crime committed by Mr. Fisher?

12         MR. DODD:  Well, Your Honor, as it is a motion to

13  dismiss, I don't have evidence.  But it is my understanding

14  that it was a crime -- or it was a -- what occurred did involve

15  violence and that what he pled to was harassment, which does

16  not exactly -- I mean, it is not a requirement that violence be

17  used to be convicted of harassment.  I do concede that.

18         THE COURT:  Where does that leave the City?

19         MR. DODD:  Well, the City -- as I argued before, I

20  don't think plaintiff has properly pled a Monell claim, so I

21  don't think that --

22         THE COURT:  Well, just as far as the violation of the

23  statute.

24         MR. DODD:  Well, if it's -- what we would argue is

25  that if that were insufficient, if the crime for which he was

1   convicted, harassment, is insufficient, we would argue that

2   Kealoha -- I'm not going to argue for Putzulu -- would be it

3   was a reasonable stake -- excuse me, a reasonable mistake under

4   which he would be entitled to qualified immunity.

5        From our point of view, Your Honor, it's something of

6   splitting hairs.  Yes, the crime itself does not have an

7   element of a necessity of the use of force, but there's

8   definitely -- the use of force is one possible way to be

9   convicted of harassment.

10       THE COURT:  We have a 1983 claim with federal

11   constitution claims, and we also have an alleged violation of

12   state statutes.  So which immunity would apply?  Would it be

13   federal immunity or state immunity?

14       MR. DODD:  Qualified immunity would only apply to the

15   federal 1983 claim.  Under state law, Chief Kealoha would be

16   entitled to the conditional privilege under Hawaii state law.

17       THE COURT:  Please proceed.

18       MR. DODD:  Your Honor, that's basically what I wanted

19   to argue.  If the court has any questions, I will do my best to

20   address those.

21       THE COURT:  You haven't discussed the injunction issue

22   at all.

23       MR. DODD:  Well, Your Honor, plaintiff has filed a

24   motion at the same time that he filed his opposition to these

25   motions.  He filed a motion for preliminary injunction.  We

1    believe that that --

2              THE COURT:  Well, it's asked for in the complaint too.

3              MR. DODD:  Correct, Your Honor, and we did not

4    separately move to dismiss that.  But we will make those

5    arguments in opposition to the plaintiff's motion for the

6    injunction.  We will argue at the time -- I won't get into that

7    now, but we will argue that the injunction should not issue.

8              THE COURT:  But you do argue that both the City and

9    Kealoha should be dismissed?  If they are dismissed, who is

10   going to carry out any injunction?

11             MR. DODD:  I think that's the confusion on our end,

12   Your Honor, which was -- led the motion, at least for Kealoha,

13   to be dismissed as a motion for partial dismissal.

14             We believe that the -- I can understand from

15   plaintiff's position we're arguing out of both sides, but

16   because typically we argue that official capacity claims are

17   only claims against the municipal entity and should be

18   dismissed as against the City.

19             But since the City is arguing there's no Monell claim,

20   I can understand that the plaintiffs say, Well, which one is

21   it?  Someone has to be responsible for the request for

22   injunctive relief, but we'll be moving to oppose that motion.

23   We believe that that motion will fail.

24             THE COURT:  Are you saying at this time you're not

25   seeking to move for a dismissal of either the City or Kealoha

1    with respect to the injunctive claim?

2              MR. DODD:  Your Honor, we would; but since we have not

3    properly briefed it, I don't think we could honestly ask the

4    court to dismiss it.  We haven't fully briefed the issue in our

5    papers.

6              THE COURT:  Thank you.

7              MR. DODD:  Thank you, Your Honor.

8              THE COURT:  Is it Te-Hina Ickes?

9              MS. ICKES:  Yes, Judge.

10             THE COURT:  I should call you Ms. Ickes or Ms.

11   Te-Hina?

12             MS. ICKES:  Ms. Ickes is fine.  Thank you, Judge.  May

13   I?

14             THE COURT:  Please.

15             MS. ICKES:  With respect to the City's motion to

16   dismiss for failure to state a claim under 42 U.S. 1983, the

17   plaintiff's position -- or the plaintiff agrees that there's no

18   municipal liability under respondeat theory or -- theory.  That

19   in order to establish municipal liability, a plaintiff must

20   allege some sort of policy or custom that the municipality has.

