**2013 IL 113867**

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

_____

(Docket No. 113867)

JERRY W. CORAM, Appellee, v. THE STATE OF ILLINOIS
(The Illinois Department of State Police, Appellant).

*Opinion filed September 12, 2013.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justice Thomas concurred in the judgment and opinion.

Justice Burke specially concurred, with opinion, joined by Justice Freeman.

Justice Theis dissented, with opinion, joined by Justice Garman.

## OPINION

¶ 1     This appeal comes to us pursuant to Illinois Supreme Court Rule 302(a) (Ill. S. Ct. R. 302(a) (eff. Oct. 4, 2011)), the circuit court of Adams County having held section 922(g)(9) of the federal Gun Control Act of 1968, as amended (18 U.S.C. § 922(g)(9) (2006)), unconstitutional as applied to Jerry W. Coram.

¶ 2     Before this court, the Illinois Department of State Police (the Department), appellant herein, contends that the firearm ban of section 922(g)(9) is "constitutional under the Second Amendment," both facially and as applied to Coram. The United States, as *amicus curiae*, argues that "the circuit court erred in holding that the denial

of petitioner's application for a firearm owner's identification card infringes on any constitutionally protected interests." As we see it, there is no viable argument as to whether the federal firearms ban was properly *imposed* upon Coram and others like him. At oral argument Coram's attorney more or less conceded as much. Moreover, as will appear hereafter, we see no need to address the contention that section 922(g)(9) is unconstitutional as applied to Coram; nor, we conclude, was there a reason for the circuit court to do so.

¶ 3     We believe the applicable state and federal statutory schemes can be interpreted in a manner consistent with congressional intent and in such a way as to afford Coram his firearm rights under the Illinois Constitution (Ill. Const. 1970, art. I, § 22) and the second amendment to the United States Constitution (U.S. Const., amend. II). We thus conclude the circuit court erred in holding section 922(g)(9) unconstitutional as applied to Coram.

¶ 4                    CORAM'S 1992 CONVICTION

¶ 5     On June 26, 1992, Jerry Coram was charged, in the circuit court of Adams County, with the offense of domestic battery, pursuant to section 12-3.2(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, ¶ 12-3.2(a)(1)), the information stating that Coram had "slapped [the victim] in the face with his hand." A police report indicated that Coram was intoxicated during an argument preceding the incident, and the victim, Coram's live-in girlfriend, had advised Coram, just prior to the assault, that she had engaged in sexual intercourse with other men. On July 10, 1992, Coram pled guilty to the offense of domestic battery, as charged. He was sentenced to 12 months' conditional discharge and was ordered to pay a $100 fine, plus costs. No jail time was imposed as part of the sentence. There is no indication that the charge to which Coram pled had been reduced to induce the guilty plea. Nothing in the police report of the incident suggests that a firearm was present when the offense was committed.

¶ 6     At the time of Coram's conviction, the disqualifying provisions of Illinois' Firearm Owners Identification Card Act (FOID Card Act) (Ill. Rev. Stat. 1991, ch. 38, ¶ 83-8(a) through (h)) would not have affected Coram's rights to keep and bear arms under either the Illinois Constitution or the second amendment to the United States

-2-

Constitution. In 1992, no federal statute disqualified Coram from possessing firearms as a result of his misdemeanor domestic battery conviction.

¶ 7                    CORAM'S 2009 FOID CARD APPLICATION

¶ 8            In 2009, Coram applied for a FOID card. In his application, he truthfully answered that he had previously been convicted of domestic battery. He subsequently received a letter from the Illinois State Police denying his application based upon a 1996 amendment to the federal Gun Control Act of 1968,[1] which imposed a firearm disability upon any person convicted of a "misdemeanor crime of domestic violence." Although not identified as a statutory basis for denial in the letter, the action was obviously premised upon the authority granted the Illinois State Police under section 8(n) of the FOID Card Act to deny the applicant a card, in the first instance, where the person is "prohibited from acquiring or possessing firearms or firearm ammunition by any Illinois State statute or by federal law." 430 ILCS 65/8(n) (West 2010).

¶ 9            Where, as here, "the denial" of a FOID card, and hence the right to legally possess a gun under Illinois law, was "based upon [a prior conviction of] *** domestic battery"—among other offenses the statute also addresses forcible felonies—section 10(a) of the FOID Card Act states that "the aggrieved party may petition the circuit court in writing in the county of his or her residence for a hearing upon such denial." 430 ILCS 65/10(a) (West 2010). At that hearing, the court is charged with determining whether "substantial justice has not been done," and if it has not, the court is authorized by statute to direct the Department to issue the FOID card. 430 ILCS 65/10(b) (West 2010). The court's determination with respect to substantial justice is governed by the criteria of subsection (c) of section 10. Pertinent to the case before us, the statute provides that the court may "grant *** relief" from "such prohibition" "if it is established by the

---

[1]The Lautenberg Amendment, effective September 30, 1996, criminalized possession of firearms by domestic violence offenders. Pub. L. No. 104-208, 110 Stat. 3009 (1996).

-3-

applicant to the court's *** satisfaction that *** the circumstances regarding a criminal conviction, where applicable, the applicant's criminal history and his reputation are such that the applicant will not be likely to act in a manner dangerous to public safety; and *** granting relief would not be contrary to the public interest." 430 ILCS 65/10(c)(2), (c)(3) (West 2010). An applicant must also establish that he or she has not been convicted of a forcible felony within 20 years of the application, "or at least 20 years have passed since the end of any period of imprisonment imposed in relation to that conviction." 430 ILCS 65/10(c)(1) (West 2010). By its plain language, subsection (c) of section 10, at the time of Coram's application and subsequent proceedings in the circuit court, allowed the court, in a proper case, to grant relief from prohibitory factors listed in section 8 and applied by the Department in the denial of a FOID card—including the factor listed in subsection (n).

¶ 10                    PROCEEDINGS IN THE CIRCUIT COURT

¶ 11          On January 25, 2010, Coram filed a petition in the circuit court of Adams County seeking judicial review of the denial of his FOID card application. On May 10, 2010, Coram's petition came before Judge Mark Schuering for hearing. Pursuant to statutory requirements (430 ILCS 65/10(b) (West 2010)), the Adams County State's Attorney was given due notice and was afforded the opportunity to present evidence and object to the relief requested in the petition. The State's Attorney did neither.

¶ 12          A psychological report was filed in support of Coram's petition. In the report, the examining psychologist indicated that Coram exhibited no psychological malady and there appeared to be no reason for mental health treatment. The report states: "A careful review of [Coram's] life showed that, with the exception of the events that happened almost 20 years ago, he has lived an exemplary life. *** He exudes a sense of significant social responsibility, is deeply religious, and has positive relationships with others." The report concludes:

              "There is no reason why, from a psychological viewpoint, [Coram] poses a danger to others, or should not be reconsidered for an FOID [card]. He is a pleasant man; shows no aberration in the last 19 years that would be considered to

-4-

> be legally, morally, or ethically significant or problematic. His behavior is positive, pro-social, and his demeanor is pleasant and positive. His life space is solid, he has adequate supports, appears to be a competent worker who has enjoyed a 15 year tenure in the same place, and enjoys being a productive member of society."

The examining psychologist "strongly recommended" that Coram be "reconsidered for an FOID [card]," noting, "[f]rom a mental health standpoint, there is no indication that [Coram] would be dangerous if given an FOID [card], and allowed to access any form of weaponry."

¶ 13    At the conclusion of the hearing, the court entered an order directing the Illinois State Police to issue a FOID card to petitioner. In the body of his order, Judge Schuering acknowledged Coram's 1992 conviction, but concluded that "[s]ubstantial justice has not been done in the denial of Petitioner's application for a FOID Card by the Department." In support of that assessment, the court found that "the circumstances regarding [Coram's] conviction, Petitioner's criminal history and his reputation are such that he will not be likely to act in a manner dangerous to public safety[,] [t]hat granting the relief requested in the said petition would not be contrary to the public interest."

¶ 14    One month after entry of the order, the Department, through the Illinois Attorney General, filed motions to intervene and vacate the court's order. The motion to intervene was allowed. In support of its motion to vacate, the Department argued that federal law prohibited Coram from possessing a firearm and ammunition because of his 1992 misdemeanor domestic battery conviction, and the Department lacked the authority to issue a FOID card to anyone who was prohibited by federal law from possessing firearms or ammunition.

¶ 15    Coram moved to dismiss the Department's motion to vacate, responding that the statute which served as the basis for prohibition (18 U.S.C. § 922(g)(9) (2006)) was unconstitutional in that it violated his second amendment rights, his right to equal protection, and his substantive due process right to carry a gun.

¶ 16    Coram provided notice to the United States Attorney that he was challenging section 922(g)(9) on constitutional grounds. The United

States did not intervene in the case, but did file a statement of interest. The United States argued, *inter alia*, that section 922(g)(9) satisfies the intermediate scrutiny standard applied to presumptively lawful categorical bans on firearm possession by violent offenders. The United States further contended that section 921(a)(33)(B)(ii) (18 U.S.C. § 921(a)(33)(B)(ii) (2006)) provided Coram a path to restoration of his rights to keep and bear arms. That section states, in pertinent part, that a "person shall not be considered to have been convicted of [a misdemeanor crime of domestic violence] for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense)." 18 U.S.C. § 921(a)(33)(B)(ii) (2006).

¶ 17          On December 30, 2011, Judge Thomas Ortbal entered judgment in this matter. The circuit court's thoughtful opinion and order identifies two issues presented: "A. Do the provisions of 18 U.S.C. section 922(g)(9) prohibit this court's judicial consideration and granting of relief from the denial of [a] FOID card pursuant to 430 ILCS 65/10? B. If applicable, are the provisions of 18 U.S.C. section 922(g)(9) violative of Coram's rights of equal protection and due process?" In the end, the court answered both those questions in the affirmative. Order at 2.

¶ 18          Relying upon the analysis of *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010), the court found that the statute survived a *facial* challenge; however, the court observed that "*Skoien*, itself *** reserved the question of whether 922(g)(9) could survive a Second Amendment challenge by a 'misdemeanant who has been law abiding for an extended period.' " Order at 5-6 (quoting in part *Skoien*, 614 F.3d at 645). The court ultimately ruled that the statute *was* unconstitutional *as applied* to Coram, insofar as the federal statutory scheme provided no avenue for relief from the federal firearm disability imposed by section 922(g)(9). Specifically, the basis for the court's ruling appears to be that section 921(a)(33)(B)(ii) cannot provide Coram relief, which he deserves, and section 10 of the FOID Card Act cannot provide the mechanism for doing so independently insofar as "the appeal and review process of 430 ILCS 65/10 does not provide for the restoration of a 'civil right' within the meaning of

-6-

section 921(a)(33)(B)(ii)." Order at 9. The court concluded:

> "The court *** finds that to deny an eligible applicant potential relief under the statutorily created scheme of 430 ILCS 65/10, adopted subsequent to the federal ban created by 922(g)(9) would be arbitrary and a denial of substantive due process as applied to the Petitioner Coram." Order at 9.

In reaching that conclusion, the court noted that a person who has had his conviction expunged, or has been pardoned, or has had his civil rights restored after a misdemeanor domestic battery conviction is eligible to possess a firearm by operation of section 921(a)(33)(B)(ii). However, the court observed that the Supreme Court, in *Logan v. United States*, 552 U.S. 23 (2007), held that the "the 'civil rights restored' language of [section] 921(a)(33)(B)(ii) does not cover a person whose civil rights were never taken away." Order at 5. Thus, Coram—because he was never sentenced to incarceration—could not take advantage of the restoration-of-rights clause insofar as Illinois does not revoke *any* civil rights by reason of a conviction for which no sentence of imprisonment is imposed. Moreover, even when a person is sentenced to incarceration, Illinois revokes—and then automatically restores upon release—only the right to vote. See Ill. Const. 1970, art. III, § 2; 730 ILCS 5/5-5-5(c) (West 2010). Further, Coram was not eligible for expungement under Illinois law (see 20 ILCS 2630/5.2 (West 2010)), and he did not attempt to seek a pardon. The Department conceded that a defendant convicted in Illinois of misdemeanor domestic battery, who actually served time in jail, would *not* be subject to the ban in section 922(g)(9), by virtue of the restoration provision in section 921(a)(33)(B)(ii), insofar as his right to vote would have been restored upon release. The circuit court determined, because section 921(a)(33)(B)(ii) could not provide Coram relief or a remedy within the federal statutory scheme, "Coram remains subject to the prohibitions of [section] 922(g)(9)." Order at 4-5.