21             We have alleged policy or custom on the part of the

22   HPD, which is not a separate entity as was the first thing that

23   was discussed, it's not a separate entity from the City.  The

24   municipality that's being sued here.

25             That policy or custom, Judge, is identified -- excuse

1    me -- in paragraph 25 and again referred to in paragraphs 50

2    and 57 of plaintiff's complaint.

3              THE COURT:  Only with respect to Mr. Fisher, right?

4              MS. ICKES:  I'm sorry, could you -- the policy with

5    respect to Mr. Fisher?

6              THE COURT:  What paragraphs of the complaint are you

7    referring to again?

8              MS. ICKES:  I see what your question is, Judge.  I'm

9    referring to paragraph 25 of the complaint wherein Mr. Fisher

10   was informed by HPD of what their custom, practice and policy

11   was with regards to issuing or denying permits to acquire.

12             You're right, Mr. Fisher is the only person referenced

13   in that paragraph.  In paragraphs 50 and 57, we just reallege

14   that --

15             THE COURT:  That's 5-0 and 5-7?

16             MS. ICKES:  Correct.  Five zero and five seven -- that

17   by maintaining these customs, practices and policies, and its

18   kind of the standard language in the causes of action section,

19   Judge.  It's kind of a lengthy paragraph.  I can read it into

20   the record, but pages 50 and 57 just reestablish what

21   plaintiff's claims are.

22             And it is policy or custom that led to the deprivation

23   of Mr. Fisher's constitutional rights specifically.  Because

24   HPD's policy is to review police reports, police reports have

25   nothing to do with whether or not a person has been convicted

1   of any crime.  I have a lengthy discussion in my memo in opp to

2   Chief Kealoha's motion to dismiss that discuss harassment and

3   whether it's a crime of violence.

4          Now HPD has specifically related that they review

5   police reports and that's just -- that has nothing to do with

6   the statute.  The statute 134-7, as well as the Lautenberg Act

7   talk about whether an applicant is convicted of a crime of

8   violence.  So that policy, Judge, is what we're alleging is

9   that policy or custom that HPD and, as an extension, the City

10  engages in. And that is the basis for our claims against the

11  municipality under 1983.

12         THE COURT:  But, again, you're only referring to

13  Mr. Fisher?

14         MS. ICKES:  Yes.

15         THE COURT:  That doesn't sound like a policy or a

16  custom.

17         MS. ICKES:  Well, Judge, the way this complaint is

18  drafted, it's drafted on Mr. Fisher's behalf, and it was

19  Mr. Fisher who was informed of what HPD's policy, customs

20  practices are with regards to determining whether or not an

21  applicant is qualified or disqualified from firearms ownership.

22         Now, while we're filing this suit on behalf of

23  Mr. Fisher, there's no reason for us to know or not know

24  whether or not HPD engages in these types of customs or

25  policies with respect to any other applicant.  If HPD is

1  relating to Mr. Fisher that this is what they do, when they

2  look at whether or not someone is statutorily qualified or

3  disqualified, they're looking at the police reports.

4       The police reports are completely irrelevant to

5  whether or not someone was ever convicted of a crime of

6  violence under Chapter 134 Hawaii Revised Statutes or the

7  Lautenberg Act under federal law.

8       So, Judge, I believe, to answer your question,

9  although we're filing on behalf of Mr. Fisher, there's no

10  reason to believe that the HPD is not doing this for every

11  other citizen who would normally be statutorily qualified.  But

12  because HPD is exceeding the scope of what the statute

13  requires, a conviction, again it could be applied to any other

14  Hawaii citizen applying for a permit to acquire pursuant to

15  Chapter 134 Hawaii Revised Statutes.  So that being said,

16  Judge, it was that policy or custom which we're alleging led to

17  the deprivation of Mr. Fisher's rights.

18       Now, the City, and I mentioned this was -- this was

19  mentioned in the City's moving papers and my memorandum in

20  opposition on behalf of Mr. Mr. Fisher that -- the ratification

21  issue.