¶ 19      Continuing with its constitutional inquiry, the circuit court reasoned that an individual who is sentenced to incarceration upon conviction of domestic battery is presumptively more dangerous, inflicted greater harm, and/or has a poorer criminal history or character than an individual who, like Coram, was not incarcerated upon conviction. Order at 7. "Thus, [section] 922(g)(9) permits one

who is logically and presumably more of a danger to the victim and the public to *automatically regain their right to possess firearms* under the [section] 921(a)(33)(B)(ii) [provision for] 'civil rights restored.' " (Emphasis in original.) Order at 7. The court continued:

> "To deny (other than through the governor's pardon) the right to a statutorily created judicial review appeal for restoration of such right is arbitrary and not narrowly tailored to its objective, as applied to the Plaintiff, a person who has led a law abiding life for an extended period of time and who based upon a judicial consideration of the offense, criminal history and reputation and character is found to be unlikely to act in a manner dangerous to public safety." Order at 7.

¶ 20    The circuit court rejected the Department's suggestion that Coram's argument invited an unworkable case-by-case standard, noting that section 10 of the FOID Card Act (430 ILCS 65/10 (West 2010)) provides appropriate standards for review of a denial of a FOID card and was enacted by the legislature presumably with full knowledge of the content of 18 U.S.C. § 922(g)(9). Apparently believing that the procedure for relief in section 10(c) of the FOID Card Act was irreconcilable with the federal statutory scheme, the court ruled section 922(g)(9)'s firearm ban unconstitutional as applied to Coram, denied the Department's motion to vacate, and confirmed that Judge Schuering's order, directing the issuance of a FOID card to Coram, "remains in full force and effect." Order at 9.

¶ 21    The Department filed notice of appeal on February 1, 2012. On March 5, 2012, this court entered an order remanding the cause to the circuit court with directions to supplement its opinion and order of December 30, 2011, to specifically address each of the requirements of Illinois Supreme Court Rule 18 (Ill. S. Ct. R. 18 (eff. Sept. 1, 2006)). In response to this court's order, the circuit court entered its Rule 18 findings, which included, *inter alia*, the following determinations:

> "As set forth in the Order of December 30, 2011, the court finds that the provisions of 18 U.S.C., sec. 922(g)(9), which are incorporated by reference in 430 ILCS 65/8(n) as grounds for denial of a FOID card, are unconstitutional [under the second amendment], as applied to the Plaintiff.

-8-

* * *

(3) The court finds that 18 U.S.C., sec. 922(g)(9) as incorporated in 430 ILCS 65/8(n), cannot reasonably be construed in a manner that would preserve its validity, as applied to Plaintiff;

(4) The court finds that the finding of unconstitutionality, as applied, is necessary to the decision rendered and that such decision cannot rest upon alternative grounds[.]"

¶ 22     With those prerequisite findings, the circuit court's judgment is properly before us.


¶ 23            RELEVANT GUN CONTROL LEGISLATION AND
                PERTINENT INTERPRETATIVE CASE LAW

¶ 24     We begin with the stated purpose for which the Gun Control Act of 1968 was enacted. As acknowledged in the Historical and Statutory Notes to section 921 of the United States Code Annotated (18 U.S.C.A. § 921, Historical and Statutory Notes (West 2000):

"Section 101 of Pub. L. 90-618 provided that: 'The Congress hereby declares that the purpose of this title [which amended this chapter] is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title.' "

¶ 25     From the beginning, it was unlawful for any person to take possession of a firearm when that person had been convicted of "a crime punishable by imprisonment for a term exceeding one year," or "ha[d] been adjudicated as a mental defective" or had "been committed to any mental institution." Gun Control Act of 1968, Pub.

L. No. 90-618, 82 Stat. 1213, 1220-21 (1968); 18 U.S.C. § 922(h)(1), (h)(4) (1970). The first disabling provision did not apply to "any State offense (other than one involving a firearm or explosive) classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 82 Stat. at 1216; 18 U.S.C. § 922(h)(1) (1970). From the outset, Congress recognized the need to provide relief from firearms disabilities in certain circumstances. 82 Stat. at 1225; 18 U.S.C. § 925(c) (1970). Section 925(c) of the Gun Control Act, at that time, allowed a person who had been convicted of "a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon ***)" to apply to the Secretary of the Treasury for relief from the federally imposed firearm disability. 82 Stat. at 1225; 18 U.S.C. § 925(c) (1968). Section 925(c) authorized the Secretary to grant relief if it was established to his satisfaction "that the circumstances regarding the conviction, and the applicant's record and reputation, [were] such that the applicant [was] not likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." No similar path to "relief"—or restoration—was provided for those who had a history of mental illness or disability.

¶ 26        That omission prompted a 1986 legal challenge. In *United States Department of the Treasury, Bureau of Alcohol, Tobacco & Firearms v. Galioto*, 477 U.S. 556 (1986), the Supreme Court was presented with an equal protection challenge by a former mental patient (Galioto) under federal firearm disability by reason of section 922(d)(4) of the federal statute (18 U.S.C § 922(d)(4) (1970) (prohibiting persons who have been committed to mental institutions from possessing firearms)). Galioto's claim was based upon the disparity of treatment accorded recovered mental patients under section 925(c) of the statute (18 U.S.C § 925(c) (1970)), who, unlike convicted felons, were excluded by omission from section 925(c)'s remedial provisions and were thus under a perpetual firearms disability. *Galioto*, 477 U.S. at 558.

¶ 27        The district court held that statutory scheme violated equal protection principles, finding " 'no rational basis for thus singling out mental patients for permanent disabled status, particularly as compared to convicts.' " *Galioto*, 477 U.S. at 559 (quoting *Galioto*

-10-

*v. Department of the Treasury, Bureau of Alcohol, Tobacco & Firearms*, 602 F. Supp. 682, 689 (D.N.J. 1985)). The district court also concluded that the statutory scheme was unconstitutional because it " 'in effect creates an irrebuttable presumption that one who has been committed, no matter the circumstances, is forever mentally ill and dangerous.' " *Galioto*, 477 U.S. at 559 (quoting *Galioto*, 602 F. Supp. at 690).

¶ 28  While the case was pending before the United States Supreme Court, Congress came to the conclusion, "as a matter of legislative policy," that the firearms statutes should be redrafted. *Galioto*, 477 U.S. at 559. Before a decision was rendered on the merits, the President signed into law Public Law 99-308 (Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986)). Section 105 of that statute amended section 925(c) by striking the language limiting utilization of the remedial provision to certain felons, and including *any* person who is "prohibited from possessing, shipping, transporting, or receiving firearms or ammunition." (Internal quotation marks omitted.) *Galioto*, 477 U.S. at 559. Congress made the amendments "applicable to any action, petition, or appellate proceeding pending on the date of the enactment of this Act." (Internal quotation marks omitted.) *Galioto*, 477 U.S. at 559.

¶ 29  In response, the Supreme Court vacated the district court's judgment and remanded for further proceedings, stating:

> "This enactment significantly alters the posture of this case. The new statutory scheme permits the Secretary to grant relief in some circumstances to former involuntarily committed mental patients such as appellee. The new approach affords an administrative remedy to former mental patients like that Congress provided for others prima facie ineligible to purchase firearms. Thus, it can no longer be contended that such persons have been 'singled out.' Also, no 'irrebuttable presumption' now exists since a hearing is afforded to anyone subject to firearms disabilities. Accordingly, the equal protection and 'irrebuttable presumption' issues discussed by the District Court are now moot." *Galioto*, 477 U.S. at 559-60.

With the amendment of section 925(c), Congress clearly intended to afford an avenue to relief, a "safety valve," for *any* deserving

individual subject to the categorical firearm disabilities imposed by section 922. See *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) ("[The Firearms Owners' Protection Act], 100 Stat. 449, included a 'safety valve' provision under which persons subject to federal firearms disabilities, including persons whose civil rights have not been restored, may apply to the Attorney General for relief from the disabilities.").

¶30     Implementation of section 925(c) apparently continued for several years, safeguarding the rights of the reformed and recovered. Then, in 1992, the budget axe fell, and Congress barred the Attorney General/Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) from using appropriated funds " 'to investigate or act upon [relief] applications,' " a bar that was thereafter annually renewed. *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) (quoting *United States v. Bean*, 537 U.S. 71, 74-75 (2002)). Though section 925(c) remained on the books, its significance became, at best, aspirational, its reimplementation prospective.

¶31     The focus of Supreme Court litigation with respect to firearms disabilities seemingly shifted to argument over the parameters of relief obtainable through the restoration-of-civil-rights clauses of the federal statute. See 18 U.S.C. § 921(a)(20), (a)(33)(B)(ii) (2006). The former provided:

> "What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." 18 U.S.C. § 921(a)(20) (2006).

The latter contained similar language:

> "A person shall not be considered to have been convicted of [a misdemeanor crime of domestic violence] if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for

-12-

the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." 18 U.S.C. § 921(a)(33)(b)(ii) (2006).

In 1994, the Supreme Court rendered its opinion in *Beecham v. United States*, 511 U.S. 368 (1994). The question in *Beecham* was "which jurisdiction's law is to be considered in determining whether a felon 'has had civil rights restored' for a prior federal conviction." *Beecham*, 511 U.S. at 369. The Court answered that question in the manner clearly mandated by section 921(a)(20)—a provision modified by Congress in response to the Court's prior opinion in *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103 (1983) (holding that federal law alone determined whether a state conviction counted, regardless of whether the state had expunged the conviction). The *Beecham* Court held that the restoration-of-rights exemption "refer[s] only to restorations of civil rights by the *convicting* jurisdiction." (Emphasis added.) *Beecham*, 511 U.S. at 372. The Court dismissed the suggestion that, because there is apparently no federal procedure for restoring civil rights to a federal felon, the restoration-of-rights provision must in that case refer to a state procedure. *Beecham*, 511 U.S. at 372. The Court acknowledged, "[h]owever one reads the statutory scheme *** people in some jurisdictions would have options open to them that people in other jurisdictions may lack" (*Beecham*, 511 U.S. at 373); nonetheless, the Court considered that disparate treatment inconsequential in light of clearly expressed congressional intent. The Court semantically shrugged: "Under our reading of the statute, a person convicted in federal court is no worse off than a person convicted in a court of a State that does not restore civil rights." *Beecham*, 511 U.S. at 373.

¶ 32        The Court did not actually decide whether a federal felon *could* have his civil rights restored:

> "We express no opinion on whether a federal felon cannot have his civil rights restored under federal law. This is a complicated question, one which involves the interpretation of the federal law relating to federal civil rights, see U.S. Const., Art. I, § 2, cl. 1 (right to vote for Representatives); U.S. Const., Amdt. XVII (right to vote for Senators); 28 U.S.C. § 1865 (right to serve on a jury); *consideration of the*

-13-

*possible relevance of 18 U.S.C. § 925(c) (1988 ed., Supp. IV), which allows the Secretary of the Treasury to grant relief from the disability imposed by § 922(g)*; and the determination whether civil rights must be restored by an affirmative act of a Government official, see *United States v. Ramos*, 961 F.2d 1003, 1008 (CA1), cert. denied, 506 U.S. 934 (1992), or whether they may be restored automatically by operation of law, see *United States v. Hall*, 20 F.3d 1066 (CA10 1994). We do not address these matters today." (Emphasis added.) *Beecham*, 511 U.S. at 373 n.*.

Thus, *Beecham* suggested that the restoration of gun rights might fall under the rubric of "civil rights restored."

¶ 33        Subsequently, in *Caron v. United States*, 524 U.S. 308 (1998), the Court considered whether *state* convictions counted for purposes of enhanced federal sentencing based on prior convictions. In that context, the Court reaffirmed the principle that the law of the convicting jurisdiction controls whether rights have been restored: "Congress responded to our ruling in *Dickerson* by providing that the law of the State of conviction, not federal law, determines the restoration of civil rights as a rule." *Caron*, 524 U.S. at 316. Although the Court mentioned "[r]estoration of the right to vote, the right to hold office, and the right to sit on a jury" (*Caron*, 524 U.S. at 316), the Court never identified those as the *requisite* civil rights necessary for exempting restoration that would bar a federal firearms prosecution; nor did it explain why those rights—irrelevant to an individual's future dangerousness with a weapon *and* the sentencing inquiry then before the Court—should be rights pertinent to that issue.

¶ 34        The issue actually before the Court concerned the proper interpretation of section 921(a)(20)'s "unless" clause. 18 U.S.C. § 921(a)(20) (2006). As previously noted, a conviction will not count against a person if he or she has had "civil rights restored"—that is, "unless such *** restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms" (18 U.S.C. § 921(a)(20) (2006)), in which case the conviction counts for purposes of federal liability. The Supreme Court described Caron's claim, and the underlying scenario, as follows:

"Petitioner claimed the court should not have counted his

-14-

Massachusetts convictions because his civil rights had been restored by operation of Massachusetts law. Massachusetts law allowed petitioner to possess rifles or shotguns, as he had the necessary firearm permit and his felony convictions were more than five years old. [Citation.] The law forbade him to possess handguns outside his home or business. [Citation.]" *Caron*, 524 U.S. at 311.