22       Now, an official with final decision-making authority,

23  in this case plaintiff submits that both Kealoha and Acting

24  Chief Putzulu did have final decision-making authority pursuant

25  to Hawaii Revised Statutes 134-2.  In fact, the statute, and

1    this is the Hawaii Revised Statutes Chapter 134, did establish

2    that it is the chiefs of police who may issue customs to -- or

3    permits to acquire.

4           So absolutely the plaintiff is arguing --

5           THE COURT:  They --

6           MS. ICKES:  I'm sorry, Judge.

7           THE COURT:  You're talking about who makes the

8    determination whether a permit will be granted?

9           MS. ICKES:  Correct.

10          THE COURT:  That's not saying who will be making some

11   city policy.  He's just carrying out the statute.

12          MS. ICKES:  I understand.  Judge, I can discuss that

13   part now about enforcing the statute, if you have questions

14   about that.  I was going to be getting to it, but I can move

15   there now.

16          THE COURT:  However you want to proceed.

17          MS. ICKES:  Okay.  So with regard to enforcing a

18   statute, Judge, the City submits that Chief Kealoha is

19   merely -- could be reasonably -- I don't want to misquote their

20   argument in their memo, but essentially that he reasonably

21   relied on the statute -- excuse me, Judge -- and therefore

22   should be excused.  And I believe this comes under their

23   qualified immunity argument that a reasonable official in

24   Kealoha's position would not understand that his common sense

25   interpretation of the law violates a convicted criminal's

1   constitutional rights.

2           Well, Judge, there is case law that discusses whether

3   or not an official's conduct violated plaintiff's

4   constitutional rights.  Case law in the Ninth Circuit does

5   discuss that a reasonably competent public official should know

6   what the law is regarding his conduct.

7           Furthermore, unlawful enforcement --

8           THE COURT:  Well, this statute is not that clear,

9   right?

10          MS. ICKES:  Well, Judge, I would -- plaintiff's

11  position is that a facial reading of the statute that it is

12  clear.  If a person is statutorily qualified meets the

13  objective requirements of Chapter 134 Hawaii Revised Statutes,

14  the permit should issue.

15          The statute --

16          THE COURT:  You don't have any case law defining these

17  statutes.

18          MS. ICKES:  Defining the Hawaii Revised Statutes,

19  Judge?

20          THE COURT:  Correct.

21          MS. ICKES:  Okay.

22          THE COURT:  Whether it's a slight touch, whether force

23  is required?

24          MS. ICKES:  The plain reading of the harassment

25  statute.  Is that the statute that you are asking about, Judge?

1    I thought we were still talking about 134.

2              THE COURT:  About the force --

3              MS. ICKES:  711-1106, that's the harassment statute,

4    the harassment statute is a person commits the offense of

5    harassment with the intent to harass, annoy or alarm that other

6    person; that person strikes, shoves, kicks or otherwise touches

7    another person in an offensive manner, or subjects the person

8    to offensive physical contact.

9              So correct, Judge, the statute does encompass conduct

10   that could be, I guess, considered violent.  But as the court

11   was -- had stated before, the statute also contemplates a

12   slight touching.

13             THE COURT:  So what's the police chief meant to do

14   with that kind of language?

15             MS. ICKES:  My argument, Judge, is that the police

16   chief is considered a reasonably competent official and could

17   make the decision that because an applicant's constitutional

18   rights are involved, that the statute could contemplate

19   behavior or conduct that is not violent in nature.  And,

20   therefore, would pass the Hawaii Revised Statutes 134 --

21   Chapter 134 requirement --

22             THE COURT:  When the police chief was, particularly

23   Mr. Putzulu, he had the record before him of what actually had

24   happened?  What happened?

25             MS. ICKES:  Judge, I don't know that --

1          THE COURT:  Did your client simply touch his wife, or

2    did he slap her?

3          MS. ICKES:  Well, Judge, I don't have that

4    information.  What I can -- I can tell you, and it's alleged in

5    our complaint, that Nicole Fisher was his wife, and she was the

6    complaining witness in that matter.  Contrary to what is --

7          THE COURT:  Their child is a complaining witness too.

8          MS. ICKES:  I'm not sure if I said Collette or Nicole.

9          THE COURT:  I think your paragraph 16 in their

10   complaint does.