The *Caron* Court determined, because Massachusetts law allowed Caron to possess some firearms (rifles and shotguns), but not others (handguns), the "unless" clause of section 921(a)(20) was operative, and the partial state restoration of gun rights that *did* take place was insufficient to exempt Caron's state convictions as predicates for purposes of enhanced federal sentencing. *Caron*, 524 U.S. at 311. Implicit in the Court's analysis is the recognition that state law can operate to restore firearm rights, as part of a "restoration of civil rights," under section 921(a)(20)'s exempting provision, "unless such *** restoration of civil rights expressly provides" otherwise. 18 U.S.C. § 921(a)(20) (2006). The Supreme Court effectively conceded that Massachusetts could have done as much, it just did so imperfectly.

¶ 35          Despite the attention paid the restoration-of-rights provisions, the courts had not entirely given up on the utility of section 925(c) as a principal means to relief from federal firearms disabilities. In *Bean v. United States*, 89 F. Supp. 2d 828 (E.D. Tex. 2000), the district court reasoned that congressional failure to fund the review of applications by the ATF was not indicative of intent to suspend *relief* available under section 925(c); rather, it evinced only the intent to suspend ATF's ability to investigate or act upon applications. *Bean*, 89 F. Supp. 2d at 831-35. The court noted: "[T]he argument that Congress intended to absolutely suspend relief to convicted persons ignores the multitude of ways under 18 U.S.C. § 921(a)(20) that a state felon may obtain restoration of his federal firearm rights by operation of state law and without the involvement of any special ATF competency." *Bean*, 89 F. Supp. 2d at 834. The court observed that "*the statute still provides for judicial review*" (emphasis in original) (*Bean*, 89 F. Supp. 2d at 835) and ultimately determined that: (1) inaction by the ATF constituted a *de facto* denial of an application such that a United States district court could consider a petition for judicial review of the

-15-

denial (*Bean*, 89 F. Supp. 2d at 836-37); and (2) Bean would not be "likely to act in a manner dangerous to public safety" and the "granting of relief would not be contrary to the public interest" (*Bean*, 89 F. Supp. 2d at 838-39 (quoting the standards for relief set forth in section 925(c)).

¶ 36    The Fifth Circuit Court of Appeals affirmed. *Bean v. Bureau of Alcohol, Tobacco & Firearms*, 253 F.3d 234 (5th Cir. 2001). In principal part, the court of appeals' opinion is an extensive refutation of the argument that Congress intended to repeal the provisions for relief from firearm disability provided by section 925(c) through Congress's repeated failure to fund the activities necessary to carry out section 925(c)'s function. As noted by the Court of Appeals: "Although it obviously has the power, Congress has not enacted legislation eliminating or amending § 925(c)." *Bean*, 253 F.3d at 238. The court distinguished this situation from other cases in which reduced or withdrawn appropriations were found to have resulted in implied repeal, noting "[i]n the case at bar, Congress is not merely promising money then changing its mind and not making it available. Nor is it directly suspending a statutory provision. In enacting § 925(c) Congress granted certain persons administrative and judicial rights." *Bean*, 253 F.3d at 239. The court found "that action clearly distinguishable from the facts in the cited precedential cases and inimical to our constitutional system of justice." *Bean*, 253 F.3d at 239. The court concluded: "Section 925(c) was enacted for apparently valid reasons, and citizens like Bean are entitled to the rights therein created and authorized unless and until Congress determines to change same. We must now conclude that merely refusing to allow the agency responsible for facilitating those rights to use appropriated funds to do its job under the statute is not the requisite direct and definite suspension or repeal of the subject rights." *Bean*, 253 F.3d at 239.

¶ 37    Addressing the merits only briefly, the court of appeals determined that the district court did not err in granting Bean the relief requested: "We do not believe that any reasonable observer is persuaded that his offense creates a likelihood he represents a threat to the public's well-being, and it is beyond peradventure to believe that Congress, or those seeking to rescind § 925(c), intended for someone like Bean to lose his livelihood [as a licensed firearms

dealer] on the basis of the facts such as are before us. Neither equity nor the law require such an injustice." *Bean*, 253 F.3d at 240.

¶ 38 The Supreme Court held otherwise. *United States v. Bean*, 537 U.S. 71 (2002). Contrary to the principle that remedial statutes should, if possible, be liberally construed to effectuate their purpose (see generally *Peyton v. Rowe*, 391 U.S. 54, 65 (1968)), the Court rejected the district court's holding that inaction by the ATF constituted a *de facto* denial of an application such that a United States district court could consider a petition for judicial review of the "denial." *Bean*, 537 U.S. at 75-76. Aside from that strict semantic insistence, the Court supported its decision with three principal justifications: (1) ATF was designated the "primary decisionmaker"; (2) the standards and procedures the district court employed were not those that would have been used by ATF; and (3) the district court lacked the investigatory capabilities of ATF. *Bean*, 537 U.S. at 75-76. Though the Court acknowledged that ATF's "investigatory capabilities" were purely theoretical—Congress having cut off funding in successive years for that very function (see *Bean*, 537 U.S. at 74-75)—the Court nonetheless concluded "that the absence of an actual denial of respondent's petition by ATF precludes judicial review under § 925(c)." *Bean*, 537 U.S. at 78. The decision in *Bean* effectively meant that applicants for relief—those who attempted to gain restoration of their rights to keep and bear arms via the very statute that Congress enacted for that purpose—had no direct federal remedy. *Bean* did not address the constitutional repercussions of congressional action (or inaction) with respect to section 925(c) funding. One might have thought section 925(c) was a dead letter.

¶ 39 Congress, however, evinced a clear intent to the contrary with the passage of the NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, 122 Stat. 2559 (2008) ("An Act To improve the National Instant Criminal Background Check System, and for other purposes"). Among the findings cited as prompting passage of the Act was the finding that the shootings at Virginia Polytechnic Institute and State University—where "a student with a history of mental illness *** shot to death 32 students and faculty members, wounded 17 more, and then took his own life"—might have been avoided with "[i]mproved coordination between State and Federal authorities," ensuring "that the shooter's disqualifying mental health

-17-

information was available to NICS." *Id*. at 2560.

¶ 40      Surprisingly, in this Act, Congress specifically addressed relief from the firearm disabilities set forth in subsections (d)(4) and (g)(4) (applying to those who have been adjudicated mentally defective or have been institutionalized in mental facilities), directing any federal department or agency that makes determinations pertinent to those sections to, "not later than 120 days after the date of enactment of [the] Act," establish "a program that permits such a person to apply for relief from the disabilities imposed by such subsections." *Id.* at 2563. Further, Congress provided that each application "shall be processed not later than 365 days after the receipt of the application." *Id.* Significantly, it is provided: "If a Federal department or agency fails to resolve an application for relief within 365 days for any reason, *including a lack of appropriated funds*, the department or agency shall be deemed for all purposes to have *denied such request for relief without cause*," thus enabling *de novo* judicial review, utilizing "the standards prescribed in section 925(c)." (Emphases added.) *Id.*

¶ 41      In addition to directions to federal departments and agencies, Congress authorized *some* federal funds to be used by states to "implement[ ] a relief from disabilities program in accordance with section 105." *Id*. at 2568. The program described in that section:

      "(1) permits a person who, pursuant to State law, has been adjudicated as described in subsection (g)(4) of section 922 of title 18, United States Code, or has been committed to a mental institution, to apply to the State for relief from the disabilities imposed by subsections (d)(4) and (g)(4) of such section by reason of the adjudication or commitment;

      (2) provides that a State court, board, commission, or other lawful authority shall grant the relief, pursuant to State law and in accordance with the principles of due process, if the circumstances regarding the disabilities referred to in paragraph (1), and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest; and

      (3) permits a person whose application for the relief is

denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial." *Id*. at 2569-70.

"If, under a State relief from disabilities program *** an application for relief referred to in subsection (a)(1) of this section is granted with respect to an adjudication or a commitment to a mental institution *** the adjudication or commitment, as the case may be, is deemed not to have occurred for purposes of subsections (d)(4) and (g)(4) of section 922 of title 18, United States Code." *Id*. at 2570.

¶ 42       Illinois accepted the investigatory and procedural responsibilities for processing those applications for relief, with respect to Illinois citizens (see 430 ILCS 65/10(f) (West 2010); Pub. Act 96-1368, § 5 (eff. July 28, 2010)), referring the matter, as in all applications enabling firearm possession, in the first instance, to the investigatory and administrative authority of the Department of State Police, and thereafter, if necessary, to the circuit court for judicial review. The standard for relief to be granted by the Department, and if need be the circuit court, is, as seen in both federal statutes (18 U.S.C. § 925(c) (2006)) and regulations (27 C.F.R. § 478.144 (2009)), and throughout Illinois' FOID Card Act, whether "the person will not be likely to act in a manner dangerous to public safety and granting relief would not be contrary to the public interest." 430 ILCS 65/10(f) (West 2010). That inquiry necessarily focuses upon the mental and emotional well-being of the applicant.

¶ 43       Around the time of the NICS Improvement Amendments Act of 2007, the Supreme Court issued another decision bearing upon the interpretation and implementation of the restoration-of-civil-rights provisions in the federal gun control statute (18 U.S.C. § 921(a)(20), (a)(33)(B)(ii) (2006)). In *Logan v. United States*, 552 U.S. 23 (2007), the Court considered whether prior misdemeanor battery convictions counted for purposes of enhanced sentencing under the provisions of the Armed Career Criminal Act of 1984 (ACCA) (18 U.S.C. § 924(e)(1) (2006)). *Logan*, 552 U.S. at 26. The state convictions would, of course, not count if defendant, *inter alia*, had his "civil rights restored" with respect thereto. 18 U.S.C. § 921(a)(20) (2006). Logan, however, had not lost any civil rights as a result of his misdemeanor conviction. In its analysis, the Court first accepted the proposition that the "civil rights relevant" under section 921(a)(20)

-19-

were "the rights to vote, hold office, and serve on a jury." *Logan*, 552 U.S. at 28 (citing, without meaningful discussion, *Caron v. United States*, 524 U.S. 308, 316 (1998)). However, the rights involved ultimately did not matter for purposes of the Court's disposition, because the Court concluded that a person who never had his civil rights taken away could not come within the exemptive provisions of the federal statute. *Logan*, 552 U.S. at 37.

¶ 44          En route to that conclusion, the Court cited and quoted, in support of its holding, section 921(a)(33)(B)(ii), a definitional provision corresponding to section 921(a)(20). Section 921(a)(33)(B)(ii), as previously noted, provides an exemption from the federal firearm disability for a person convicted of a misdemeanor crime of domestic violence if, *inter alia*, that person "has had civil rights restored (*if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense*)." *Logan*, 552 U.S. at 36 (adding emphasis to the statutory language). The Court cited the foregoing language of section 921(a)(33)(B)(ii) as an indicator that Congress *intended* to deny the restoration-of-civil-rights exemptions to offenders who retained their civil rights, and that Congress did *not* "labor[ ] under the misapprehension that all offenders—misdemeanants as well as felons—forfeit civil rights, at least temporarily." *Logan*, 552 U.S. at 35.

¶ 45          In its "plain-meaning approach to the language Congress enacted"—reminiscent of the strict construction of "denial" applied in *Bean*—the Court rejected Logan's reliance upon "the harsh results a literal reading [of the statute] could yield," *i.e.*, "[u]nless retention of rights is treated as legally equivalent to restoration of rights, less serious offenders, who have committed the same crime, will be subject to ACCA's enhanced penalties, while more serious offenders in the same State, who have civil rights restored, may escape heightened punishment." *Logan*, 552 U.S. at 32. Without really answering that charge on an *intrastate* level, the Court initially held that "automatic restoration of rights qualifies for § 921(a)(20)'s exemption" (*Logan*, 552 U.S. at 32 (citing *Caron*, 524 U.S. at 313)), thus seemingly approving a mechanism for relief from federal firearms disabilities, without *any* individualized assessment of the

person's present character, condition, or dangerousness.[2] The *Logan* Court then dismissed Logan's assertion that such a result "rises to the level of the absurd," noting: (1) that Logan's argument overlooked section 921(a)(20)'s "unless" clause, under which an offender gains no exemption from ACCA's application through restoration of civil rights if the dispensation expressly provides that the offender may not possess firearms; and (2) that Logan's position "could produce anomalous results" in an *interstate* context. *Logan*, 552 U.S. at 32-33. The Court appears to chide Congress for amending section 921(a)(20), in response to the Court's decision in *Dickerson*, taking the determination of what defines a state conviction out of the purview of federal law and making it a matter of state law. *Logan*, 552 U.S. at 33-35. *Logan* contains no meaningful response to the assertion that a person sentenced to incarceration—and thus in a position, in certain jurisdictions, to have some civil rights restored—is presumptively more dangerous, inflicted greater harm, and/or has a poorer criminal history or character than a similarly situated individual who was not incarcerated upon conviction.