11         MS. ICKES:  I may have misspoken with the name

12   Collette and Nicole.  Contrary to what's argued in the City's

13   motion, Mr. Fisher was not arrested for abuse but was arrested

14   for harassment.  Now, it's my understanding that apparently at

15   least until 2009, when Acting Chief Putzulu denied the

16   application, Mr. Fisher's application, they had the police

17   reports.  What's contained in the police reports, Judge, I

18   don't know.  I've never seen the police reports nor has

19   Mr. Wilkerson, my co-counsel.  Mr. Fisher was represented by

20   other attorneys.

21         THE COURT:  So we're all ignorant as to what really

22   happened.

23         MS. ICKES:  Our office has attempted to request the

24   transcripts from those matters from his guilty plea.  We do

25   have some very limited documents from that original case.  And

1   this was over ten years ago.  The judiciary retention statutes

2   for the state is ten years.  So by the time Mr. Fisher retained

3   us, that retention period had long since passed by at least a

4   year.

5        And the reason I know that, Judge, is because that was

6   the response we got from the court when we tried to request

7   those transcripts or the audio recordings of the transcripts.

8   So if the court needs me to, I can submit that correspondence.

9   I have not attached it to any motion.

10       THE COURT:  So what if the record says that your

11  client slapped his wife and daughter?

12       MS. ICKES:  Well, that would be part of the record

13  because generally in state court there's a factual basis.

14  Mr. Fisher pled guilty and generally there's a factual basis

15  established by the prosecutor who reads the facts into the

16  record, or defense counsel, or they stipulate to it, but it's

17  made part of the record.  And we don't have that record.

18       So whether or not the record would indicate whatever

19  Mr. Fisher -- the factual basis of his guilty plea, Judge, I

20  would argue that whatever is contained in the police report is

21  irrelevant.  If that was not made a part of the record in his

22  guilty plea and/or conviction, then I would submit that it does

23  not constitute a crime of violence because he was never

24  convicted under those facts.

25       So because those -- whether or not Mr. Fisher --

 1    Judge, I think at this point I'm confusing myself.  So if Your

 2    Honor has any specific questions or am I going on too long or

 3    being unclear --

 4            THE COURT:  I'm waiting to hear more from you.

 5            MS. ICKES:  Okay.  With regards to --

 6            THE COURT:  What if your client did slap his wife?

 7            MS. ICKES:  Well, if he slapped -- if a person slapped

 8    his wife and was charged with harassment and was later

 9    convicted, either by way of trial or a guilty plea or a no

10    contest plea, Judge, I would submit that whatever the factual

11    basis of that conviction was -- now if a person did that and

12    the factual basis was, I punched my wife, Judge, that I believe

13    could be considered under the Hawaii statutes as a crime of

14    violence.

15            But just because someone is arrested for that and then

16    later pleads guilty, if that factual record is not clear, then

17    I don't think we can say whether or not it was a slight

18    touching.

19            THE COURT:  Doesn't your client have a copy of his

20    plea agreement?

21            MS. ICKES:  Judge -- yes, we do have copies of the

22    judgment.  And, you know, this is in district court, and I have

23    seen it.  It does not contain whatever the factual basis was of

24    the guilty plea.  And those forms are prepared by -- they're

25    form documents, Judge, that are filled in as you go through the

1  change of plea.  So it's a change of plea form that you fill

2  in.  Now this was not a felony court thing, so those plea forms

3  are more detailed.

4        The district court forms, Judge, and I can provide

5  these for the court's review, back in 1998 or 1999, whenever

6  Mr. Fisher's guilty plea occurred, are much different, and they

7  do not contain space for the factual basis of the guilty plea.

8        THE COURT:  Your client at one point got an order

9  requiring the police department to return the firearms, right?

10       MS. ICKES:  Correct, Judge.  Back in --

11       THE COURT:  And they did?

12       MS. ICKES:  Yes.  He did get an order permitting the

13  return.  More than ten years later -- and HPD did return his

14  firearms and ammunition.  When he reapplied for some sort of

15  other firearm, HPD went back and checked and said, Hey, wait a

16  minute, 10-year-old conviction, you've got to turn in all of

17  your guns -- or you have to turn in all of your firearms and

18  ammunition, and he complied.