¶ 46          Against this backdrop of what some might see as failed and inadequate federal procedures for the remediation—in appropriate cases—of federally imposed firearm disabilities, we cannot ignore what appears to be an ascendancy of second amendment rights in federal jurisprudence. At the core of resurgent second amendment jurisprudence are the Supreme Court's landmark decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. ___, 130 S. Ct. 3020 (2010). More than one court has acknowledged that the ground opened by *Heller* and *McDonald* is a "vast 'terra incognita' " that "has troubled courts since *Heller* was decided." (Internal quotation marks omitted.) *Osterweil v. Bartlett*, 706 F.3d 139, 144 (2d Cir. 2013) (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012), quoting *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J.)). This much we know.

---

[2]In *Skoien*, the Seventh Circuit Court of Appeals in fact held that section 921(a)(20)'s sister statute, section 921(a)(33)(B)(ii), "provides that *** restoration of civil rights means that a conviction no longer disqualifies a person from possessing firearms." *Skoien*, 614 F.3d at 644.

-21-

¶ 47        In *Heller*, the Supreme Court noted for the first time that the second amendment "codified a *pre-existing*" individual right to keep and bear arms. (Emphasis in original.) *Heller*, 554 U.S. at 592. The Court announced that the second amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The Court held that the second amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," and struck down District of Columbia laws banning handgun possession in the home and requiring that citizens keep their firearms in an inoperable condition. *Heller*, 554 U.S. at 592.

¶ 48        However, in so holding, the Court made clear that the right guaranteed by the second amendment "is not unlimited." *Heller*, 554 U.S. at 626. The Court recognized that, even in days of yore, "commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. The Court cautioned that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. The Court noted that list was not intended to be exhaustive of presumptively lawful regulatory measures. *Heller*, 554 U.S. at 627 n.26.

¶ 49        In *McDonald*, the Court held that the second amendment is applicable to the states and their subdivisions through the fourteenth amendment (*McDonald*, 561 U.S. at ___, 130 S. Ct. at 3046) noting, en route to that holding, "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S. at ___, 130 S. Ct. at 3042. The plurality opinion reaffirmed and underscored the Court's statements in *Heller* regarding permissible, long-standing regulatory measures prohibiting the possession of weapons by felons and the mentally ill. *McDonald*, 561 U.S. at ___, 130 S. Ct. at 3047.

¶ 50        Meanwhile, closer to home, the Seventh Circuit Court of Appeals began mapping the contours of "terra incognita." For present

purposes, that court's first pronouncement of interest came in *United States v. Miller*, 588 F.3d 418 (7th Cir. 2009), when it suggested that the failure to fund the firearm relief provisions of section 925(c) might have real consequences, noting that "appropriations riders have hampered restorations under § 925(c)," and insisting that "the Attorney General must implement that statute when funds are available." *United States v. Miller*, 588 F.3d at 420.

¶ 51        Then came the Seventh Circuit's decision in *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012), which announced that a ban on carrying loaded weapons in public "as broad as Illinois's can't be upheld merely on the ground that it's not irrational." *Moore*, 702 F.3d at 939. In the court's analysis, considerations of public safety had to yield to second amendment rights. According to *Moore*:

> "[T]he Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts. 554 U.S. at 636, 128 S. Ct. 2783. If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois." *Moore*, 702 F.3d at 939.

¶ 52        In addition, *Moore* suggests that, when we speak of the second amendment, we are in fact talking about "rights," as opposed to a single "right." According to *Moore*, "The right to 'bear' as distinct from the right to 'keep' arms is unlikely to refer to the home. To speak of 'bearing' arms within one's home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore*, 702 F.3d at 936.

¶ 53        Close on the heels of *Moore* came a decision out of the Court of Appeals for the District of Columbia echoing the concern expressed by the Seventh Circuit Court of Appeals in *Miller*. In *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013), a 64-year-old veteran (Schrader), who had been convicted of common law misdemeanor assault and battery some 40 years ago, and who was thus barred "by virtue of 18 U.S.C. § 922(g)(1) *** from ever possessing a firearm," contended that "section 922(g)(1) is inapplicable to common-law misdemeanants as a class and, alternatively, that application of the statute to this class of individuals violates the Second Amendment."

-23-

*Schrader*, 704 F.3d at 982. The court of appeals rejected the contention that section 922(g)(1) was unconstitutional as applied to the class of common law misdemeanants.

¶ 54      However, the court noted that Schrader and the Second Amendment Foundation, at several points in their briefs, appeared to go beyond that contention and "claim that the statute is invalid as applied to Schrader specifically." *Schrader*, 704 F.3d at 991. Citing allegations of Schrader's exemplary record over the last 40 years, the court observed: "To the extent that these allegations are true, we would hesitate to find Schrader outside the class of 'law-abiding, responsible citizens' whose possession of firearms is, under *Heller*, protected by the Second Amendment." *Schrader*, 704 F.3d at 991 (quoting *Heller*, 554 U.S. at 635). However, the court found it unnecessary to "wade into these waters" because plaintiffs had not argued in the district court that section 922(g)(1) was unconstitutional as applied to Schrader. *Schrader*, 704 F.3d at 991. The court determined that the wisest course was to leave the resolution of "these difficult constitutional questions" to a case where the issues were properly raised and briefed. *Schrader*, 704 F.3d at 991. The court concluded:

> "Leaving these questions for their proper day has an added benefit: it gives Congress time to consider lifting the prohibition on the use of appropriated funds for the implementation of section 925(c), which *** permits individuals to obtain relief from section 922(g)(1) by demonstrating that they no longer pose a risk to public safety. Without the relief authorized by section 925(c), the federal firearms ban will remain vulnerable to a properly raised as-applied constitutional challenge brought by an individual who, despite a prior conviction, has become a 'law-abiding, responsible citizen[ ]' entitled to 'use arms in defense of hearth and home.' " *Schrader*, 704 F.3d at 992 (quoting in part *Heller*, 554 U.S. at 635).

¶ 55                          ANALYSIS

¶ 56      The circuit court of Adams County has found Coram to be the person described in *Schrader*—an individual who, despite a prior

-24-

misdemeanor conviction, has become a " 'law-abiding, responsible citizen[ ]' entitled to 'use arms in defense of hearth and home.' " *Schrader*, 704 F.3d at 992 (quoting in part from *Heller*, 554 U.S. at 635). However, as explained hereafter, the constitutional question is one we need not reach. We must consider nonconstitutional issues first and consider constitutional issues only if necessary to the resolution of this case. *People v. Melchor*, 226 Ill. 2d 24, 34-35 (2007). As we construe the interrelated federal and state statutory schemes, Coram has a remedy, and Illinois a procedure, which entitles him to relief/exemption from the disabling effect of section 922(g)(9).

¶ 57        As this court has often stated, statutes should be interpreted so as to promote their essential purposes and to avoid, if possible, constructions that would raise doubts as to their validity. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 510 (2007). In the construction of our statutes, this court presumes that the legislature did not intend to create absurd, inconvenient, or unjust results. *People v. Gutman*, 2011 IL 110338, ¶ 12. Statutes are presumed constitutional, and courts have a duty to construe legislative enactments so as to uphold their validity if there is any reasonable way to do so. *Wade*, 226 Ill. 2d at 510. A similar canon of construction prevails in the federal courts. The Supreme Court has emphasized that federal courts will, "where possible," and consistent with the "legislative will" of Congress, construe federal statutes so as to avoid serious doubts of their constitutionality. *Stern v. Marshall*, 564 U.S. ___, ___, 131 S. Ct. 2594, 2605 (2011).

¶ 58        Both the Illinois Constitution and the United States Constitution safeguard the respective state and federal rights to keep and bear arms. Article I, section 22, of the Illinois Constitution provides: "Subject only to the police power, the right *of the individual citizen* to keep and bear arms shall not be infringed." (Emphasis added.) Ill. Const. 1970, art. I, § 22. The second amendment of the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right *of the people* to keep and bear Arms, shall not be infringed." (Emphasis added.) U.S. Const., amend. II. The language of the Illinois Constitution suggests that the right, or "rights," of Illinois citizens to keep and bear arms are not generic or categorical, that Illinois secures to its citizens, via the Illinois

-25-

Constitution and implementing laws, *individualized* consideration of a person's rights to keep and bear arms. That policy is reflected in the provisions of Illinois' FOID Card Act (see 430 ILCS 65/5, 8, 10 (West 2010)), which mandates individual assessment of a person's application and circumstances by the *Department of State Police* in the first instance, and individualized *judicial* consideration of the basis for denial of a FOID card—without which firearm possession is illegal under state law—and judicial relief from that denial in appropriate circumstances.

¶ 59       We reiterate the standards that apply before an Illinois court can grant relief to a person denied a FOID card on the basis of disqualifying factors listed in section 8 of the FOID Card Act—including the factor listed in subsection (n) (possession violates state or federal law), which in this instance brings the federal prohibition of section 922(g)(9) to bear. Subsections (2) and (3) of section (c) of the 2010 version of the FOID Card Act allow a court to grant relief from the denial of a FOID card, by directing its issuance, if "the circumstances regarding a criminal conviction, where applicable, the applicant's criminal history and his reputation are such that the applicant *will not be likely to act in a manner dangerous to public safety*" and "*granting relief would not be contrary to the public interest.*" (Emphases added.) 430 ILCS 65/10(c)(2), (c)(3) (West 2010). This general provision for relief, applicable to *anyone* who is denied a FOID card in the first instance, mirrors subsection (f) of section 10, which specifically provides that "[a]ny person who is prohibited from possessing a firearm under 18 U.S.C. 922(d)(4) and 922(g)(4) of the federal Gun Control Act of 1968"—prohibiting firearms possession by a person who has been adjudged mentally defective or who has been committed to a mental institution—"may apply to the Department of State Police requesting relief from such prohibition and the Director shall grant such relief if it is established to the Director's satisfaction that the person *will not be likely to act in a manner dangerous to public safety and granting relief would not be contrary to the public interest.*" (Emphasis added.) 430 ILCS 65/10(f) (West 2010).

¶ 60       The standards in those state provisions reflect the standard the United States Attorney General is charged to employ—without funds to do so—in considering whether to grant relief from federal firearms

disabilities under section 925(c), which provides that the Attorney General may grant relief if it is established to his satisfaction that "the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant *will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.*" (Emphasis added.) 18 U.S.C. § 925(c) (2006); *cf.* 430 ILCS 65/10(c)(2), (c)(3) (West 2010). *That* standard is reiterated verbatim in the Code of Federal Regulations (27 C.F.R. § 478.144) to be applied by the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives. Suffice it to say, the standards for relief, state and federal, are consistent.

¶ 61        It seems the next question should be: Did, and does, Congress intend for there to be state and federal means to relief from federally imposed firearms disabilities? We have no doubt that was and is Congress's intent. Congress obviously did not believe it reasonable or necessary to impose a perpetual firearm disability on anyone in the listed categories in section 922(g).

¶ 62        The provisions of section 921(a)(20) (applicable to felons) and section 921(a)(33)(B)(ii) (applicable to domestic violence misdemeanants) have long evinced congressional intent to provide exemption or relief from section 922(g) disabilities, or *de facto* restoration of firearms rights—whatever one chooses to call it. Irrespective of how those sections have been interpreted in the retrospective context of enhanced federal sentencing, or would be in this context, where Coram, prospectively, seeks to regain the very rights at issue (the rights to keep and bear arms), those statutes nonetheless make clear congressional intent to provide a means for *state* law or action to neutralize the prohibitions of section 922(g), where those prohibitions are based upon prior *state* convictions.

¶ 63        In addition to those provisions, Congress's enactment of section 925(c)—which it has for decades failed to repeal or repudiate—directly addresses the very concern that underpins the imposition of categorical disabilities: the inference that possession of firearms by persons in those categories presents a danger to others. Section 925(c), at once, implicitly recognizes that circumstances may change over time, that rehabilitation (in the case of disqualifying convictions) and recovery (in the case of mental illness) are possible, *and* that a lifetime ban on firearm possession—in effect the perpetual

-27-

deprivation, without remedy, of an important constitutional right—is not warranted in every case.