19       THE COURT:  And then he filed a motion with the family

20  court?

21       MS. ICKES:  Correct.  Under that old family court

22  number.  Now that judge -- there were no findings --

23       THE COURT:  They denied that, right?

24       MS. ICKES:  Yes.  The motion was ultimately denied.

25       THE COURT:  Did he appeal the order?

```
 1              MS. ICKES:  I'm sorry, Judge?

 2              THE COURT:  Did he appeal the order?

 3              MS. ICKES:  The order was not appealed.

 4              THE COURT:  Why not?

 5              MS. ICKES:  We filed here for damages and injunctive

 6    relief based on the constitutional violation.

 7              THE COURT:  That order of denial was some time ago,

 8    wasn't it?

 9              MS. ICKES:  Yes, Judge, it is -- well, the dates are

10    laid out in the complaint.  And I believe it was sometime --

11    the order was issued in 2008.  Now the --

12              THE COURT:  So he never bothered to appeal it?

13              MS. ICKES:  Well, the order -- he never had any

14    problems with the order back in 1998.  The motion was for --

15              THE COURT:  This was -- I'm talking about an order

16    that denied his motion.

17              MS. ICKES:  Correct.

18              THE COURT:  So he would have had a problem with it.

19              MS. ICKES:  In 2010, that was not appealed.

20              THE COURT:  Why not?

21              MS. ICKES:  I don't have the answer to that, Judge.  I

22    believe that -- just based on the information we have and the

23    further investigation we did, we believe we had a

24    constitutional violation and this would be the appropriate

25    forum to pursue those claims.
```

1          Judge, with regards to this statute, we discussed how

2     the harassment statute can contemplate touching, rough

3     touching, violent touching, but it also encompasses slight

4     touching.  And what I had been leading up to, before I started

5     discussing that, was with regards to qualified immunity, that

6     plaintiff -- we would be submitting that the individual

7     defendants in this case are not entitled to qualified immunity

8     because plaintiff had a clearly established constitutional

9     right, and our submission is that the defendants' conduct --

10          THE COURT:  What constitutional rights has he clearly

11     established?

12          MS. ICKES:  The constitutional rights that we have

13     alleged are Second Amendment, Fifth Amendment and Fourteenth

14     Amendment.  We have not addressed the Fifth Amendment claim,

15     and I did not discuss that in my memo because, as I understand

16     it, the Fifth Amendment applies to federal defendants.

17          THE COURT:  And your view is that the Fifth should be

18     dismissed too?

19          MS. ICKES:  Yeah.  I would just be submitting on that

20     issue.  I did not brief that at all.

21          With regards to the Second and Fourteenth Amendment,

22     those are the constitutional claims that the plaintiff has

23     alleged and believes have been violated.

24          So with regards to -- well, Defendant Kealoha is the

25     only defendant on this motion before the court.  And plaintiff

1    would just submit that, based on his experience, based on what

2    a reasonably competent public official should be aware of, that

3    the --

4            THE COURT:  You and I have trouble determining what

5    the statute means and what it doesn't mean, so why should the

6    police chief?

7            MS. ICKES:  Yes, Judge.  I would submit that the

8    reason we have trouble is because we don't know what the record

9    says.  We don't know what the factual basis of Mr. Fisher's

10   guilty plea was.

11           Now, what Police Chief Kealoha -- and it's my

12   understanding that he didn't -- or Acting Chief Putzulu did not

13   personally go down there and go through the records, but

14   someone under their employment did, and they ratified it by

15   signing off on that decision.

16           Now, that ratification or that custom of doing that is

17   our argument that that exceeds the scope of what the statute --

18   the firearm statutes.  This is what Chapter 134 Hawaii Revised

19   Statutes contemplates.

20           Now --

21           THE COURT:  Now, what did he do wrong on 134?

22           MS. ICKES:  Well, 134-7 discusses, if anybody has been

23   convicted of a crime of violence, a permit shall not issue.

24   And they're looking at HPD, and the defendants are looking at

25   that -- that wording and saying because harassment could

1    contemplate a crime of violence, he is statutorily

2    disqualified.