¶ 64        That Congress does *not* intend to abandon the principle of entitlement to individual relief in appropriate circumstances can be seen in its passage of the NICS Improvement Amendments Act of 2007. In a climate in which one might suspect Congress would choose to *limit* the opportunities for persons previously suffering from mental illness to regain their gun rights—the aftermath of the shootings at Virginia Polytechnic Institute—Congress insisted that those who had recovered from mental illness, and posed no danger, should have their firearm rights restored, directing federal departments and agencies to implement relief from disabilities programs for those individuals. The standard to be employed is one by now familiar: "the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." Significantly, five years after the Supreme Court's decision in *Bean*, Congress included in the amendment language that would—at least insofar as section 925(c) could be used as a vehicle to provide relief to those previously suffering from mental illness—address and overrule the Supreme Court's holding in *Bean*. Congress specifically provided: "If a Federal department or agency fails to resolve an application for relief within 365 days for any reason, *including a lack of appropriated funds*, the department or agency shall be deemed for all purposes to have *denied such request for relief without cause*." (Emphases added.) 122 Stat. at 2563. This clearly indicates, to us, that Congress wanted the relief process to go forward, to judicial review, irrespective of whether it had provided funding to the agency charged with investigatory responsibilities in the first instance. Finally, the fact that Congress chose to turn over some responsibilities for relief programs to the states indicates to us that Congress at once saw a way to overcome federal funding constraints, and believed the states were fully capable of implementing programs for relief from federally imposed firearms disabilities—and in a way more direct and meaningful than those the states already controlled via interpretations of section 921(a)(20) and (a)(33)(B)(ii). In short, Congress clearly intends for there to be meaningful avenues to relief from federally imposed firearms disabilities, and it intends for the states to take an active role in those

-28-

relief efforts.

¶ 65       The Supreme Court has acknowledged congressional intent to provide direct, meaningful, individualized consideration where relief is sought from federal firearm disabilities. In *Logan*, the Court noted that "[the Firearm Owner's Protection Act], 100 Stat. 449, included a 'safety valve' provision under which persons subject to federal firearms disabilities, including persons whose civil rights had not been restored, may apply to the Attorney General for relief from the disabilities." *Logan*, 552 U.S. at 28 n.1 (citing 18 U.S.C. § 925(c) (Supp. V 2006)). Moreover, as interpreted by the Supreme Court, the federal exemption statutes provide an alternative avenue to indirect relief for persons who are seeking restoration of firearm rights, insofar as those statutes specify that a prior state conviction is not "a conviction"—in this situation a disabling conviction for purposes of section 922(g)—if, with respect thereto, the convicting jurisdiction has restored unrelated "civil rights" lost as a result of the conviction.

¶ 66       As the Court acknowledged in *Logan*, section 921(a)(20)—a corollary statute to section 921(a)(33)(B)(ii)—"does not define the term 'civil rights.' " *Logan*, 552 U.S. at 28. While the Court, in *Logan*, stated that "courts have held," and the petitioner therein "agree[d]," that the "civil rights relevant" to that section are "the rights to vote, hold office, and serve on a jury" (*Logan*, 552 U.S. at 28 (citing, *inter alia*, *Caron v. United States*, 524 U.S. 308, 316 (1998)), as previously noted, we see no analysis in *Caron* dictating that result. In *Beecham*, the Supreme Court itself suggested that restoration of firearm rights could be "a consideration of *** possible relevance" in that context. *Beecham*, 511 U.S. at 373 n.*; see also *United States v. Sonczalla*, 561 F.3d 842, 844 (8th Cir. 2009) ("We have noted that for a person to have his civil rights restored by a state for the purposes of section 921(a)(20), the relevant state must actually have restored the felon's right to possess firearms." (internal quotation marks omitted)). Obviously, the *Logan* Court's narrow interpretation of requisite rights that must be restored for exemption was rendered in the context of determining, for purposes of enhanced federal sentencing, what constitutes a predicate conviction; the Court was not considering whether a person previously convicted of an offense constitutes a present danger with a weapon going forward, and whether that individual's rights to keep and bear arms should be

restored. Some might well suggest in *this* context *that*, logically, should be the core question, and quibbling over what rights irrelevant to that question have been restored, or, as some cases would have it, *how many* of those rights, misses the point and is a construction inconsistent with the objectives of Congress.

¶ 67        Whatever one may think of the wisdom of applying *Logan*'s automatic restoration-of-rights procedure in *this* context, we submit that congressional intent to place within the authority of the states the power to *indirectly* remove federal firearm disabilities via pardons, expungements, and restorations of civil rights, pursuant to section 921(a)(20) and (a)(33)(B)(ii), suggests that Congress intends, or at least countenances, the states taking an active role in *directly* restoring second amendment rights to those under federal firearms disabilities, or providing relief from those disabilities pursuant to the standards of section 925(c), which amounts to the same thing. As previously mentioned, the fact that Congress has begun turning over responsibility for some firearm disability relief programs to the states also supports that view.

¶ 68        Indeed, it has long been recognized in Supreme Court jurisprudence that a state may, in certain circumstances, provide the means to enforce a remedy where Congress has clearly sanctioned or recognized a right or remedy, but Congress has not provided the means. As the Supreme Court has stated: " 'If an act of Congress gives a penalty [meaning civil and remedial] to a party aggrieved, without specifying a remedy for its enforcement, there is no reason why it should not be enforced, if not provided otherwise by some act of Congress, by a proper action in a state court. The fact that a state court derives its existence and functions from the state laws is no reason why it should not afford relief.' " *Mondou v. New York, New Haven, & Hartford R.R. Co.*, 223 U.S. 1, 57-58 (1912) (quoting *Claflin v. Houseman*, 93 U.S. 130, 137 (1876)). That proposition would seem to apply here, where Congress has recognized the remedy, but has not supplied the necessary money for its implementation. Upon state courts, equally with the courts of the Union, rests the obligation to guard and enforce every right secured by the Constitution and laws of the United States whenever those rights are involved in any suit or proceedings before them. *Robb v. Connolly*, 111 U.S. 624, 637 (1884). In *Ortega Co. v. Triay*, 260 U.S.

-30-

103, 109 (1922), the Supreme Court quoted approvingly this proposition from an earlier Florida Supreme Court decision (*State ex rel. R.R. Commissioners v. Atlantic Coast Line Co.*, 54 So. 394 (Fla. 1911)), a principle that applies here: "Authority that is indispensable or useful to the valid purposes of a remedial law may be inferred or implied from authority expressly given."

¶ 69  If, as it clearly does (see NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, 122 Stat. 2559 (2008)), Congress deems a state's investigatory and administrative apparatus capable of determining whether a person defined as a "mental defective" is safe to possess a firearm, how and why should it be different for persons who decades ago committed an isolated act which resulted in a conviction of misdemeanor domestic violence? Congress has determined that the standard applicable to persons applying for relief from disabilities imposed pursuant to subsections (d)(4) and (g)(4) of section 922 and subsections (d)(9) and (g)(9) of that section is the same: whether the applicant "will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c) (2006); *cf.* 430 ILCS 65/10(c)(2), (c)(3), (f) (West 2010). Given the broad powers Congress has given the states to restore rights and grant relief from federally imposed firearms disabilities, we believe the power to grant relief, or restore rights, to those who have lost them as a result of state misdemeanor convictions is necessarily implied.

¶ 70  We find no obstacles of preemption here. As the Supreme Court observed in *Haywood v. Drown*, 556 U.S. 729, 734-35 (2009), quoting *Claflin v. Houseman*, 93 U.S. 130, 136-37 (1876), the "Federal and state law 'together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent.' " *Haywood*, 556 U.S. at 734-35. "So strong is the presumption of concurrency that it is defeated only in two narrowly defined circumstances," the first of which is "when Congress expressly ousts state courts of jurisdiction." *Haywood*, 556 U.S. at 735.

¶ 71  The supremacy clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States *** shall

be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. " 'State law is preempted under the supremacy clause in three circumstances: (1) when the express language of a federal statute indicates an intent to preempt state law; (2) when the scope of a federal regulation is so pervasive that it implies an intent to occupy a field exclusively; and (3) when state law actually conflicts with federal law.' " *Poindexter v. State of Illinois*, 229 Ill. 2d 194, 210 (2008) (quoting *Village of Mundelein v. Wisconsin Central R.R.*, 227 Ill. 2d 281, 288 (2008)). This court has recognized: "The key inquiry in all preemption cases is the objective or purpose of Congress in enacting the particular statute. The doctrine requires courts to examine the Federal statute in question to determine whether Congress intended it to supplant State laws on the same subject." *Kellerman v. MCI Telecommunications Corp.*, 112 Ill. 2d 428, 438 (1986). None of the listed circumstances support a presumption of preemption. In fact, the deference to state law, to determine whether rights have been restored for purposes of the disabling statutes' application, suggests the contrary, as does congressional action in beginning to turn over programs for relief therefrom to the states, presumably for lack of federal funding. Illinois' statutory scheme provides a framework for individualized review—and where appropriate relief—that essentially mirrors section 925(c). See 430 ILCS 65/10(c), (f) (West 2010).

¶ 72        Apart from the individualized assessment mandated by section 925(c), the Supreme Court has construed section 921(a)(20) and (a)(33)(B)(ii) in such a way as to give the states the authority to automatically restore, through operation of state law, unrelated civil rights of those whose state convictions—both felonies and misdemeanors—have resulted in federally imposed firearms disabilities, thus exempting those individuals from the disabling effect of the federal statute without an individual assessment of their future dangerousness going forward. With respect to that restoration-of-rights process, it has been held that those who never lost civil rights do not have an avenue to automatic restoration of their rights to possess firearms—only those who have lost rights due, in many cases, to incarceration. See *Logan*, 552 U.S. at 37 ("Having no warrant to stray from § 921(a)(20)'s text, we hold that the words

-32-

'civil rights restored' do not cover the case of an offender who lost no civil rights.").

¶ 73       Though we acknowledge the binding precedent of cases like *Logan*, and abide by the principle of automatic restoration of firearm rights upon the restoration of unrelated rights, reasonable minds might rightfully find cause for concern with a statutory scheme for restoration or relief that does not afford individualized consideration of a person's mental and emotional state—both critical to an assessment of dangerousness—insofar as it could place the public at risk. While some might find that state of affairs consistent with the recent decisional ascendency, in our panoply of constitutional rights, of the rights to keep and bear arms, in that milieu, the lack of any effective federal alternative providing for *direct* relief, pursuant to individualized assessment, for those who, despite prior convictions, have been rehabilitated and wish to reestablish their firearm rights seems oddly incongruent. In any event, we have no quarrel with the proposition that one who has become a law-abiding citizen should not be precluded from exercising those rights. Other courts appear to take the same view. See *Schrader*, 704 F.3d at 992. Congress agrees. See 18 U.S.C. § 925(c) (2006). Indeed, the scrutiny given to those who try to regain their firearms rights would seem to ensure that they pose less of a danger to the public than many who have not yet come to the attention of law enforcement and mental health professionals. Unfortunately, as recent events sadly demonstrate, it is too often the case that *those* individuals, as yet unidentified or unreported, that inflict the greatest harm on their fellow citizens.

¶ 74       The individual scrutiny given Coram's circumstances, by Judge Schuering, pursuant to the standards for review set forth in Illinois' FOID Card Act (430 ILCS 65/10(c) (West 2010)), has resulted in an assessment that Coram "will not be likely to act in a manner dangerous to public safety" and "granting relief would not be contrary to the public interest." That is the same standard of review Congress has given the states the authority to employ in considering restoration of firearms rights for those who have previously suffered from disabling mental illness. That is the same standard Congress has established for use in federal programs for relief from federal firearms disabilities. Application of that standard, via section 10(c) of Illinois' FOID Card Act, removes the federal firearm disability and entitles

Coram to a FOID card. Thus construed, there is no need to address the constitutionality of section 922(g)(9).

¶ 75    We note, in passing, the recent amendment of section 10 of the FOID Card Act via Public Act 97-1150, § 545, effective January 25, 2013, providing that a circuit court may not order issuance of a FOID card if the petitioner is otherwise prohibited from possessing or using a firearm under federal law, and that relief can be granted under subsection (c) only if "granting relief would not be contrary to federal law." Pub. Act 97-1150, § 545 (eff. Jan. 25, 2013) (amending 430 ILCS 65/10(b), (c)(4)). Obviously, the current version of the statute was not in effect when proceedings under section 10(c) were conducted with respect to Coram. However, given our construction of the statute, and our interpretation of its effect, it would not matter if the amendments had been in effect. Relief granted pursuant to statutory review *removes* the federal firearm disability.

¶ 76    For the reasons stated, we affirm that part of the circuit court's judgment that upheld the original order of Judge Schuering, directing the issuance of a FOID card to Coram. We vacate that portion of the judgment that held section 922(g)(9) of the federal Act (18 U.S.C. § 922(g)(9) (2006)) unconstitutional.