3         Now, we're not disputing the validity of the statute.

4    We're disputing the enforcement of this valid statute that the

5    City, HPD, and the individual defendants have exceeded what the

6    statute mandates by looking at these police reports, looking at

7    all these different things, and not looking at what the

8    conviction was based on.  And if they did -- well, Judge, the

9    record doesn't exist anymore because the case is so old.  But

10   the --

11        THE COURT:  Do you think his wife filed a complaint

12   with the police department because her husband slightly touched

13   her?

14        MS. ICKES:  Well, there are all different types of

15   things that could constitute a slight touching, Judge, which

16   could be offensive.  And I believe in my memo I discussed

17   spitting on a person, tapping somebody's shoulder.

18   Realistically, Judge, the question you're asking me, I can't

19   answer it.  Do I really think -- I can't answer that without

20   having a knowledge of what Mr. Fisher was convicted of -- the

21   factual basis of what he was convicted of.

22        And, like I said, Judge, this is a really old case.

23   For the past ten years, Mr. Fisher, around there for

24   approximately the last ten years, Mr. Fisher had his firearms

25   and ammunition returned to him.  So he had moved on --

1          THE COURT:  He had them what?

2          MS. ICKES:  He had had them returned.  So when -- it

3    was only when he attempted to reapply for some sort of

4    additional permit for a different type of firearm is when,

5    after ten years, the City, HPD, Defendant Kealoha said, Wait a

6    minute, you have this 10-year-old conviction for harassment.

7    You've got to turn in -- you've got to surrender your firearms

8    or properly dispose of them.  That's all laid out in the

9    complaint, Judge.

10          THE COURT:  He simply put them in his wife's name?

11          MS. ICKES:  Correct.  Right now he is prohibited from

12    having these firearms as -- he is prohibited from having the

13    firearms and ammunition.

14          THE COURT:  What about the federal statute?

15          MS. ICKES:  The federal statute, Judge, has to do with

16    whether or not a person was also again convicted of a

17    misdemeanor crime of domestic violence.  Now, there's no --

18    there's some case law, and the City attorney discussed it

19    briefly, about whether or not there's a relationship -- whether

20    or not a spouse -- there were spouses married, that's not an

21    issue in contention here.  He was married to his wife at that

22    time, and that was his natural child at that time.  So that's

23    not an issue here.

24          The issue is, what is a misdemeanor crime of domestic

25    violence?

1          Now, it discusses use of force and threatened use of

2    force.  And that I believe is in Section 921.  There are many

3    subsections there, Judge, and it's defined as -- I'm sorry, I

4    don't have that specific subsection, but it is set forth in my

5    memorandum in opposition.  It discusses the use of force or the

6    threatened use of force.  And, just like my argument on how HRS

7    711-1106, the harassment statute, does not contemplate -- or

8    can include slight touching.  The harassment statute does not

9    require use of force or threatened use of force.  It's not an

10   element of the offense.

11         So a similar analysis, which I set forth in my memo,

12   discusses why the Lautenberg Act, that's U.S.C. 922, is also

13   inapplicable here.  Furthermore, it's never been established

14   that -- or Mr. Fisher was never convicted of a crime that

15   included the use of force or the threatened use of force.  And

16   that under 711-1106 --

17         THE COURT:  As far as you know.

18         MS. ICKES:  Excuse me?

19         THE COURT:  I said as far as you know.

20         MS. ICKES:  As far as the record shows, Judge.

21         THE COURT:  Now, we don't have the record.

22         MS. ICKES:  We don't have the record.  Judge, I've

23   skipped all over my notes here, and I believe I've covered all

24   the points I was hoping to in response to the City's motion.

25   If the court does not have any questions for me, my argument is

1  complete.

2       THE COURT:  Okay.  Thank you.

3       MS. ICKES:  Thank you.  Oh, Judge, if I may one more

4  brief thing.  Also included in my memorandum in opposition, the

5  plaintiff submits that we have established the claim under 1983

6  as set forth.  Our arguments are set forth in the memo there.

7  But the caveat at the end, Judge, was motion for leave to amend

8  the complaint.

9       If the court finds any merit in the City's arguments

10  that -- we submit that the motion to dismiss should be denied.