¶ 77    Affirmed in part.

¶ 78    Vacated in part.

¶ 79    JUSTICE BURKE, specially concurring:

¶ 80    After the Illinois Department of State Police (the Department) denied petitioner Jerry W. Coram's application for a Firearm Owner's Identification (FOID) Card, he petitioned the circuit court of Adams County for relief pursuant to section 10 of the FOID Card Act (430 ILCS 65/10 (West 2010)). The circuit court ultimately concluded that Coram was statutorily barred from obtaining relief. However, the court also held that the statutory bar violated Coram's second amendment rights. Because the circuit court held a statute unconstitutional, the Department appealed directly to this court. Ill. S. Ct. R. 302(a) (eff. Oct. 4, 2011).

¶ 81    Like Justice Karmeier, I believe that before addressing the constitutional issue raised by the Department's appeal, it is necessary

-34-

to first determine whether the circuit court was correct in its interpretation of the FOID Card Act and in its conclusion that Coram cannot obtain relief under the statute. Also like Justice Karmeier, I believe the circuit court erred when it concluded that statutory relief is unavailable. However, my reasons for reaching that result differ from Justice Karmeier's. I therefore specially concur.

¶ 82                                   I

¶ 83        In 1992, Coram pled guilty to a charge of domestic battery, a class A misdemeanor (Ill. Rev. Stat. 1991, ch. 38, ¶ 12-3.2(a)(1), (b)). The factual basis of the plea established that Coram slapped his live-in girlfriend in the face with his hand during an argument. Coram was sentenced to 12 months' conditional discharge and ordered to pay a $100 fine.

¶ 84        Some 17 years later, in 2009, Coram applied to the Department for a FOID card, a requirement for lawfully possessing a firearm in the state of Illinois. See 430 ILCS 65/2(a)(1) (West 2010). The Department denied Coram's application pursuant to the authority granted it under section 8(n) of the FOID Card Act (430 ILCS 65/8(n) (West 2010)). That provision states that the Department may deny an application for a FOID card if the Department finds that the applicant is a "person who is prohibited from acquiring or possessing firearms or firearm ammunition by any Illinois State statute or by federal law."

¶ 85        When a state statute incorporates federal law, as section 8(n) does, the general rule is that the incorporation is limited to federal statutes or regulations in existence at the time the state statute was adopted. See 34 Ill. L. and Prac. § 12, at 25 (2001). The incorporation cannot include future amendments to the federal law because such an incorporation would constitute an unlawful delegation of state legislative power to the federal government. See, *e.g.*, *State v. Williams*, 583 P.2d 251, 254 (Ariz. 1978); 1950 Ill. Att'y Gen. Op. No. 258.[3] Further, the effect of incorporating federal law into section

---

[3]Article IX, section 3(b), of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IX, § 3(b)), permits the General Assembly to adopt by reference future provisions of the income tax laws of the United States. This section was included because of concerns that, without it, state legislation that

8(n) is " 'the same as though the statute or the provisions adopted had been incorporated bodily into the adopting statute.' " *People v. Lewis*, 5 Ill. 2d 117, 122 (1955) (quoting *People ex rel. Cant v. Crossley*, 261 Ill. 78, 85 (1913)).

¶ 86      Section 8(n) was added to the FOID Card Act in 1997. See Pub. Act 90-130 (eff. Jan. 1, 1998).[4] At that time, there existed a provision of federal law, section 922(g)(9) of Title 18 of the United States Code (18 U.S.C. § 922(g)(9) (Supp. II 1996)), which became incorporated into section 8(n) and which subsequently informed the Department's decision to deny Coram's application for a FOID card.

¶ 87      Section 922(g)(9) of Title 18 states that it is unlawful for any person "who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." "[M]isdemeanor crime of domestic violence" is defined to include an offense, committed by a person in a domestic relationship with the victim, that "is a misdemeanor" and that "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon." 18 U.S.C. § 921(a)(33)(A)(i), (ii) (Supp. II 1996).

¶ 88      After reviewing Coram's application, the Department concluded that Coram's conviction of domestic battery fit within the federal definition of misdemeanor domestic violence. The Department also determined that certain exceptions found in federal law which would negate the conviction for misdemeanor domestic violence were inapplicable. These exceptions, set forth in section 921(a)(33)(B)(ii) of Title 18 (18 U.S.C. § 921(a)(33)(B)(ii) (Supp. II 1996)), provide that a person shall not be considered to have been convicted of

---

adopted tax laws that had not yet been enacted by Congress "would probably constitute an unlawful delegation of authority by the state to the federal government." 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2210.

    [4]The language currently found in subsection (n) was originally added as subsection (l). Subsection (l) was changed to subsection (n) by Pub. Act 90-655 (eff. July 30, 1998).

misdemeanor domestic violence if the conviction has been expunged or set aside, if the person has been pardoned, or if the person's "civil rights" have been "restored." Because these exceptions were inapplicable, the Department concluded that if Coram were permitted to possess a firearm in or affecting interstate commerce (which presumably would be most firearms), he would violate federal law. Based on this determination, the Department denied Coram's application.[5]

¶ 89        Following the denial of his application, Coram filed a petition in the circuit court of Adams County pursuant to section 10 of the FOID Card Act (430 ILCS 65/10 (West 2010)), contesting the Department's decision. Section 10 states that whenever an application for a FOID card is denied by the Department based on section 8 of the FOID Card Act, the decision may be appealed, either to the Director of the Department of State Police, or to the circuit court in the county in which the petitioner resides. Pursuant to section 10(a), when the Department has denied an application for a FOID card based on "domestic battery," or other listed offenses, "the aggrieved party may petition the circuit court in writing in the county of his or her residence for a hearing upon such denial." 430 ILCS 65/10(a) (West 2010). If, following the hearing, the court concludes that "substantial justice has not been done," the court "shall issue an order directing the Department of State Police to issue a Card." 430 ILCS 65/10(b) (West 2010). In addition, subsection (c) of section 10 provides that in appeals directed to both the Director of the Department and the circuit court, relief may be granted if it is established that (1) the applicant has not been convicted of a forcible felony within 20 years of the application, "or at least 20 years have passed since the end of any period of imprisonment imposed in relation to that conviction," (2) "the circumstances regarding a criminal conviction, where applicable, the applicant's criminal history and his reputation are such that the

---

[5]As of January 1, 2013, the determination as to whether a person who has been convicted of a state offense would be guilty of violating section 922(g)(9) if he were to possess a firearm in or affecting interstate commerce will take place primarily in the circuit court, where the State must prove beyond a reasonable doubt that the prohibitions of section 922(g)(9) apply. See 725 ILCS 5/112A-11.1, 112A-11.2 (West 2012).

applicant will not be likely to act in a manner dangerous to public safety," and (3) "granting relief would not be contrary to the public interest." 430 ILCS 65/10(c)(1), (c)(2), (c)(3) (West 2010).

¶ 90    Along with his petition, Coram filed a report prepared by a psychologist who had examined Coram for purposes of determining his fitness to possess a firearm. The psychologist concluded that Coram posed no danger to others and "strongly recommended" that Coram be issued a FOID card.

¶ 91    As required by section 10(b) (430 ILCS 65/10(b) (West 2010)), the State's Attorney of Adams County was notified of Coram's petition and given the opportunity to object. The State's Attorney declined to do so. Following a hearing, Judge Mark Schuering concluded that Coram had established all the conditions necessary for obtaining relief set forth in section 10 of the FOID Card Act. Judge Schuering therefore entered an order directing the Department to issue Coram a FOID card.

¶ 92    The Department subsequently moved to intervene. That motion was granted. The Department also moved to vacate Judge Schuering's order, arguing that the circuit court could not, despite its findings under section 10, order the Department to issue a FOID card. A second judge, Judge Thomas Ortbal, heard the Department's motion to vacate. After considering arguments, Judge Ortbal agreed with the Department that Coram could not obtain statutory relief from the denial of his application for a FOID card and that Judge Schuering had erred in granting relief to Coram pursuant to section 10 of the FOID Card Act. However, Judge Ortbal went on to hold that the application of the statutory bar to Coram violated his second amendment rights. Judge Ortbal therefore denied the Department's motion to vacate. This appeal followed.

¶ 93                                II

¶ 94    At the outset it is necessary to clarify what statutory provision is at issue in this appeal. In its brief, the Department states that the issue in this case is the constitutionality, both facially and as applied, of section 922(g)(9). This is incorrect. Section 922(g)(9) is a federal criminal statute. Coram has not been convicted or charged with violating section 922(g)(9) by the federal government and, indeed, as

-38-

far as the record shows, does not possess a firearm. Coram's petition was filed in the circuit court in order to determine whether he may be permitted to possess a firearm as a matter of state law. It is the state regulatory scheme under the FOID Card Act which is at issue, not federal criminal law.

¶ 95         To be sure, one or more provisions of the FOID Card Act may incorporate the language of section 922(g)(9), but "[t]he two statutes exist as separate, distinct, legislative enactments, each having its appointed sphere of action" (*Van Pelt v. Hilliard*, 78 So. 693, 698 (Fla. 1918)). See also, *e.g.*, F. Scott Boyd, *Looking Glass Law: Legislation by Reference in the States*, 68 La. L. Rev. 1201, 1221-22 (2008) (noting that when one statute incorporates by reference another, it is the former statute that is the controlling authority); Horace Emerson Read, *Is Referential Legislation Worth While?*, 25 Minn. L. Rev. 261, 269 (1941). If any statutory provision imposes a bar to Coram's obtaining a FOID card and, thereby, raises constitutional concerns, it is necessarily a provision of the FOID Card Act.

¶ 96         In his order denying the Department's motion to vacate, Judge Ortbal concluded that there was a statutory bar to Coram's obtaining relief, but he did not specify which provision of the FOID Card Act imposed the bar. Subsequently, in his findings entered pursuant to Supreme Court Rule 18 (Ill. S. Ct. R. 18 (eff. Sept. 1, 2006)), Judge Ortbal stated "that the provisions of 18 U.S.C., sec. 922(g)(9), which are incorporated by reference in 430 ILCS 65/8(n) as grounds for denial of a FOID card, are unconstitutional, as applied to [Coram]." From this, it would appear that Judge Ortbal concluded that section 8(n), through its incorporation of the language of section 922(g)(9), imposed a permanent bar on Coram's obtaining a FOID card, and further, that this statutory bar was unconstitutional. But this cannot be correct. As both parties acknowledge, all denials of FOID card applications based on section 8 are subject to review under section 10. Coram himself employed this procedure. In short, section 8(n) does not, under the plain language of the statute, impose a permanent bar on Coram's ability to obtain a FOID card.

¶ 97         In its filings in the circuit court, the Department pointed to another provision of the FOID Card Act, one which went unaddressed by the circuit court, as the basis for concluding that Coram could not

-39-

be granted a FOID card. This provision, section 13 of the FOID Card Act, states that "[n]othing in this Act shall make lawful the acquisition or possession of firearms or firearm ammunition which is otherwise prohibited by law." 430 ILCS 65/13 (West 2010). According to the Department, the phrase "otherwise prohibited by law" in section 13 refers to federal law and, therefore, incorporates by reference section 922(g)(9) of Title 18. Further, in the Department's view, Coram would be in violation of that federal law were he to possess a firearm. The Department maintained that the hearing procedure under section 10 "should not be allowed under Section 13 to override [the] FOID Card Act's incorporation of the federal ban." Thus, because the FOID Card Act under section 13 "could not make lawful" what was prohibited by federal law, the Department contended that the circuit court could not enter an order directing it to provide Coram with a FOID card. This assertion is also incorrect.

¶ 98  Section 13 was adopted by the General Assembly in 1967. See 1967 Ill. Laws 2600 (eff. July 1, 1968). Section 922(g)(9) was enacted by Congress in 1996. See Pub. L. No. 104-208, 110 Stat. 3009 (1996). Because the federal provision did not exist at the time section 13 was adopted, that provision could not, as a matter of law, have been incorporated into the state statute. See, *e.g.*, 1950 Ill. Att'y Gen. Op. No. 258, at 183 (an incorporation of a future amendment to federal law into an Illinois statute "would involve a surrender, abandonment, or delegation of legislative power").