11  But if the judge believes we can clear anything up by amending

12  the complaint, we would request leave to do so.

13       THE COURT:  Thank you.  One area that I'm concerned

14  about is qualified immunity.

15       MS. ICKES:  Okay.  Judge, I think I've covered all my

16  points in my case law -- well, I haven't cited anything for you

17  on the record here, but it's all laid out in the memorandum in

18  opposition.  And I don't have anything further on qualified

19  immunity.

20       THE COURT:  Okay.  Thank you.

21       MS. ICKES:  Thank you.

22       THE COURT:  Mr. Dodd.

23       MR. DODD:  Just briefly, Your Honor.  I think the

24  court made it clear what our problem is.  The problem is that

25  the statute includes a harassment -- it could be a crime of

1   violence; but if it's simply an offensive touching, maybe it's

2   not.  But we don't have enough record to know what happened in

3   this case.  Did he simply slightly touch her and the daughter?

4   Or, was it actually something which would be clearly a crime of

5   violence -- a crime of domestic violence?

6        So I think it would be incumbent on the plaintiff to

7   provide the record so that we could see what he actually was

8   convicted of, then the issue would become clear.

9        I think that the complaint should have that as part of

10  it.  It should be included in the complaint as to what exactly

11  what he pled to so we would understand.

12       THE COURT:  I think the plaintiff makes the argument

13  that you just go by categories, not by the underlying facts.

14       MR. DODD:  I mean, I understand the argument, but I

15  think in this one, as the court noted, if he beat up his wife

16  pretty good, and he says, Well, the statute is insufficient, I

17  still get my guns, I think that would frustrate congress's

18  purpose in passing the Lautenberg Amendment.

19       Because in the U.S. versus Hayes case, a similar type

20  of argument was rejected because simply the domestic

21  relationship was not a predicate element of the offense to say,

22  Well, he still can possess the firearms would frustrate

23  congress's purpose.  I think, in this case, it similarly would

24  be a frustration of congress's purpose if the crime he was

25  convicted of and what he pled to was a crime of violence, but

1    yet we don't have the record, so we can't make that decision.

2         THE COURT:  Well, the complaint alleges that the

3    plaintiff was told that the police chief simply looked at the

4    police report rather than the actual court order of conviction.

5         MR. DODD:  I agree, Your Honor, that is what the

6    complaint alleges.  We don't have evidence, but we have what

7    the complaint alleges.

8         THE COURT:  What's your rebuttal to that?

9         MR. DODD:  Your Honor, I think the confusion is, as

10   the court noted, it's confusing as to whether harassment

11   necessarily is it a crime of violence or is it not?  Due to

12   that confusion, if the claim is against the chief of police, he

13   made a reasonable mistake in doing what he did, then we would

14   be entitled to qualified immunity.

15        THE COURT:  Is that it?

16        MR. DODD:  That's it, Your Honor.

17        THE COURT:  Thank you.  Anything more, Ms. Ickes?

18        MS. ICKES:  Just one point, Judge.  We all acknowledge

19   the problem, the record being unclear.  Now Mr. Fisher pled

20   guilty in 1997 -- on December 3, 1997, on November 4, 1998,

21   less than a year later, the Honorable Dan Kochi, a state court

22   judge, issued the order permitting the return of the firearms.

23   And HPD returned Mr. Fisher's firearms at that time.

24        So even back then when the record was available, HPD

25   acknowledged that he was entitled to his guns back then.  Ten

1    years later, the statutes are all the same, and that's alleged

2    in our complaint also, that the statutes Hawaii Revised

3    Statutes 134, Chapter 134, and the harassment statute 711-1106

4    was the same back then as it was now.

5          So back then, '97, '98, at the time of Mr. Fisher's

6    guilty plea and the time of the order permitting return of

7    firearms, and HPD's prompt return of Mr. Fisher's firearms

8    indicates that, at that time when the record was available,

9    they believed that Mr. Fisher was statutorily qualified under

10   134-2.  Because the conduct back then of HPD just goes to show

11   that they didn't believe back then that he was -- had been in

12   fact convicted of a crime of violence.