¶ 99  Moreover, the interpretation of section 13 offered by the Department makes little sense. The Department agrees that the language of section 922(g)(9) is incorporated into section 8(n), and agrees that section 10 addresses denials of FOID card applications based on section 8(n). Thus, the Department reads the FOID Card Act as stating that (1) an application for a FOID card may be denied by the Department if the Department concludes that the applicant has committed misdemeanor domestic violence; (2) the applicant is entitled to then proceed under section 10 and, if the applicant establishes that substantial justice has not been done, the court "shall" enter an order directing the Department to issue the card; (3) however, the court may not enter such an order if the applicant has committed misdemeanor domestic violence. This is a nonsensical result. To avoid rendering the circuit court's findings and order

entered pursuant to section 10 a complete nullity, the phrase "otherwise prohibited by law" in section 13 must refer to some law other than that which is incorporated into the FOID Card Act in section 8(n) and specifically addressed in section 10. The Department has pointed to no law which prohibits the General Assembly from providing, as a matter of state law, that an applicant may be awarded a FOID card after a hearing under section 10 has determined that the applicant is a safe, responsible person. Accordingly, section 13 does not bar the circuit court from ordering the Department to grant Coram a FOID card.

¶ 100  Based on the foregoing, it is clear there is no statutory bar, either in section 8(n) or section 13 of the FOID Card Act, which prohibited Judge Schuering from granting relief to Coram pursuant to the standards set forth in section 10.

¶ 101  Further support for this reading of the statute comes from recent amendments made to the FOID Card Act. Effective January of 2013, section 10(b) of the FOID Card Act states that the circuit court "shall not" issue an order directing the Department to provide an applicant with a FOID card if the applicant "is otherwise prohibited from obtaining, possessing, or using a firearm under federal law." 430 ILCS 65/10(b) (West 2012) (as amended by Pub. Act 97-1150, § 545 (eff. Jan. 25, 2013)). In addition, section 10(c) now states that, before ordering the issuance of a FOID card, the applicant must establish that "granting relief would not be contrary to federal law." 430 ILCS 65/10(c)(4) (West 2012) (as amended by Pub. Act 97-1150, § 545 (eff. Jan. 25, 2013)). An amendatory change in the language of a statute creates a presumption that it was intended to change the law as it previously existed. *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284, 299 (2010) Here, nothing rebuts that presumption. The amendments make clear that a circuit court no longer has the authority to make findings or grant relief under section 10 if the court concludes that the applicant would be in violation of federal law if he or she were to possess a firearm. However, at the time Coram applied for his FOID card, nothing in the FOID Card Act prevented the circuit court from granting relief under section 10.

¶ 102  In the circuit court, the Department raised an additional objection to granting Coram relief. The Department contended that issuing a FOID card to Coram would be to "implicitly condone criminal

-41-

conduct" and that such a result could not have been intended by the General Assembly. Thus, in the Department's view, despite the plain language of section 10, Coram should not be granted a FOID card. This argument is unpersuasive.

¶ 103        The only thing that can be established with finality under a state regulatory scheme such as the FOID Card Act is whether or not an applicant is compliant with state law. A determination by an Illinois state court as to whether an applicant for a FOID card would be in compliance with federal law if he were to possess a firearm has no binding effect on federal authorities. In addition, the purpose of the state prohibitions on firearm possession, like the federal prohibitions, is "to keep firearms away from potentially dangerous persons." *Lewis v. United States*, 445 U.S. 55, 67 (1980). Given these facts, it is not unreasonable to conclude that the General Assembly intended for a judicial finding that an applicant is a safe and responsible citizen under section 10 to stand as a final determination that the applicant is eligible, as a matter of state law, to possess a firearm. It would then be incumbent upon the applicant to seek a declaration from the federal government regarding his rights under federal law. See, *e.g.*, *Shrader v. Holder*, 704 F.3d 980, 992 (D.C. Cir. 2013) (noting that the federal firearms ban "remain[s] vulnerable" to an as-applied, second amendment challenge brought by a misdemeanant who has become a " 'law-abiding, responsible citizen[ ]' " (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). Such a state regulatory scheme is not "condoning criminal activity." It is simply recognizing the limits of state authority, and recognizing that a binding determination as to whether a person is in compliance with federal law can only be made by the federal government.

¶ 104        In addition, a state regulatory scheme which permits an applicant to obtain individualized judicial review, as Coram obtained under section 10, avoids the constitutional objections that arise when a permanent ban on firearm possession is imposed on misdemeanants, and that are implicated under the current federal law (see, *e.g.*, *Schrader*, 704 F.3d at 991-92).[6] Of course, with its recent

────────────

[6]Had Coram's application for a FOID card been filed under the new amendments to the FOID Card Act we would be squarely presented with

amendments to the FOID Card Act the General Assembly has altered this statutory scheme. The point, however, is simply that the plain language of the FOID Card Act in effect at the time Coram applied for his card—the language of section 10 which allowed Coram to obtain individualized relief—does not lead to impossible or absurd results and, therefore, we are not free to ignore it.

¶ 105    Although this result answers the question of whether Coram has established the right to possess a firearm as a matter of state law, it remains an open question as to whether Coram is prohibited from possessing a firearm as a matter of federal law. However, that is a matter to be resolved between Coram and the federal authorities.

¶ 106    Because Coram was properly granted relief under section 10 of the FOID Card Act from the Department's denial of his application for a FOID card, there was no need for Judge Ortbal to address Coram's constitutional arguments. I therefore join with Justice Karmeier's opinion in vacating that portion of the circuit court's judgment which held the FOID Card Act unconstitutional as applied to Coram.

¶ 107    I also join Justice Karmeier in affirming the judgment of the circuit court denying the Department's motion to vacate. However, I cannot join in Justice Karmeier's reasoning in reaching this result. Justice Karmeier focuses his analysis on whether Coram is prohibited from possessing a firearm as a matter of federal law. Justice Karmeier ultimately concludes that a state court may grant relief from the federal firearm prohibitions imposed under section 922(g)(9) by employing the standards set forth in section 10(c) of the FOID Card Act. Although no provision of federal law states this, Justice Karmeier determines, for various reasons, that such authority is "necessarily implied." *Supra* ¶ 69. Because Coram satisfied the standards under section 10(c), Justice Karmeier finds that Coram's federal disability was removed, as was any statutory bar under the

---

these constitutional objections, *i.e.*, whether the state may burden the second amendment rights of a misdemeanant who poses no safety risk by requiring him to obtain a pardon before he may lawfully possess a firearm, and whether the state may permanently bar such a person from possessing firearms. I express no opinion on these issues.

-43-

FOID Card Act. Whatever the merits of this analysis, it rests on the initial premise that it is necessary to address whether Coram would be prohibited by federal law from possessing firearms. I disagree with this premise. As explained above, denials of FOID card applications based on section 8(n) are reviewable under section 10, and section 13 does not incorporate the language of section 922(g)(9). There is no need, therefore, for this court to determine whether Coram can overcome any federal prohibition on possessing firearms. For this reason, I do not join in Justice Karmeier's reasoning.

¶ 108        For the foregoing reasons, I specially concur.

¶ 109        JUSTICE FREEMAN joins in this special concurrence.

¶ 110        JUSTICE THEIS, dissenting:

¶ 111        This case involves whether petitioner Jerry W. Coram is entitled to a Firearm Owner's Identification (FOID) card pursuant to the Firearm Owners Identification Card Act (FOID Act) (430 ILCS 65/0.01 *et seq.* (West 2010)) where federal law prohibits his possession of a firearm. Based on the plain language and express legislative intent of the statute, I would hold that Coram's disqualification from acquiring or possessing a weapon under federal law continues to make him ineligible for a FOID card in Illinois and would reject the circuit court's finding that the federal prohibition is unconstitutional. Accordingly, I would reverse the denial of the Department's motion to vacate the order directing the issuance of a FOID card to Coram.

¶ 112        In 2009, Coram applied for and was denied a FOID card under section 8(n) of the FOID Act, which authorizes the Department to deny an application where the person is prohibited from possessing firearms by any Illinois state statute or by federal law. 430 ILCS 65/8(n) (West 2010). It is conceded that Coram was prohibited from possessing firearms under the federal Gun Control Act of 1968, as amended, due to his prior conviction in 1992 for misdemeanor domestic battery as a result of an incident involving domestic

violence.[7] 18 U.S.C. § 922(g)(9) (2006).

¶ 113        Thereafter, Coram filed a petition in the circuit court contesting
the denial of his application as provided for under section 10 of the
FOID Act (430 ILCS 65/10(a) (West 2010)). At the time of his
petition, section 10(c) of the Act provided, in relevant part, that the
court may grant the petitioner's request for relief if the petitioner
establishes that: (1) he has not been convicted of a forcible felony
within 20 years of the application for a FOID card; (2) the
circumstances regarding his criminal conviction, his criminal history
and his reputation are such that he would not be likely to act in a
manner dangerous to public safety; and (3) granting the relief would
not be contrary to the public interest. 430 ILCS 65/10(c) (West 2010).

¶ 114        Following a hearing, in which the State's Attorney did not object,
the circuit court concluded that Coram had satisfied the conditions of
section 10 and entered an order directing the Department to issue
Coram a FOID card. Subsequently, the Department moved to vacate
the order, arguing essentially that nothing in the Act could overcome
Coram's disqualification under section 922(g)(9) of the federal Gun
Control Act, which precluded him from possessing a firearm under
federal law, and that granting his requested relief would be against
public policy.

¶ 115        Coram did not dispute the determination that his conviction for
misdemeanor domestic battery fell within the prohibitions under
section 922(g)(9) of the federal Gun Control Act dealing with
misdemeanor crimes of domestic violence. Nor did he raise any

---

[7]According to the record, Coram's conviction was based on the
following conduct. In June 1992, Coram was living with his girlfriend. She
arrived home one night to find Coram highly intoxicated and seeking to
engage her in a fight. Not wanting to argue with him, and knowing that she
had to get up early to go to work the next day, she attempted to go to bed.
After shutting the bedroom door on one another repeatedly, Coram accused
the girlfriend of having sex with "black persons." When she said, "yeah,"
Coram slapped her on the left eye while she was lying on the bed. He
slapped her two or three times with an open hand. According to the
girlfriend, she had been hit on another occasion, but did not file any report.
Coram pled guilty and was sentenced to 12 months of conditional
discharge.

argument at any time in the proceedings disputing the Department's construction of the FOID Act. Instead, he maintained that section 922(g)(9) was not a bar to his being issued a FOID card because section 922(g)(9) was unconstitutional as applied to him and ultimately a violation of the second amendment. Thus, the arguments presented by the parties were entirely focused on the constitutionality of section 922(g)(9). The circuit court ultimately agreed with Coram's constitutional claim and denied the Department's motion to vacate on that basis. This appeal followed. On appeal, the Department challenged the circuit court's finding that section 922(g)(9) violated the second amendment as applied to Coram.

¶ 116　　　The FOID Act is part of a broader statutory framework involving public safety laws. The General Assembly has specifically determined that "in order to promote and protect the health, safety and welfare of the public, it is necessary and in the public interest to provide a system of identifying persons who are not qualified to acquire or possess firearms *** within the State of Illinois." 430 ILCS 65/1 (West 2010). Thus, the express legislative purpose of the Act is to identify those individuals that are not qualified to possess firearms in order to protect the public interest.

¶ 117　　　To that end, the Department shall issue a FOID card only to those applicants found qualified under section 8 of the Act. 430 ILCS 65/5 (West 2010). Under section 8, the General Assembly has specifically included felons and those convicted of domestic battery among those persons deemed unqualified to acquire or possess firearms and, therefore, represent grounds for the Department to deny a FOID card. 430 ILCS 65/8 (West 2010). Specifically, section 8(n), which the Department relied on here, incorporates the provisions of the federal Gun Control Act, and disqualifies those who are prohibited from acquiring or possessing firearms due to their conviction for misdemeanor domestic violence from obtaining a FOID card. 430 ILCS 65/8(n) (West 2010); 18 U.S.C. § 922(g)(9) (2006). Although the FOID Act has been amended numerous times, since the Act's original enactment in 1967, section 13 has consistently provided that, "[n]othing in this Act shall make lawful the acquisition or possession of firearms or firearm ammunition which is otherwise prohibited by law." 430 ILCS 65/13 (West 2010).

¶ 118　　　Although not provided for under federal law, the lead opinion

finds that Congress implicitly gave the states the authority to establish a framework to remove a federal disability and finds that our own state legislature drafted the FOID Act in such a way to remove the disability here through a section 10 hearing. Whether or not Congress has impliedly granted such authority, I reject the proposition that our own state legislature has taken on this task in this context. A section 10 hearing cannot make it lawful for Coram to acquire or possess a firearm that he concedes he is prohibited from possessing under federal law. Rather, section 13 makes clear that nothing in the FOID Act relieves Coram of the disability imposed under the federal Gun Control Act, as amended.