13         Other than that, Judge, I have nothing more to add.

14         THE COURT:  Maybe the judge made a wrong ruling.

15         MS. ICKES:  Perhaps the judge made a wrong ruling, but

16   I don't know Judge Kochi.  And all I know is that the issue was

17   ordered and HPD did return the firearms.

18         THE COURT:  This is family court judge?

19         MS. ICKES:  Yes, family court judge.  I'm not

20   particularly -- I'm not familiar with this particular judge,

21   Judge Kochi, but I noticed the case number is FCCR and that

22   indicates family court criminal.

23         THE COURT:  Oh, criminal.

24         MS. ICKES:  FCCR stands for family court criminal.

25         THE COURT:  Thank you.

1          MS. ICKES:  Thank you, Judge.

2          THE COURT:  Mr. Dodd, what do you have to say about

3     that?

4          MR. DODD:  Your Honor, I don't believe we can take

5     what HPD, the City, with the municipal entity did back then as

6     an indication that they were doing anything other than

7     following a court order, rather than that they were evaluating

8     the harassment statute as to whether that permitted Mr. Fisher

9     to possess firearms.  I think the court order came out, I don't

10    think we can assume anything more than just that, they followed

11    a court order.  I don't think we can extend that to say they

12    acknowledged that he had a right to the firearms.

13         THE COURT:  The court even referred to Chapter 134 and

14    said that this order is provided there's no violation of

15    Chapter 134.

16         MR. DODD:  Your Honor, it does say that, and I

17    acknowledge that, but I think we can just -- all we can assume

18    is that what HPD did at that time was to follow the court

19    order.  I think that's -- anything more than that would be

20    making an assumption that we just don't know.

21         THE COURT:  Well, they followed the court order,

22    returned the guns at that point in time, but then ten years or

23    so later, when he applied for a permit to buy a new gun, he was

24    told that he was disqualified under his prior conviction and

25    that he had to return all of his guns.

1          MR. DODD:  It is an odd result, Your Honor.  I fully

2     agree with that.  Perhaps, I know it was looked in a later

3     time, it was determined that he wasn't statutorily qualified.

4     I don't want to make assumptions and guesses, Your Honor.  It

5     is odd that the guns were returned and then later he was told

6     to turn in the firearms as he was not qualified.

7          But looking at what happened in the later time period,

8     I think that the action was reasonable based upon the

9     information provided and that the statute -- the statute of

10    harassment, even if it didn't necessarily be a crime of

11    violence, it was possibly a crime of violence, and that it was

12    reasonable for the chief to act as he did.

13         THE COURT:  I'm looking for my page that shows up in

14    my memo here.  Maybe my law clerk can help me.  What page in

15    the memo does that show up, that court order?

16         MS. ICKES:  Judge, if I may.  In the complaint, if the

17    court has the complaint, the exact text of the order is on

18    page -- bottom of page 6 top of page 7.  And that's exactly the

19    language pulled from the order.

20         THE COURT:  It is hereby ordered that the Honolulu

21    Police Department shall return to Mr. Fisher all firearms,

22    etcetera, which was surrendered to the above mentioned court

23    order, provided that the provisions of HRS Chapter 134 are

24    satisfied and that no outstanding state or federal restraining

25    orders, etcetera, Section 922(g)(8), 1347 prohibitions under so

1    and so.

2            I guess one way you can read that in this case is that

3    the court order said the police are directed to return the

4    firearms, provided that that is permissible under Chapter 134

5    and is permissible under 922.  The police made a mistake in

6    returning the firearms at that time.  That's another way of

7    looking at it, right?

8            MS. ICKES:  That's possible, Judge.

9            THE COURT:  Okay.  Well, I want to look at these cases

10    again.  I'm going to take this under advisement at this time.

11    Thank you both.

12            MR. DODD:  Thank you, Your Honor.

13            MS. ICKES:  Thank you, Your Honor.

14    (Recess at 12:07 p.m. )

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2          I, Gloria T. Bediamol, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that the foregoing is a true, complete and correct transcript

 5   from the record of proceedings in the above-entitled matter.

 6

 7          DATED at Honolulu, Hawaii, October 19, 2012.

 8

 9

10                              /s/ Gloria T. Bediamol

11                              GLORIA T. BEDIAMOL.

12                              RPR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25
```