¶ 119        Additionally, I strongly disagree with the proposition raised in the special concurrence that any disqualification from possessing a firearm under federal law has no bearing on Coram's right to a FOID card or that the disqualification is a matter strictly between Coram and the federal government. Rather, based on the plain language of the FOID Act, granting a person who is disqualified from possessing a firearm with a FOID card would be against the public interest, would nullify federal law, and would be directly contrary to the expressly stated legislative intent to deny cards to those who are identified as unqualified to possess a firearm. Indeed, the parties and the circuit court all apparently recognized that under a proper construction, Coram cannot obtain relief under section 10 if he is disqualified under section 922(g)(9). He must first remove the federal disability.

¶ 120        According to the construction asserted by the special concurrence, the General Assembly intended for an applicant to be issued a FOID card if the state court determines that he poses no risk to public safety, despite his being barred from possessing a firearm or purchasing a firearm by any licensed federal firearms dealer. See 430 ILCS 65/3.1 (West 2010). Then, after being issued a FOID card, it would be incumbent on the applicant to seek relief from the federal government to attempt to remove the federal disability. *Supra* ¶ 103 (Burke, J., specially concurring, joined by Freeman, J.). Thus, the special concurrence recognizes that issuing Coram a FOID card is meaningless because he remains ineligible to possess a firearm, and suggests that the only way to resolve this empty solution is to mount

a successful constitutional challenge in federal court.[8]

¶ 121      Rather, the General Assembly intended for an applicant to first remove the federal disability before being eligible for a FOID card. The federal statutes provide a means to do that. The disability is removed "if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored." 18 U.S.C. § 921(a)(33)(B)(ii) (2006). If an applicant satisfies 921(a)(33)(B)(ii), he would then be eligible for a FOID card. A card holder and the public should be secure in the knowledge that a valid FOID card means that the card holder is not disqualified from possessing a firearm and should be able to rely on that fact. The special concurrence undermines that confidence.

¶ 122      Contrary to the construction asserted by the special concurrence, our state firearms licensing system does not work independently and distinctly from the federal system. Instead, it works in concert with it. The statutory construction offered by the special concurrence to grant Coram a FOID card would essentially condone a state scheme that allows an individual to be issued a FOID card, knowing that by possessing a firearm he is guilty of a federal offense and subject to up to 10 years' imprisonment. See 18 U.S.C. § 924(a)(2) (1994). Issuing a FOID card to a person who is barred from possessing a firearm would render the carefully crafted identification system meaningless, would undermine the value of a FOID card, and would lead to an absurd result that violates the stated purpose of the Act and threatens the public interest.

¶ 123      Moreover, recent legislative amendments to the FOID Act make abundantly clear the legislative intent to incorporate by reference the federal prohibitions under section 922(g)(9) and to mirror the congressional concern for identifying those domestic violence misdemeanants unqualified to possess a firearm. Section 10(b) now expressly clarifies that the court "shall not" issue a FOID card "if the petitioner is otherwise prohibited from obtaining, possessing, or using a firearm under federal law." 430 ILCS 65/10(b) (West 2012) (as

---

[8]Indeed, Coram raised a constitutional challenge in the trial court and before this court and neither the lead nor the concurring opinion engages his arguments.

amended by Pub. Act 97-1150, § 545 (eff. Jan. 25, 2013)). Additionally, the General Assembly added a fourth requirement to the relief provisions under section 10(c), requiring the petitioner to show that "granting relief would not be contrary to federal law." 430 ILCS 65/10(c)(4) (West 2012) (as amended by Pub. Act 97-1150, § 545 (eff. Jan. 25, 2013)).[9]

¶ 124    Thus, contrary to the lead opinion, it is evident that the General Assembly has not exercised any implied authority to remove the federal disability but, rather, has clarified its intent to make the Act consistent with the prohibitions on firearm possession established under federal law, including section 922(g)(9) relating to domestic violence crimes. At the very least, my colleagues must concede that under the amended statute, the relief procedures under section 10 cannot remove a federal firearms disability. Instead, a federal firearms disability is one of the additional grounds that the court is required to consider before it can provide any relief to future applicants and would preclude the relief requested. Thus, whatever effect the lead opinion and special concurrence have on Coram's application, they would have no bearing on future applicants who are disqualified from possessing firearms under section 922(g)(9).

¶ 125    Turning then to the issue as framed by Coram and the Department, and as analyzed by the circuit court, the question we have been asked to address is whether the federal firearms disability under section 922(g)(9) violates Coram's second amendment rights because it acts as a perpetual ban on his right to bear arms. Essentially, the crux of his claim is that, despite being a domestic violence misdemeanant who has demonstrated a long-term postconviction history without violence, he is essentially "always and forever" banned from obtaining a license to possess a firearm under the FOID Act because he has no viable remedy available to him to remove the federal disability imposed by his 20-year-old conviction.

¶ 126    The circuit court found that enforcement of section 922(g)(9) as applied to Coram in perpetuity in his particular case violated his right

---

[9]The FOID Act was subsequently amended again by Public Act 97-1167, § 5 (eff. June 1, 2013), and Public Act 98-63, § 150 (eff. July 9, 2013). Neither amendment makes changes to the above-quoted language.

-49-

to keep and bear arms as guaranteed by the second amendment because he could not avail himself of the statutory procedure for restoration of those rights under section 10 of the FOID Act (430 ILCS 65/10 (West 2010)). In rendering its determination, the circuit court found that section 922(g)(9) could not be reasonably construed in a manner that would preserve its validity, as applied to Coram, that the finding of unconstitutionality, as applied, was necessary to the decision rendered, and that such decision could not rest upon alternative grounds.

¶ 127      I disagree with the circuit court that at this juncture it can be conclusively determined that section 922(g)(9) denies Coram any rights in perpetuity or that the statute cannot be construed to preserve its validity as applied to Coram. I also disagree with the circuit court that a finding of unconstitutionality as applied to him is necessary. As the lead opinion points out, "[w]e must consider nonconstitutional issues first and consider constitutional issues only if necessary to the resolution of this case." *Supra* ¶ 56 (citing *People v. Melchor*, 226 Ill. 2d 24, 34-35 (2007)).

¶ 128      Under section 922(g)(9), a person convicted of a misdemeanor crime of domestic violence is prohibited from possessing a firearm. 18 U.S.C. § 922(g)(9) (2006). This particular prohibition was enacted by Congress based on evidence that " '[f]irearms and domestic strife are a potentially deadly combination nationwide,' " and to close a "dangerous loophole" in that " '[e]xisting felon-in-possession laws *** were not keeping firearms out of the hands of domestic abusers,' " because "domestic abusers often commit acts that would be charged as felonies if the victim were a stranger, but that are charged as misdemeanors because the victim is a relative." *United States v. Skoien*, 614 F.3d 638, 642-43 (7th Cir. 2010) (quoting *United States v. Hayes*, 555 U.S. 415, 426-27 (2008), quoting 142 Cong. Rec. 22986 (1996)). Additionally, "the recidivism rate is high, implying that there are substantial benefits in keeping the most deadly weapons out of the hands of domestic abusers." *Id*. at 644. By statutory definition, domestic violence misdemeanants are violent criminals. See 18 U.S.C. § 921(a)(33)(A) (2006); *Skoien*, 614 F.3d at 642.

¶ 129      Since *Heller*, the categorical disqualification from possessing a firearm by domestic violence misdemeanants has been upheld by

numerous courts of appeals, including the Seventh Circuit. See *United States v. Staten*, 666 F.3d 154, 168 (4th Cir. 2011) (second amendment challenge survived intermediate scrutiny); *United States v. Booker*, 644 F.3d 12, 26 (1st Cir. 2011) (holding that section 922(g)(9) did not violate the second amendment, as it was substantially related to an important governmental interest in preventing domestic gun violence); *Skoien*, 614 F.3d at 642 (stating that, "[N]o one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective. Both logic and data establish a substantial relation between § 922(g)(9) and this objective."); *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010) (upholding the constitutionality of section 922(g)(9) as a presumptively lawful " 'longstanding prohibition[ ] on the possession of firearms' " (quoting *Heller*, 554 U.S. at 626)).

¶ 130      I agree with the lead opinion that Coram essentially concedes the statute's facial validity. He also acknowledges that section 921(a)(33)(B)(ii) of the Act provides an exception to the application of section 922(g)(9) "if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored." 18 U.S.C. § 921(a)(33)(B)(ii) (2006). This determination is governed by the law of the convicting jurisdiction. Thus, depending upon state law, an individual convicted of misdemeanor domestic violence potentially has three avenues of relief from the federal ban. *Id.*

¶ 131      Nevertheless, Coram argues that as applied to him, he cannot realistically benefit from this provision because (1) in Illinois an offender does not lose civil rights, as that term has been construed, for a misdemeanor offense and, therefore, he cannot have his rights restored; (2) Illinois does not provide for expungement of his offense; and (3) the likelihood of a pardon is remote. Thus, based on the argument presented, before we engage in an analysis of whether Coram even falls within the class of persons protected by the scope of the second amendment and, if so, whether there is an adequate fit between the statute's means and its objective as applied to him, we must first ascertain whether indeed the statute acts as a perpetual ban.

¶ 132      As we recently reiterated, although not binding authority, the Seventh Circuit's decisions may serve as persuasive authority and provide guidance where reasonable and logical. *State Bank of Cherry*

*v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 53. The Seventh Circuit has rejected the claim that domestic violence misdemeanants are subject to a permanent ban where a remedy is potentially available to them. Specifically, in *Skoien*, the defendant raised a similar argument, contending that, as a practical matter, the routes to restoration were unavailable to domestic battery misdemeanants in Wisconsin where misdemeanants' rights are not lost and, therefore, cannot be restored. Despite this fact, the court noted that Wisconsin does provide misdemeanants an opportunity to seek a pardon or expungement. The court held, "[t]his means that § 922(g)(9) in its normal application does not create a perpetual and unjustified disqualification for a person who no longer is apt to attack other members of the household." *Skoien*, 614 F.3d at 645; see also *United States v. Jennings*, 323 F.3d 263, 275 (4th Cir. 2003); *United States v. Barnes*, 295 F.3d 1354, 1368 (D.C. Cir. 2002); *United States v. Smith*, 171 F.3d 617, 626 (8th Cir. 1999) (although unable to avail themselves of the civil rights restored avenue, where the statute contained other means for misdemeanants to regain the right to possess firearms, it did not violate equal protection).

¶ 133    In Illinois, the constitution gives the Governor the unfettered authority to "grant *** pardons, after conviction, for all offenses on such terms as he thinks proper." Ill. Const. 1970, art. V, § 12. The pardon power is extremely broad. See 730 ILCS 5/3-3-13 (West 2010); *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 473 (2004). Although a matter of grace, the statutory procedures provide a petitioner with an avenue in which the executive can consider a wide range of factors, including Coram's relevant history and specific reasons why a pardon should be granted, in his case to remove a specific statutory disability. 730 ILCS 5/3-3-13 (West 2010). His petition will be reviewed by the Prisoner Review Board, at which he may request a public hearing and be represented by counsel. *Id.* If an individual is granted a pardon, the Governor may authorize expungement, allowing the petitioner to seek expungement of his conviction through a court order. 20 ILCS 2630/5.2(e) (West 2010).

¶ 134    Where Coram has not availed himself of a potential state remedy available to him under the statute, we need not and should not determine whether the statute is an unconstitutional perpetual ban which violates his second amendment rights. A remedy does not

-52-

become unavailable merely because it is discretionary or resort to it may fail. It is not futile without ever being tried. Thus, where it is yet unknown whether Coram can satisfy section 921(a)(33)(B)(ii), the question of "[w]hether a misdemeanant who has been law abiding for an extended period must be allowed to carry guns again, even if he cannot satisfy § 921(a)(33)(B)(ii), is a question not presented today." *Skoien*, 614 F.3d at 645.

¶ 135       Moreover, it is elementary that "constitutional principles should be addressed only as a last resort, when a case cannot be resolved any other way." *In re Haley D.*, 2011 IL 110886, ¶ 54. Although Coram maintains that we should decide this issue in the interest of efficiency and judicial economy, these interests do not justify reaching a constitutional issue unnecessarily. *People v. Hampton*, 225 Ill. 2d 238, 244-45 (2007). "Unnecessarily addressing a constitutional issue is improper because it may result in compromising the stability of the legal system in the event that the statute is declared unconstitutional when the particular case does not require that action." *Id*. at 245. Accordingly, for all of these reasons, I would hold that the trial court erred in finding section 922(g)(9) unconstitutional as applied to Coram.

¶ 136       Where Coram's constitutional claim fails and nothing in the FOID Act relieves him of the disqualification imposed under the federal law, granting Coram a FOID card would be contrary to the public interest and contrary to the express legislative intent of the FOID Act. Therefore, I would reverse the judgment of the circuit court and remand with instructions to grant the Department's motion to vacate the order requiring it to issue a FOID card to Coram.

¶ 137       JUSTICE GARMAN joins in this dissent.

-53-