```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF HAWAII

 3
     KIRK C. FISHER,              ) CIVIL NO. 11-00589 ACK-BMK
 4                                )
              Plaintiff,          ) Honolulu, Hawaii
 5                                ) September 17, 2013
          vs.                     ) 10:09 A.M.
 6                                )
     LOUIS KEALOHA, et al.,       ) Plaintiff's Motion for
 7                                ) Permanent Injunction and
              Defendants.         ) Plaintiff's Motion for
 8   _____  ) Summary Judgment

 9                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE ALAN C. KAY,
10             SENIOR UNITED STATES DISTRICT JUDGE

11
     APPEARANCES:
12
     For the Plaintiff:         Te-Hina Ickes
13                              1003 Bishop Street, Suite 703
                                Honolulu, HI 96813
14
     For the City              D. Scott Dodd
15   Defendants:               Office of Corporation
                                Counsel-Honolulu
16                              530 S King St Ste 110
                                Honolulu, HI 96813
17
     Amicus Brady Center to    Mark M. Murakami
18   Prevent Gun Violence:     Damon Key Leong Kupchak Hastert
                                1003 Bishop Street, Suite 1600
19                              Honolulu, HI 96813

20                              Phillip A. Rubin
                                Covington & Burling LLP
21                              1201 Pennsylvania Ave N W
                                Washington, DC 20004-2401
22
     Amicus Hawaii Defense     Alan A. Beck
23   Foundation:               4780 Governor Drive
                                San Diego, CA 92122
24

25
```

```
1     APPEARANCES CONTINUED:

2     Official Court
      Reporter:                    Cynthia Ott, RMR, CRR
3                                  United States District Court
                                   P.O. Box 50131
4                                  Honolulu, Hawaii  96850

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

1    TUESDAY, SEPTEMBER 17, 2013                    10:09 A.M.

2            THE CLERK:  Calling the case of Civil 11-00589ACK-BMK,

3    Kirk C. Fisher versus Louis Kealoha, et al.  This hearing has

4    been called for Plaintiff's Motion for Permanent Injunction and

5    Plaintiff's Motion for Summary Judgment.  Counsel, appearances

6    for the record.

7            MS. ICKES:  Good morning, Your Honor.  Te-Hina Ickes

8    on behalf of plaintiff, Kirk Fisher.

9            THE COURT:  Good morning.

10           MR. DODD:  Good morning, Your Honor.  Scott Dodd on

11   behalf of the city defendants.

12           THE COURT:  Good morning.

13           MR. RUBIN:  Good morning, Your Honor.  Phil Rubin and

14   Mark Murakami on behalf of the Brady Center to Prevent Gun

15   Violence.

16           THE COURT:  Good morning.

17           MR. BECK:  Alan Beck on behalf of the Hawaii Defense

18   Foundation, Your Honor.

19           THE COURT:  It's difficult to hear you, Mr. Beck.

20           MR. BECK:  I'm sorry, sir.  Alan Beck on behalf of the

21   Hawaii Defense Foundation, Your Honor.  Can you hear me better?

22           THE COURT:  Good morning.  Please be seated.

23           Ms. Ickes, this is your motion, so please come up to

24   the podium.

25           MS. ICKES:  Yes, Judge.  Thank you.  If the Court

```
 1    doesn't mind, I'll take up the motion for summary judgment
 2    first.  Does the Court prefer which order?
 3              THE COURT:  That's fine.
 4              MS. ICKES:  Okay.  As the Court is aware, plaintiff
 5    has two causes of action in this civil matter and both are for
 6    Section 1983 violations, one having to do with the Second
 7    Amendment right, Mr. Fisher's Second Amendment right to keep
 8    and bear arms.
 9              Second cause of action has to do with his Fourteenth
10    Amendment right to due process.
11              THE COURT:  Due process?
12              MS. ICKES:  Section 1983 for violations of due
13    process, that's the second count of plaintiff's first amended
14    complaint, and the basis of that count is that Mr. Fisher was
15    denied procedural due process.  He was denied a liberty and
16    property interest, and he was given no meaningful opportunity
17    to be heard regarding the decision to rescind and deny his
18    application for a permit to acquire under Hawaii law.
19              With respect to the first count, the Second Amendment
20    right, I will start there.  Count one is the 1983 violation of
21    the Second Amendment right.  As the Court's well aware for
22    1983, allegations of -- violations of 1983, the plaintiff must
23    prove that, one, under color of state law, there's a
24    deprivation of plaintiff's constitutional rights.  Plaintiff
25    would submit that it's undisputed that the defendants here were
```

1    acting under a color of state law.  I believe as stated in our

2    motion, our moving papers, that the city admits that Defendant

3    Kealoha was acting under color of state law.  So I'll just move

4    on to the second prong.

5           THE COURT:  Well, before you do that --

6           MS. ICKES:  Yes, Judge.

7           THE COURT:  Just to clear up the record, you have

8    another defendant, Paul Putzulu.  He was the acting chief at

9    some point.  He's never been served, has he?

10          MS. ICKES:  Yes, Judge.  At this point, although there

11   hasn't been a voluntary dismissal of Mr. Putzulu, he's no

12   longer, he's been retired from HPD and as the law stands, we

13   have made claims against Chief Kealoha and Chief -- or then

14   acting Chief Putzulu in their official capacities.  The only

15   causes of action we have here are 1983.

16          And individual liability under 1983 is not allowed

17   against the chiefs.  They -- the 1983 is only allowed for

18   injunctive relief.  At this point, Kealoha is the current

19   chief.  Putzulu is no longer there, and he hasn't been there

20   for years.  So at this point, I don't think -- well,

21   plaintiff's position is that there's no -- Putzulu has no

22   liability at this point because even if we did sue him, we are

23   not allowed to sue him in his individual capacity under 1983.

24   And those are the only claims that plaintiff has.  And that's

25   my understanding of the -- my analysis of 1983 case law.

1          So although there's no -- Putzulu is still out there,

2     we have not been able to serve him.  At this point we don't

3     think there's any liability on his part anyway.

4          THE COURT:  So in answer to my question, you are

5     dismissing him voluntarily?

6          MS. ICKES:  I think that would be the next step for

7     plaintiff, and we just haven't -- we just haven't gotten there.

8          THE COURT:  Well, why not?

9          MS. ICKES:  Just an oversight on our part, Judge.

10    We've been focusing on, you know, these motions, and it kind of

11    got pushed to the back burner, you know, just one of those

12    things that I never got around to doing --

13         THE COURT:  There's no better time than right now for

14    you to do it.

15         MS. ICKES:  Yes, Judge.  If you want me to put it on

16    the record, plaintiff has been contemplating the voluntary

17    dismissal of Mr. Putzulu.  We haven't been able to locate him,

18    and it's plaintiff's position at this point in time that

19    there's no liability under 1983 because the Court couldn't

20    order any injunctive -- him to act because he has no authority

21    at HPD any longer.

22         And the only thing we could get against him is

23    injunctive relief under the causes of action we have under

24    1983.

25         THE COURT:  Aside from that discourse, you now dismiss

1    him voluntarily?

2              MS. ICKES:  Yes, Judge.

3              THE COURT:  Very well.

4              MS. ICKES:  With respect to the second prong

5    of -- under 1983 liability, the plaintiff has to show that he's

6    been deprived of a constitutional right.  So when we're talking

7    about the Second Amendment, the Heller case, which we have

8    discussed in our motion for preliminary injunction which was

9    filed last year, March of 2012, Second Amendment is a

10   fundamental right.

11             Plaintiff submits that Mr. Fisher is statutorily

12   qualified under both state and federal law.  I don't know if

13   the Court at this point wants me to rehash the facts.

14             THE COURT:  No, I do not.

15             MS. ICKES:  Okay.  But at issue are the Hawaii Statute

16   134-7 and the Federal Statute 18 USC 922.  And those statutes

17   both discuss the fact that you look at -- the Court looks at

18   what someone has been convicted of, not what someone's arrested

19   of, not the facts underlying what someone was arrested and

20   charged for by the police, but what one was convicted of.

21             Now, at the last hearing, when we were here last month

22   and the Court asked us to visit this Descamps case, the

23   Descamps court resolved, as the Court I'm sure is well aware,

24   resolved the Ninth Circuit split regarding categorical and

25   modified categorical approach.  Now, in our supplemental brief

1    we argue that the categorical approach pursuant to Descamps

2    should be applied here, but plaintiff would submit that under

3    either approach plaintiff is statutorily qualified.

4         THE COURT:  You mean under the -- what they now call

5    fact-specific or circumstances specific or something like that?

6         MS. ICKES:  Are you referring to the Descamps case or

7    the --

8         THE COURT:  Well, you say under both approaches.  I

9    thought you were meaning modified categorical on the one hand

10   and circumstances specific on the other hand.

11        MS. ICKES:  Well, Judge, as I understand it -- well,

12   actually what I meant was either under the categorical approach

13   that Descamps says should be applied when there is an

14   indivisible statute versus the modified categorical approach

15   with which Descamps struck down for crimes that have a single

16   and indivisible set of elements.

17        I'm sorry, I just misspoke.  Descamps says that the

18   modified categorical approach should be used only to determine

19   which alternative element in a divisible statute forms the

20   basis of conviction.  Descamps struck down the modified

21   categorical approach for crimes with a single and indivisible

22   set of elements.

23        We've argued in our supplemental brief that the

24   modified categorical approach should not be applied because the

25   harassment statute of conviction, or the harassment

```
1    statute -- the section that Mr. Fisher was charged with and
2    ultimately convicted of or pled guilty to, we've argued that
3    it's an indivisible statute.
4              THE COURT:  Indivisible?
5              MS. ICKES:  That's what we've argued.  That's what
6    we've put forth in our papers.  Because, you know, the -- there
7    are a lot of alternative sections comprised within 711.1106
8    subsection (a), (b), (c).  Mr. Fisher was charged under
9    subsection (a).  Now, what we've argued is that it's overbroad,
10   not indivisible -- or not divisible, just like the statute in
11   Descamps.
12             Now the statute in Descamps is a California statute.
13   It has to do with burglary.  So it's not very -- it's not the
14   same obviously as the Hawaii harassment statute, but it's a
15   lengthy statute.  And it does have a lot of "ors."  And I won't
16   read the entire statute but what it has to do is it was a
17   burglary statute that the Court in Descamps ruled was an
18   indivisible statute, therefore -- it had an indivisible set of
19   elements, therefore, the modified categorical approach did not
20   apply.  The statute was simply overbroad.  We're making that
21   same argument that the harassment section under which Mr.
22   Fisher was ultimately convicted is overbroad rather than
23   divisible.
24             Now, that being said, if you follow Descamps and it's
25   overbroad rather than divisible, the modified categorical
```

1    approach would not apply.  In applying the categorical

2    approach, you look at only the statute.  And what the defendant

3    did, what he was arrested for, is irrelevant to whether a

4    statute, that statute has a particular element.  And it limits

5    the Court's inquiry to the elements of the statute.

6         Now, the Court would not look at, you know, the facts

7    underlying the arrest or even the facts underlying the

8    conviction, just what the Defendant was convicted, the statute

9    of conviction.  Now, even if the Court were to decide or even

10   if the Court believes that the harassment statute under which

11   Mr. Fisher was convicted is the opposite, is a divisible

12   statute, that is it -- and it applies the modified categorical

13   approach, plaintiff's position is that even looking at the

14   conviction under the modified categorical approach that Mr.

15   Fisher is still statutorily qualified to firearms ownership and

16   the permit should issue.

17        The reason being is, as the Court I know is well

18   aware, the modified categorical approach allows the Court to

19   look beyond the statute of conviction, beyond what the

20   categorical approach allows, and consult reliable judicial

21   records.  And that's the hitch there, reliable judicial

22   records.  And there's lots of Ninth Circuit cases, including

23   Descamps, that talk about what the Court's analysis is limited

24   to, those reliable judicial records.  And Shepard, the Shepard

25   case which is briefed in our motions, our moving papers, and in

1   our supplemental brief discusses what types of reliable

2   judicial records are available for the Court's analysis, the

3   statute, the charging document, the plea agreement, a

4   transcript, findings by the trial judge which the defendant

5   assented to.  And, in fact, there is a case that I cite in my

6   brief that the police reports, it's inappropriate to look at

7   police reports.  And if the Court will just give me a moment, I

8   believe I cite to it in my reply.

9        Well, I will find it, Judge, and give the Court that

10  citation.  But there is case law out there that says under the

11  modified categorical approach looking at police reports is even

12  inappropriate.  Now, looking at the limited class of documents

13  available in this case, the city defendants have submitted a

14  whole number of police reports and declarations by police

15  officers.  Now, those have to do with the facts underlying Mr.

16  Fisher's arrest.  And, in fact, he was arrested and charged

17  with abuse of a family or household member.

18       Now, what he was ultimately charged with in criminal

19  court was harassment, 711.1106(a)(1), and that's what he was

20  convicted of.  The reliable judicial records that are out there

21  don't discuss what he admitted to at the plea.  He pleaded

22  guilty.  It doesn't discuss the facts underlying the

23  conviction.

24       And, again, even under the modified categorical

25  approach, the facts underlying the defendant's arrest is

1    irrelevant because the statutes at issue, Hawaii Revised

2    Statute 134 and the Federal Statute 18 USC 922 talk about

3    prohibiting firearms ownership to convicted -- to persons

4    convicted of crimes of violence.  Moving on -- and that's just

5    not the case here.  The reliable judicial records, if the Court

6    applies the modified categorical approach, looking at the

7    reliable judicial records here, there's no way to say that the

8    facts underlying Mr. Fisher's conviction make it a crime of

9    violence.  Therefore, plaintiff submits he's statutorily

10    qualified under both state and federal law.

11         The Court also asked the parties to discuss Mr.

12    Fisher's deposition testimony regarding his testimony that he

13    pushed his wife and also the substance abuse issue.  Now, just

14    kind of going back, taking a step back to categorical and

15    modified categorical approach, under the categorical approach

16    if the Court were to apply that here, the deposition testimony

17    would be out as the Court is -- analysis is limited to only the

18    statute of conviction, what the statute says.

19         Now, if you look at the modified categorical approach,

20    I just mentioned to the Court that the Court's analysis would

21    be limited to, pursuant to Descamps and Shepard and some other

22    Ninth Circuit cases that are briefed in our moving papers and

23    our reply and our supplemental briefing, that a deposition

24    transcript taken 15-plus years later would not qualify as a

25    reliable judicial document.  And contrary to defense position

1   that it somehow bolsters or, you know, makes the police reports

2   reliable is just -- it's simply not supported by any case law

3   or it's not supported in this record.

4          Mr. Fisher -- despite what's stated in the defendant's

5   briefing, Mr. Fisher does not admit that he was convicted

6   of -- the reason he was convicted was because of these things

7   he testifies to in his deposition.  Now, I've set forth, I'm

8   not going to read -- the Court has before it the transcript,

9   and I've pointed out on pages six through seven of our

10  supplemental brief filed August 22nd the relevant portion of

11  Mr. Fisher's testimony, and even those relevant portions about

12  pushing his wife back have nothing to do with what he pled

13  guilty to, have nothing to do with the harassment conviction.

14  And it's just -- the fact that defense would state in their

15  papers that this is an admission regarding his conviction is

16  just -- it's simply incorrect.  It's not supported by the

17  record.

18         Now, with respect to any substance abuse issues that

19  Mr. Fisher testified about, he testified that he's never been

20  formally diagnosed as being an alcoholic.  Yes, he was

21  sentenced as a condition of probation to get an assessment

22  done, and following that, he took an educational course and

23  completed that 12-hour educational course.  Now, the Statute

24  134, Chapter 134 HRS discusses the fact that one who has been

25  under treatment or counseling for addiction to, abuse of, or

1    dependence upon any drug or intoxicating liquor can be

2    prohibited.  Now, in this case, the record does not support the

3    fact that Mr. Fisher was ever under treatment or counseling for

4    addiction to alcohol.

5         He took a 12-hour class, an education class, and

6    plaintiff's position --

7         THE COURT:  Well, it was a condition of probation was

8    that he shall participate in counseling and/or treatment until

9    clinically discharged or as directed by the probation officer.

10   The defendant is ordered to attend domestic substance abuse

11   assessment and shall participate in counseling and/or

12   treatment.  That's what the condition of probation was.

13        MS. ICKES:  I believe, Judge -- I believe what it

14   states is that if --

15        THE COURT:  I just read from it.  That's what it

16   states.

17        MS. ICKES:  That he would be ordered to participate in

18   a counseling or treatment if deemed necessary.

19        THE COURT:  No, it doesn't say that.  I just read from

20   it.  Defendant is ordered to attend domestic substance abuse

21   assessment and shall participate in counseling and/or treatment

22   until clinically discharged or as directed by the probation

23   officer.

24        MS. ICKES:  Or as directed by the probation officer.

25   That's the --

1          THE COURT:  Shall participate until, so.

2          MS. ICKES:  Mr. Fisher did undergo the assessment but

3    was never ordered by his probation officer.  That's how that

4    can be --

5          THE COURT:  As you said earlier, he participated in a

6    12-hour drug and alcoholic course.

7          MS. ICKES:  An education course.

8          THE COURT:  Isn't that counseling?

9          MS. ICKES:  Well, Judge, in the -- I guess it could be

10   interpreted that way.  Mr. Fisher was issued a certificate of

11   completion.  He attended a 12-hour education class on --

12         THE COURT:  Drug and alcohol education.  And he

13   admitted in his deposition that he had consumed a six-pack of

14   beer that day.

15         MS. ICKES:  There is no support in the deposition

16   testimony.  There's no testimony by Mr. Fisher or even in

17   the --

18         THE COURT:  Well, you say I can't consider the

19   deposition anyway.  Well, I can under this.

20         MS. ICKES:  Yes, Judge.  Thank you.  The Statute

21   134-7, Hawaii revised statute, says a person who has been under

22   treatment and counseling for addiction to, and there's

23   essentially abuse of drugs or intoxicating liquors can be

24   prohibited from owning or possessing a firearm.

25         Now, in --

1          THE COURT:  And then it says unless the person has

2    been medically documented to be no longer adversely affected.

3          MS. ICKES:  Yes, Judge.  I'm reading from my brief and

4    I paraphrased it and, you're right, the statute does continue

5    with that "unless."

6          THE COURT:  And do we have anything in the record that

7    shows that he's been medically documented to be no longer

8    adversely affected?

9          MS. ICKES:  Well, Judge, plaintiff would submit that

10   he was never -- there's nothing in the record to support that

11   he had ever been adversely affected.  Now, the document --

12         THE COURT:  Meaning, going back to the order,

13   condition of probation.

14         MS. ICKES:  Understood, Judge.

15         THE COURT:  That's what he was ordered to do.

16         MS. ICKES:  That's a preprinted order where the Court

17   goes through and checks things off.  And the Court can see

18   there that it's kind of a lengthy -- well, I think it's a one

19   or two-page form.  And the Court has a lot of options on what

20   they can sentence Mr. Fisher to, standard conviction or

21   standard terms of probation.  Now, I believe the next condition

22   that's not ordered is that Mr. Fisher or defendant not possess

23   or consume alcoholic beverages.  The Court also does not

24   order --

25         THE COURT:  The next condition is defendant is ordered

1    to appear on a particular date.

2              MS. ICKES:  I'm sorry, Judge.  I do not have a copy of

3    that.

4              THE COURT:  Well, I'm reading from it.

5              MS. ICKES:  What I'm referring to, Judge, is not what

6    Mr. Fisher was actually sentenced to.  I understand the Court's

7    reading from the order of probation.

8              THE COURT:  Well, that's what you were referring to.

9    You said the next condition on this form that has a lot of

10   options --

11             MS. ICKES:  Yes.

12             THE COURT:  -- was something about drugs or something,

13   but it's not.  Number 10, number 10 is the defendant is ordered

14   to appear on a certain date.

15             MS. ICKES:  Okay.  Well, then, obviously, it's not the

16   very next option, but there's a couple of other options on that

17   form.

18             THE COURT:  There are a lot of other options.

19             MS. ICKES:  And one of those options is that a

20   defendant not possess or consume alcoholic beverages.  Mr.

21   Fisher was not ordered to do that.  Another option is that the

22   Court could have ordered Mr. Fisher to submit to periodic drug

23   testing.  It could have ordered him to do that.  It did not.

24   Now, I believe if the Court -- plaintiff would submit that if

25   the Court at that period -- at that time believed Mr. Fisher to

1   have this drug or alcohol addiction or problem, the Court very

2   well could have but did not order that condition of probation.

3        What they did was order an assessment, and he took a

4   class.  He took a class.  The Court did not order him to Hina

5   Mauka or Salvation Army for residential or outpatient

6   treatment.  They did not order Alcoholics Anonymous.  Mr.

7   Fisher was ultimately given a certificate of completion and

8   that was that.  So plaintiff submits that although he, he

9   meaning Mr. Fisher was ordered to undergo an assessment and he

10  took a class, that falls short of --

11       THE COURT:  He was ordered to go, to participate in

12  counseling.

13       MS. ICKES:  Judge, plaintiff would argue that the

14  Court's reading and, I guess, the plaintiff's interpretation of

15  that --

16       THE COURT:  I'm just reading from the order.

17       MS. ICKES:  Well, Judge there's "ors" put in there.

18       THE COURT:  Pardon me?

19       MS. ICKES:  There's "ors" put in there, the word "or,"

20  O-R.

21       THE COURT:  And/or treatment.

22       MS. ICKES:  Well, or, I'm sorry, Judge, we --

23       THE COURT:  Counseling and/or treatment, and those are

24  the two magic words referred to in 134-7(c).

25       MS. ICKES:  Understood, Judge.  Now, I guess, I

1    don't -- having done many criminal cases, I know that with when

2    these types of things are ordered for probation, the probation

3    officer has a lot of discretion on what happens after that.

4    When there's -- oftentimes, when there's an assessment ordered,

5    pursuant to an assessment, they could say take a 12-hour

6    course, or you've got to go residential treatment.  Now -- or

7    nothing at all.  So as directed by the probation officer, I

8    think, is key.  And that being a part of the record and us not

9    knowing because of judicial retention -- judicial retention

10   statutes, it's silent as to what the probation officer actually

11   recommended.

12          We do know that he took a 12-hour course, but

13   plaintiff's position is that it falls -- that falls very short

14   of the standard for denying a permit under 134-7(c)(1) that has

15   to do with addiction to drugs or alcohol.  And then we'd also

16   like to point out, as the Court mentioned earlier, there's that

17   exception, or that "unless" part, unless he's clinically

18   discharged.  We'd just like to point out again that he was

19   given a certificate of completion, however, there is no medical

20   documentation.

21          THE COURT:  Pardon me?

22          MS. ICKES:  There is no medical documentation --

23          THE COURT:  Okay.

24          MS. ICKES:  -- of addiction or clinical discharge.

25          THE COURT:  Okay.

1          MS. ICKES:  With respect to -- and I believe those are

2     the three issues that the Court had asked the parties to visit

3     and submit supplemental briefing on had to do with Descamps,

4     the deposition testimony, and Mr. Fisher's 12-hour educational

5     course.

6          Moving on to count two with respect to plaintiff's

7     motion for summary judgment, we have made -- plaintiff has made

8     allegations of 1983 -- claims for 1983 for violations of Mr.

9     Fisher's procedural right or right to due process.  We

10    specifically allege that he was denied procedural due process.

11    He was denied a liberty and property interest, and he was given

12    no meaningful opportunity to be heard when HPD rescinded his

13    prior permit and when they denied the application for his new

14    permit.

15         In support of their declaration -- or in support of

16    their opposition, the city defendants submit, again, the police

17    reports, but specifically in this regard when we say Mr. Fisher

18    was given no meaningful opportunity to -- for his, for the

19    denial to be reviewed, the defense submits this declaration of

20    some HPD officers.  Now --

21         THE COURT:  Well, first it was denied by Chief

22    Putzulu.

23         MS. ICKES:  That's correct.

24         THE COURT:  And then, secondly, it was denied by Chief

25    Kealoha.

1          MS. ICKES:  It was reviewed and again -- well, the

2     decision to deny it was upheld by Chief Kealoha.

3          THE COURT:  So there was some opportunity for

4     reconsideration?

5          MS. ICKES:  Well, what had happened, Judge, and, you

6     know, it's set forth in detail in the complaint, the first

7     amended complaint, but just a quick summary was that he,

8     meaning Mr. Fisher, applied.  He was denied.  He sought

9     counsel.  Mr. Wilkerson wrote a letter, and Kealoha wrote back

10    saying denied again, we're upholding the denial.

11         So although, you know, after Mr. Fisher -- well,

12    actually I'm sorry, Mr. Fisher called HPD and then sought

13    counsel.  And that's, again, set forth in the statement of

14    facts in our first amended complaint, in plaintiff's first

15    amended complaint.  Now, I think -- well, the city defendants

16    rely on the fact that -- and say so in their opposition, that

17    because Mr. Wilkerson wrote a letter and it was responded to,

18    that satisfies due process.  Now --

19         THE COURT:  What are you seeking to achieve by your

20    claim of lack of due process?

21         MS. ICKES:  Well, just, it was, I think we

22    contemplated in the beginning that he be afforded due process

23    so that way he can get back his -- the guns that HPD had

24    already taken away and to get the new application approved.

25         Now, I believe we accomplished that at the -- after

1   this court ordered the -- or granted our motion for preliminary

2   injunction.  Now at this point --

3         THE COURT:  That wasn't on the basis of your due

4   process claim.

5         MS. ICKES:  Well, I believe that the -- what we had

6   hoped to accomplish because Mr. Fisher was denied due process

7   and HPD didn't adequately review his application then, that's

8   why we brought the lawsuit.  That's why we made these claims.

9   He was not afforded due process.  He needs due process.

10        THE COURT:  If I were to find that he has a right -- a

11  Second Amendment right to have his guns, that's it.  You don't

12  need a due process claim on top of that, do you?

13        MS. ICKES:  Very well, Judge.  I completely understand

14  where the Court's coming from.  We -- in the abundance of

15  caution, I guess, and to cover all the constitutional grounds,

16  we included in our complaint, for a time period Mr. Fisher was

17  deprived of due process, and we believe that he may be entitled

18  to damages.

19        THE COURT:  Well, I've already ruled that Chief

20  Kealoha is entitled to qualified immunity.

21        MS. ICKES:  Yes, Judge.  But he is still liable for,

22  under the injunctive relief.  So I guess, you know, for

23  purposes of this motion, the motion for summary judgment, that

24  would be correct.  At the previous motion that the city brought

25  for either to dismiss, the Court in its order did rule that

1   Kealoha was entitled to qualified immunity as an individual,

2   but he was still liable for injunctive relief.

3          THE COURT:  Right.

4          MS. ICKES:  And I guess that would take us into the

5   next motion for permanent injunction, which I don't have a lot

6   to say on -- which I don't have a lot to say about, unless the

7   Court has questions.  We've --

8          THE COURT:  But I want to go back to my question about

9   due process.

10          MS. ICKES:  Yes, Judge.

11          THE COURT:  What are you trying to achieve now by your

12   claim of due process?

13          MS. ICKES:  I guess, Judge, it would just be because

14   Mr. Fisher was deprived of due process, a constitutional right,

15   for a period of time that he may be entitled to monetary

16   damages.

17          THE COURT:  But, again, I ruled against you in that

18   respect on qualified immunity.

19          MS. ICKES:  We still have other defendants there,

20   Judge.  The city.

21          THE COURT:  Oh, you're saying the city is going to be

22   responsible for someone who's entitled to qualified immunity?

23          MS. ICKES:  Well, the city -- the, obviously, I

24   haven't briefed that issue, Judge.  And I know that

25   municipalities, the city, can be liable, is liable under 1983

1    for -- if I can just have a moment, Judge.

2            MR. BECK:  May I interject, Judge, here?

3            THE COURT:  Did you say something, Mr. Beck?

4            MR. BECK:  Yes.  Can I interject?

5            THE COURT:  No, no.  You cannot at this point.

6            MR. BECK:  Okay.  Sorry, sir.

7            MS. ICKES:  That counties, i.e., the City and County

8    of Honolulu is a person under 1983 beyond that -- and is

9    liable -- can be liable under 1983 for the constitutional

10   violations predicated upon Mr. Fisher.

11           So, yes, I guess the short answer without -- Judge, I

12   haven't briefed the issue, so I guess I can't answer the

13   Court's question as fully as I'm sure the Court would like, but

14   we do have causes of action remaining against the city for,

15   under 1983.  And we believe that Mr. Kealoha or Chief Kealoha

16   is liable for injunctive relief, and I think the Court's ruled

17   in our favor in the past on that with regards to that.

18           Although the Court did say he was entitled to

19   qualified immunity for individual liability, in his official

20   capacity he was still liable for injunctive relief.

21           THE COURT:  That's correct.

22           MS. ICKES:  So, yes, Judge, the remaining defendant

23   would be the City and County of Honolulu.

24           THE COURT:  And the only person that --

25           MS. ICKES:  That's the only --

1          THE COURT:  The only person who was acting on behalf

2     of the city was Chief Kealoha.

3          MS. ICKES:  Relevant to this action, yeah, he has the

4     final say-so.  He is the official with, acting under color of

5     state law with the final decision-making authority.  And that's

6     set forth -- I believe that's undisputed because that's set

7     forth in the statute that Chief Kealoha or the chiefs the

8     respective counties make the decision whether or not to issue

9     or deny.

10          THE COURT:  Okay.  I've given you 45 minutes so far.

11          MS. ICKES:  A long time, Judge.  Unless you have -- I

12     will sit down.  There's obviously still the motion for

13     permanent injunction.  The standard's the same for preliminary

14     injunction but for the success on the merits.

15          The Court has issued a previous order granting a

16     preliminary injunction.  We would just ask that that

17     preliminary injunction be entered as a permanent injunction for

18     the same reasons set forth in our prior briefing.  If the Court

19     has any additional questions, I'd be happy to try to answer

20     them with respect to the motion for permanent injunction.

21          THE COURT:  No.  Thank you.

22          MS. ICKES:  Thank you, Judge.

23          THE COURT:  Okay, Mr. Beck, we will hear from you

24     briefly.

25          MR. BECK:  Yes, Your Honor.  Briefly, the City and

1    County of Honolulu is through Chief Kealoha in his official

2    capacity.  His official capacity ultimately is simply the City

3    and County of Honolulu is liable under 42 USC 1983 because

4    under HRS 91, the State of Hawaii has given broad discretion

5    for the various municipalities of the State of Hawaii to

6    promulgate standards to make the various provisions of HRS --

7             THE COURT:  You're kind of echoing through the phone,

8    so it's hard to understand.

9             MR. BECK:  I'm sorry, sir.

10            THE COURT:  That's one reason -- that's one reason why

11   I thoroughly discourage people from trying to participate on

12   the phone.

13            MR. BECK:  I'm sorry.  I'm sort of saving up money,

14   sir.  So, but HRS 91 gives the City and County of Honolulu via

15   its official, Chief Kealoha, the ability to promulgate

16   standards and regulations which allow the various provisions of

17   the HRS to comply with the United States Constitution.

18   Accordingly, they're liable by Monell due to the fact they have

19   failed to comply with HRS 91's broad mandate.

20            THE COURT:  HRS what?

21            MR. BECK:  91.

22            THE COURT:  91?

23            MR. BECK:  Yes, sir.  HRS 91 is a part of Hawaii

24   revised statutes that gives the various islands, i.e.,

25   counties, the ability to promulgate statutes and regulations

1    pretty much under basically anything, quite frankly.  I mean it

2    gives them extremely broad discretion to allow them to make

3    standards.

4          And accordingly, under HRS 91, Chief Kealoha and/or

5    the City and County of Honolulu could have made a -- made a,

6    you know, standards to have them -- to have HRS 134-7 comply

7    with the Second Amendment as promulgated by Heller and then

8    further, McDonald, which incorporates an individual right to

9    keep and bear arms.

10         Now, the true question before this court is what level

11   of scrutiny is to be applied.  Unfortunately the analysis of

12   the amicus Brady campaign is, well, an initial matter is

13   somewhat, I'll admit that I agree with them in the fact that

14   HRS 134-7 is extremely overbroad and allows the State of Hawaii

15   to look to a wide variety of evidentiary material that really

16   isn't applicable, I mean, well, isn't reliable, I should say,

17   sir.

18         THE COURT:  Are you trying to say that this is a city

19   policy?  Is that your argument?

20         MR. BECK:  My argument is that the city could

21   promulgate standards to make HRS 134-7 constitutional, and they

22   have failed to do so.

23         And amicus Brady Center or Brady's campaign alongside

24   the city has made the argument that an American citizen in

25   a -- simply because this is a civil matter bears the burden of

1    giving important -- well, giving a reason why he can exercise

2    his constitutional rights.  Now, that fails any of, basic

3    analysis of our country's history and the United States

4    Constitution.

5          Literally they're making a statement that Mr. Fisher

6    needs to provide them with a compelling interest as to why he

7    should be able to exercise his Sixth Amendment rights.  I mean

8    this is analogous to him having to show a compelling reason why

9    he should be able to protest or exercise his -- any of his

10   other fundamental rights.

11         THE COURT:  Did you have anything else you wanted to

12   say?

13         MR. BECK:  I could go on for a while, but I mean

14   unless -- I'll just leave it at that unless you have any

15   questions, Your Honor.

16         THE COURT:  Okay.  Thank you very much.  Mr. Dodd.

17         MR. DODD:  Yes, Your Honor.  Thank you.

18         Your Honor, I will try to be brief.  I think what the

19   first argument that we're putting forth is that --

20         THE COURT:  You better speak into the microphone, so

21   everyone can hear you.

22         MR. DODD:  Is that this court is, should be analyzing

23   HRS 134-7 under state law principles and that the categorical

24   approach is not applicable to this analysis.

25         THE COURT:  State law principles, in your mind, don't

```
 1    allow categorical approach, is that it?

 2              MR. DODD:  I'm not saying they wouldn't allow it, Your

 3    Honor, but it has not been used.

 4              THE COURT:  You've cited the Nobriga case.

 5              MR. DODD:  I mean under Hawaii state law cases.

 6              THE COURT:  Well, the state statutes are involved in

 7    Nobriga.

 8              MR. DODD:  Your Honor, yes, but what Nobriga was

 9    looking at was different from what we're looking at in this

10    instance.  When -- it's the police department, not a reviewing

11    court.  The police department is determining under HRS 134-7

12    whether someone is, statute, qualified or not qualified to own,

13    possess, or control firearms.

14              The statute itself says that a person is disqualified

15    if he has been convicted, he or she has been convicted of a

16    crime of violence.  And a crime of violence is defined under

17    Section 134-1 as any offense that involves injury or threat of

18    injury to another.

19              THE COURT:  Now, is there anything in the legislative

20    history of 134, HRS 134, that indicates Hawaii legislature

21    intended circumstance specific approach instead of a

22    categorical approach?

23              MR. DODD:  Your Honor, I think I need to leave a more

24    intelligent discussion on that issue to the Brady Center, what

25    I would say is that --
```

1          THE COURT:  He's more intelligent than you?

2          MR. DODD:  A more intelligent discussion, Your Honor.

3    But they're probably much better versed in this area of law

4    than me.  But what -- Your Honor, what I would like to get to

5    is that I don't think that the legislative history instructs

6    that the police department should use a categorical approach or

7    look to the terms of a plea on a conviction to determine

8    whether someone is qualified or not qualified to bear, own, or

9    control firearms.

10         Your Honor, and the reason that we believe that the

11   Descamps or Descamps, or however you say that case, and

12   the -- is not applicable to the instant situation is that we

13   have, you know, the reasons that were enunciated in Descamps

14   for a categorical approach.  Remember, that was a sentencing

15   enhancement.  That was whether the ACCA permitted a sentencing

16   enhancement under that situation, whether a California burglary

17   statute had somehow gotten away or had removed the breaking and

18   entering element of a burglary conviction.

19         And the Court found that because that statute was not

20   divisible that a modified approach was not appropriate and that

21   the categorical approach showed that this statute, this

22   California burglary statute could not be used for a sentencing

23   enhancement under the ACCA.  But because we're not dealing with

24   sentencing enhancement in this case, we're dealing with whether

25   the plaintiff is qualified or not qualified to possess a

1   firearm, we believe that that's one reason why it doesn't

2   apply.  The second issue is that the Sixth Amendment is not

3   relevant to this action.

4         THE COURT:  Well, the third reason that the Descamps

5   court utilizes and proclaims is that it would be daunting,

6   difficulties and inequities at first encourage us to adopt the

7   categorical approach under Taylor.  The sentencing courts

8   following Aguila-Montes would have to expend resources

9   examining (often aged) documents for evidence that a defendant

10  admitted in a plea colloquy or a prosecutor showed at trial

11  facts that, although unnecessary to the crime of conviction,

12  satisfy an element of the relevant generic offense, and the

13  meaning of those documents will often be uncertain and the

14  statements of facts in them may be downright wrong.

15        A defendant, after all, often has little incentive to

16  contest facts that are not elements of the charged offense and

17  may have good reason not to.  At trial, extraneous facts and

18  arguments may confuse the jury, indeed the Court may prohibit

19  them for that reason.  And during plea hearings, the defendant

20  may not wish to irk the prosecutor or court by squabbling about

21  superfluous factual allegations.  In this case, for example,

22  Descamps may have let the prosecutor's statements go by because

23  it was irrelevant to the proceedings.  He likely was not

24  thinking about the possibility that his silence could come back

25  to haunt him in an ACCA sentencing 30 years in the future, et

1   cetera.

2        Now, aren't those same considerations applicable as to

3   the approach that you're seeking?

4        MR. DODD:  Well, Your Honor, I could understand the

5   length of time, especially, but, you know, what -- another

6   central issue that I believe Descamps was concerned with was

7   having courts invading the province of the jury, having a court

8   to go look at a 30-year-old conviction to determine whether

9   that can be used in the present.

10        THE COURT:  We're not involved with a jury in this

11   case, so that's --

12        MR. DODD:  We're not.  And we're not involved

13   with -- well, HPD's decision to deny him a firearms application

14   had nothing to do with the Court.  It was HPD's duty to

15   determine whether he is or is not qualified to own, possess, or

16   control firearms.

17        THE COURT:  Well, what about this certificate --

18        MR. DODD:  Certificate.

19        THE COURT:  -- of completion that we discussed with

20   Ms. Ickes?

21        MR. DODD:  Yes, Your Honor.  He obtained --

22        THE COURT:  Doesn't that satisfy the medically

23   documented requirement under 134-7(c)?

24        MR. DODD:  I'm going to say it does not, Your Honor.

25   One thing that was not discussed when plaintiff's counsel was

1    talking, it's not simply -- 134-7(c) is not only limited to

2    treatment or counseling for addiction, it also talks about

3    dependence.  So it's even broader than, the person does not

4    have to be found to be addicted to a substance.  And then it

5    says, it shall, you know, "shall not," "no person who is or has

6    been under treatment for addiction, abuse of," so it has abuse

7    of, "or dependence upon any dangerous, harmful or detrimental

8    drug," we don't have evidence of that, "intoxicating compound

9    or intoxicating liquor," then it goes on below "shall own,

10   possess or control any firearm or ammunition unless that person

11   has been medically documented."

12          We do not believe that the certificate, because he has

13   a certificate of compliance of completing a course, a substance

14   abuse course, has been medically documented to be no longer

15   adversely affected.

16          THE COURT:  Well, you know, in that certificate, it's

17   signed by two people, and after each person's name there's a,

18   some sort of a title, NCAC-11, what does that mean?

19          MR. DODD:  Your Honor, I don't know what that means,

20   but I don't believe it -- even if it was a doctor's signature

21   on that, it's not -- it's saying he's completed the course, not

22   that he has been medically documented to be no longer adversely

23   affected.  I mean you can complete that course --

24          THE COURT:  It says he's successfully completed the

25   course.

1      MR. DODD:  And it does not say that he's no longer

2  medically -- or he's no longer, he's not been medically

3  documented to be no longer adversely affected.

4      THE COURT:  So what is the practice of the state as

5  far as -- or the city as far as what type of documentation do

6  they require in this kind of a situation?

7      MR. DODD:  Your Honor, I don't know exactly what would

8  be required.  I think a declaration from a doctor stating

9  language similar to what we see in HRS 134-7(c) would be

10  sufficient.

11      THE COURT:  A doctor's certificate?

12      MR. DODD:  Yes.  Documenting that he -- so, you know,

13  the doctor is saying this person has been medically documented

14  to be no longer adversely affected.

15      Your Honor, the next point I was going to address was

16  the divisibility of the HRS 134 statute, the harassment

17  statute.

18      THE COURT:  Just getting back to my first question,

19  you're not aware of anything in the legislative history that

20  indicates that Hawaii requires a circumstance specific approach

21  instead of a categorical elements approach?

22      MR. DODD:  Your Honor, I am not aware.  I am not

23  aware, and I'm not going to say one way or the other.  I'm not

24  aware of any Hawaii state case utilizing the categorical

25  approach in a review of a denial of the firearms application

1    permit.

2           THE COURT:  But you feel that under your circumstance

3    specific approach that you could -- that the Court should look

4    at Mr. Fisher's deposition?

5           MR. DODD:  Well, Your Honor, to the extent that the

6    deposition corroborates the evidence previously adduced by the

7    defendants.

8           THE COURT:  Where was that?

9           MR. DODD:  In the opposition to the motion for summary

10   judgment.

11          THE COURT:  Are you referring to the police report

12   and --

13          MR. DODD:  The police reports.

14          THE COURT:  And witness statements?

15          MR. DODD:  Correct.  That is correct, Your Honor.

16          THE COURT:  Well, he seems to raise an issue of

17   self-defense in his deposition.  Am I meant to go back and try

18   that again?

19          MR. DODD:  I don't believe so, Your Honor, because

20   we -- whatever he was -- whatever he's suggesting in his

21   deposition, we know that he was convicted of harassment for

22   actions that occurred that evening.  Now, the police reports

23   and the witness statements indicate there was some degree of

24   violence towards his wife and perhaps to a lesser extent his

25   daughter.

1          THE COURT:  Well, that's disputed whether there was

2     any violence, right?

3          MR. DODD:  Well, it's disputed, Your Honor, but the

4     burden is on plaintiff in this situation, in the motion that

5     we're here for.  So, but the defendants have adduced evidence

6     in opposition to the plaintiff's motion that there was some

7     violence that occurred that evening.  So then when plaintiff

8     submitted a declaration that didn't say, you know, my plea was

9     because I was -- I only pled to the harassment which did not

10    include violence, I mean, it's his burden to show that he was

11    convicted of something which did not include violent behavior.

12         THE COURT:  Well, do you agree that if the Court

13    utilizes the modified categorical approach the Court could not

14    look at those documents?

15         MR. DODD:  Your Honor, I -- I would -- I would think

16    that that's, without conceding the point, I could see why the

17    Court would rule that way.  If it's using a modified approach,

18    it would not be looking at police reports.  I do see that.  But

19    my argument is we shouldn't be using the categorical approach

20    at all.

21         THE COURT:  No, I understand that.  Anything else?

22         MR. DODD:  Your Honor, I would be -- the only other

23    thing I was going to address was whether the statute was

24    divisible.

25         THE COURT:  Pardon me?

1           MR. DODD:  The divisibility of the harassment statute,

2    and we would argue that it is clearly divisible, and its

3    divisibility is precisely what plaintiff has based this entire

4    case on was because he could have been convicted of something

5    which was included violent behavior or which did not.  And it's

6    that precise divisibility upon which he makes his case.

7    Because his argument is that I was, you know, I could have been

8    convicted for behavior which was not violent whatsoever.

9           Well, okay, but then the statute would, you know, the

10   statute prohibits, the statute obviously prohibits violent and

11   nonviolent behavior, and it is precisely that divisibility.  So

12   if the Court is going to apply the categorical approach, the

13   defense's argument was that, okay, at minimum it should be the

14   modified categorical approach.

15          THE COURT:  Thank you.

16          MR. DODD:  Anything else, Your Honor?  That's all I

17   was going to say.

18          THE COURT:  No, no.  Thank you.

19          MR. DODD:  Thank you very much.

20          THE COURT:  Mr. Murakami.

21          MR. MURAKAMI:  Yes, Your Honor.  I would like to

22   produce Mr. Rubin who's going to be presenting the argument on

23   behalf of the Brady Center.  He has been admitted pro hac vice,

24   Your Honor.

25          THE COURT:  Okay.

1          MR. MURAKAMI:  Thank you.

2          MR. RUBIN:  Good morning, Your Honor, and thank you

3     for the opportunity to speak today on this important case.  I

4     know that we've already spent some time on this argument this

5     morning, so I'm going to try and be brief and not overlap with

6     where the city's counsel --

7          THE COURT:  I am holding the amici to brief

8     arguments --

9          MR. RUBIN:  Yes, sir.

10         THE COURT:  -- just as I did Mr. Beck.

11         MR. RUBIN:  Yes, yes, Your Honor.  Now Mr. Fisher's

12    1983 claim arises out of a misapplication of state law, and I

13    know, Your Honor, you mentioned the third Descamps criteria,

14    the difficulty of applying it, so I thought that I would start

15    with that issue.

16         And the first thing that I would stress is that under

17    Erie it must be interpreted, the state statute, the way a state

18    court would do so.  Now, we don't have any state court cases

19    interpreting the how to apply HRS 134-7 or H 34-1 in this

20    particular type of circumstance.  There isn't a controlling

21    state case to point to, but we do know that Hawaii courts in

22    these cases would look to the plain language of the statute.

23         So notwithstanding the concern of a third factor in

24    Descamps, the plain language of the statute and its purpose

25    would control here, even if it might mean that the state

1    statute is applied differently than it would be under federal

2    law.

3              THE COURT:  What are you -- what authority are you

4    referring to?

5              MR. RUBIN:  For that point it would be Erie, Your

6    Honor, that federal courts construing state law have to

7    construe it as a state court would do so.  So this would be

8    essentially an Erie guess because there is no state law

9    controlling it, but either way the Court must sit as it thinks

10   a Hawaii state court would construe the statute.  We have

11   no -- we were unable to find any cases whatsoever applying the

12   modified categorical approach or categorical approach, not just

13   for these statutes but anywhere in Hawaii law at all.

14             THE COURT:  Again, you're discounting Nobriga.

15             MR. RUBIN:  I believe, Your Honor, and I unfortunately

16   don't have Nobriga in front of me, but I believe that case was

17   the construction of a federal disqualification due to a state

18   conviction, am I correct on that?

19             THE COURT:  It involves interpretation of two state

20   statutes.

21             MR. RUBIN:  But in this case we have no case that has

22   interpreted Hawaii 134-7, 134-1, Your Honor, to determine

23   whether it would use a circumstance specific approach or a

24   categorical approach.

25             THE COURT:  Well, it's similar.  I would say

1   analogous.

2          MR. RUBIN:  Your Honor, I think we would just look to

3   the plain language of the statute.  And this is a very

4   different statute than the federal statutes, for example, the

5   misdemeanor crime of domestic violence statute, 18 USC 921.

6   Now, that one says that it has -- it requires that it has as an

7   element the use or potential use of physical force, and that

8   essentially answers the question.  Hawaii took a different

9   route, and, in fact, this statute seems to have existed in some

10  form, this crime of violence prohibition, since 1927, at least,

11  before this was even a state.  And before the state even

12  excluded felons, they excluded crimes of violence.

13         Now, the plain language of this statute is so much

14  different.  Now we look at 134-1 which is really where the

15  important language is because it defines crime of violence, and

16  it says that it means any offense as defined in Title 37 that

17  involves injury or threat of injury to the person of another.

18         THE COURT:  Yeah, referring to the elements.

19         MR. RUBIN:  Well, Your Honor, we have a few things.

20  Now, I know I'm pointing to state cases or to state principles,

21  but the Supreme Court itself has recognized that words such as

22  "crime," "felony," and "offense," sometimes refer to generic

23  crimes and sometimes refer to specific acts in which an

24  offender engages, and specifically use the terms circumstance

25  specific, that's Nijhawan v. Holder, which is a case, an

1   immigration case where the Supreme Court, based on differences

2   in the language comparing the immigration statute to ACCA,

3   rejected the use of the categorical or modified categorical

4   approach when it involved determining whether a fraud was for

5   more than $10,000.  And they said --

6          THE COURT:  That is slightly different though.

7          MR. RUBIN:  It's different in kind, but it's not

8   different in what it says for our analysis, which is when the

9   statute differs from ACCA, which is really where the

10  categorical approach lives, a sentencing statute, we look to

11  the plain language of the statute just as we always would.  And

12  I would point, Your Honor, and we did this in our brief

13  extensively, our opening original brief, the most important

14  case on this is United States versus Hayes.  A case, the only

15  case where the Supreme Court in this kind of context has

16  construed the federal ban and tried to determine whether it

17  would look at facts specifically underlying the conviction or

18  not.

19         Not only -- now, of course, when they looked at

20  subsection (2) of 18 USC 921 -- and they did use an element

21  centric approach because the statutory language said so -- but

22  they wanted to know on the second part of that whether a

23  person, it says if it's a crime that's committed by a person

24  with whom the victim shares a child in common so on, a domestic

25  relationship.

1         And the Supreme Court resisted the lower court's

2    attempts to use an element centric approach basically to

3    require a domestic relationship in the statute and instead said

4    we look at the plain text of the statute.  We look at the

5    purpose of the statute.  And the Supreme Court in this case,

6    which came out after Taylor and Shepard and this line of cases,

7    did not once mention or cite Taylor or Shepard or any of the

8    modified or categorical approach cases.

9         THE COURT:  Which court are you referring to now?

10        MR. RUBIN:  The Supreme Court, Your Honor.

11        THE COURT:  What case?

12        MR. RUBIN:  In United States versus Hayes.

13        THE COURT:  Okay.

14        MR. RUBIN:  And there are, I think the city's brief

15   mentions a different United States versus Hayes case in the

16   Tenth Circuit, that's not the same case.  This came out of the

17   Fourth Circuit and went up to the Supreme Court.  So same name,

18   different case.

19        THE COURT:  One with an E and one without.

20        MR. RUBIN:  I beg your pardon, Your Honor?

21        THE COURT:  I said one with an E and one without.

22        MR. RUBIN:  That's correct, Your Honor, yes.  In this

23   case, this is the one with the E.  This case shows how the

24   Supreme Court has interpreted the kind of language that we

25   would look at here.  They said, well, element applies only to

1    the use of physical force in the statute.  The domestic

2    relationship part doesn't say that it has an element of a

3    domestic relationship, and not only that, but doing so would

4    interrupt the purpose and effectiveness of the statute because

5    it would apply in so few cases at that point that Congress

6    would have had very little purpose in enacting it in the first

7    place.

8          Excuse me.  Now, if we turn back to the Hawaii state

9    statute, it doesn't use the term "element" at all.  It uses the

10   term "involves."  Now it's just a plain language

11   interpretation, Your Honor.  If you imagine two prisoners are

12   sitting in jail together, one says to the other, what are you

13   in for?  He says, armed robbery.  Oh, well, what did that

14   involve?

15         We know that the response to that question will not be

16   a recitation of the elements of armed robbery.  It'll be a

17   description of what his crime involved, the factual background

18   of the crime.  And unless that's --

19         THE COURT:  Meaning the elements of the crime?

20         MR. RUBIN:  The two prisoners sitting in jail, what

21   did your crime involve, the natural reaction will be a

22   fact-based description, oh, well, I robbed a bank and then my

23   car broke down and the police caught me.  Rather than imagining

24   in just casual conversation, which is what both Supreme Court

25   jurisprudence and Hawaii jurisprudence tells us to do.

1          But if that's not enough, Hawaii has a statute, Your

2     Honor, that instructs courts if the statute is ambiguous how to

3     interpret it.  And this is HRS 1-15(2), which says, if the

4     statute is ambiguous, the reason and spirit of the law and the

5     cause which induced the legislature to enact it may be

6     considered to discover its true meaning.

7          Now, you've asked other counsel a couple times, Your

8     Honor, about whether there's legislative history that resolves

9     some of these questions for us.  The legislative history that

10    we could find seems fairly scant.

11         THE COURT:  Seems fairly what?

12         MR. RUBIN:  Scant, there's not very much of it.  But

13    what we could find, Your Honor, is in 1968 Hawaiian Session

14    Laws Act 19, which was when Hawaii decided to extend the law

15    from crimes of violence to felonies and crimes of violence.

16         What the legislature said is, this is a quote, "Since

17    the possession of firearms and/or ammunition by persons having

18    a prior record of conviction for crimes of violence gives rise

19    to a reasonable apprehension that such persons might use

20    firearms for criminal and violent purposes, legislation

21    prohibiting the possession and control of firearms by such

22    persons in making such possession a felony is urgent and

23    necessary for the protection of the general public."

24         And I must correct myself, that's when they turned it

25    from a misdemeanor into a felony, not when they added felonies

1   to it.  But, Your Honor, what I would focus on there is the

2   concern is that people who have engaged in violence, it's

3   actually not the elements they're concerned about.  They're

4   concerned about the violence.  That's what gives the reasonable

5   apprehension is the previous acts, not the elements of the

6   previous offenses.

7        Now, of course, the element approach is in some ways

8   easier to apply, but what I would point out, Your Honor, is

9   there are a host of situations where there will be no

10  conviction on the record, yet the Hawaii statute still

11  instructs police to withhold the permit.  For example, it

12  doesn't just say no person who's convicted of a crime of

13  violence, it says no person who is under indictment for, has

14  waived indictment for, has been bound over to the circuit court

15  or who has been convicted in this state.

16       And so in those cases, you wouldn't have a record of

17  conviction at that time.  You would merely have an indictment.

18  You would have the facts alleged there, because -- and this

19  goes to the legislature's concern -- their concern is that

20  people who have engaged in violence in the past are more likely

21  to use guns for violence in the future.

22       Now, they knew that back in 1968, but we have studies

23  now and we mention these in our brief that show that this is

24  absolutely a correct instinct by the Hawaii legislature.  I'll

25  spend almost no time on this whatsoever, but I would point the

```
 1    Court to the UC Davis study that we mentioned in our brief.

 2    And they managed to take a study during the period before and

 3    after Hawaii's Misdemeanor Violent Offender Statute took

 4    effect, and they found a noticeable increase.  Those who were

 5    able to get permits before the ban took effect were more likely

 6    to engage in crimes and more likely to use guns when doing so.

 7    It's exactly the cause that animated the legislature here.

 8            And if the statute is unclear, that cause, Your Honor,

 9    because of Erie and because of Hawaii state statute pointing

10    courts to the purpose of the statute, that should control over

11    a sentencing line of cases that the Supreme Court itself hasn't

12    applied to this.

13            THE COURT:  That's keyed in on the word "violence,"

14    right?

15            MR. RUBIN:  It's keyed in on violence, but also the

16    definition of violence involves injury or threat of injury to

17    the person of another.

18            THE COURT:  Well, that is an issue here.

19            MR. RUBIN:  I beg your pardon, Your Honor?

20            THE COURT:  That's an issue whether or not there was

21    violence.

22            MR. RUBIN:  I think it's the issue, but the question

23    is what we can look at to determine it, and there was no

24    indication in any of this legislative history of any kind of

25    limitation.  And, in fact, it's notable what would happen if a
```

1    categorical approach is applied.

2           Now, early on in this case there was some back and

3    forth over which crime Mr. Fisher was convicted of, abuse of a

4    family member or harassment, and he was originally charged with

5    the former and convicted of the latter.  But if the categorical

6    approach is to reign, Your Honor, then it wouldn't matter.

7    Because abuse of a family or household member, that is the

8    domestic violence crime in Hawaii, under subsection (1), "It

9    shall be unlawful for any person singularly or in concert to

10   physically abuse a family or household member or to refuse

11   compliance with the lawful order of a police officer.

12          Under Mr. Fisher's argument if he were convicted of

13   abuse of a family member, that wouldn't be a crime of violence

14   because he could have been convicted of refusing to comply with

15   the lawful order of a police officer which wouldn't involve

16   violence.  Terroristic threatening --

17          THE COURT:  Why wouldn't it involve violence?

18          MR. RUBIN:  Why wouldn't it, Your Honor?

19          THE COURT:  Yeah.

20          MR. RUBIN:  His argument is you can only look to the

21   elements, and if the elements contain the mere possibility that

22   nonviolence was the reason for the conviction, then that's it,

23   even if there was actually violence and we know it.  And

24   the -- and what I'm trying to say is that the statute, under

25   this categorical approach, abuse of a family or household

1    member is not a crime of violence.  That's the problem.  That's

2    the effect of using the categorical approach on this kind of

3    statute.

4         Because the subsection (1), abuse of a family or

5    household member, it includes a nonviolent possible element in

6    it.  And so all we're saying, we're not saying that these would

7    necessarily have to be violent all the time, we're just saying

8    that they can look at the factual record to determine whether

9    someone physically abused a family or household member or

10   whether they refused to comply with the lawful order of a

11   police officer.

12        To use the categorical approach, Your Honor, it would

13   eliminate abuse of a family or household member, it would

14   eliminate the misdemeanor form of arson, it would eliminate

15   terroristic threatening in the second degree.  It couldn't be a

16   crime of violence under their approach because terroristic

17   threatening is defined as threatening to cause bodily injury to

18   another person.

19        THE COURT:  Slow down, so I can hear you.

20        MR. RUBIN:  I beg your pardon, Your Honor.

21   Terroristic threatening, the generic overall offense, is

22   defined as a person who commits the offense of terroristic

23   threatening if the person threatens by word or conduct to

24   cause --

25        THE COURT:  The reporter can't keep up with you.

1  You've got to slow down.

2         MR. RUBIN:  Yes, sir.  "A person commits the offense

3  of terroristic threatening if the person threatens by word or

4  conduct to cause bodily injury to another person or serious

5  damage to the property of another or to commit a felony."

6         Now, the felony form of that tends to be specifically

7  elicited about crimes against person, but the misdemeanor form

8  second-degree terroristic threatening is anything that doesn't

9  fall in the felony category.  So threatening to destroy

10  someone's house but not threatening to cause injury or threat

11  of injury to the person of another in doing so is a possible

12  way to commit terroristic threatening without engaging in

13  violence or threat of violence.

14         Therefore, under Mr. Fisher's approach, that crime

15  would be out.  That crime could not, even if the facts in this

16  actual case showed that violence occurred, and here, Your

17  Honor, the facts in this case show what actually happened that

18  night.  Now you mentioned, Your Honor, that Mr. Fisher's

19  deposition shows that -- shows that he claims it was

20  self-defense, and he certainly does in his deposition.  But

21  that's not really --

22         THE COURT:  I'm not sure that he raised that defense

23  at that point in time.

24         MR. RUBIN:  I don't know that he did, but certainly to

25  revisit the facts, it sounds like he says his wife started it.

1    But that's not really this issue.  The issue is he's claiming

2    that under the harassment statute it says, any person or a

3    person who commits the offense of harassment if they strike,

4    shove, kick, or otherwise touches another person in an

5    offensive manner.  He's saying hold up, I could have been

6    convicted of a mere offense of touching.  That could have been

7    what happened.  And since that could have been what happened,

8    you can't find this to be a crime of violence.

9          Regardless of what the sequence of events were, Mr.

10   Fisher's deposition testimony shows that it was not a mere

11   touching.  It sort of raises an unbarking dog here where Mr.

12   Fisher has filed his affidavit in this case, and he's never

13   once said that he didn't actually engage in violence.

14         He's trying to use this, what essentially is a

15   technical exception, and all we're asking is that the Court say

16   based on the purpose and the text of this statute, which is so

17   different from the federal statute and so different from the

18   causes which animate this modified categorical approach in the

19   federal cases, the police are correct to look at the underlying

20   factual record.

21         THE COURT:  I read through that third reason that the

22   U.S. Supreme Court gave in Descamps, and that doesn't ring any

23   bell with you as far as the difficulties and the possible

24   unfairness that would occur?

25         MR. RUBIN:  It certainly rings a bell, Your Honor, and

1    I think it raises a challenge.  Although there's some extent to

2    which that's going to be the case in most cases where there are

3    disputed factual issues that can be difficult to unwind and

4    difficult to determine.  We already know that there are certain

5    federal gun disqualifications that don't require a trial at

6    all, and in that case, the factual issues would be even harder

7    to determine, for example, in United States versus Barton, the

8    Ninth Circuit has already found constitutional under Heller the

9    federal prohibition on drug offenders.

10          In that case, you don't have to have a drug

11    conviction.  All you have to have is be addicted to a drug.  In

12    fact, the Ninth Circuit mentioned --

13          THE COURT:  Would that apply to alcohol counseling?

14          MR. RUBIN:  No.  The federal prohibition does not, so

15    in this case it would be the state.  But my point in bringing

16    Barton up --

17          THE COURT:  Why would it not?

18          MR. RUBIN:  It's sort of a quirk of the statute.  It

19    specifically refers to the definition of controlled substance

20    in, I believe it's one of the FDA acts.  And that definition

21    does not include --

22          THE COURT:  But as far as the same analogous

23    reasoning, would it apply or would it not apply?

24          MR. RUBIN:  The federal drug disqualification, Your

25    Honor?

1          THE COURT:  Yeah.

2          MR. RUBIN:  It wouldn't, simply because when it

3  defines being addicted to a controlled substance, the

4  definition of controlled substance under federal law does not

5  include alcohol, by the text of the statute alone.

6          THE COURT:  I mean if you apply that same reasoning,

7  could you reach the same result?

8          MR. RUBIN:  Which reasoning would that be, Your Honor?

9  I'm sorry?

10         THE COURT:  Well, if -- what I'm trying to do is

11 compare the Ninth Circuit cases that have held that drug users

12 may be permitted -- or prohibited, but not permanently, from

13 possessing firearms without violating the Second Amendment.

14         MR. RUBIN:  What the -- Barton was a very short case,

15 Your Honor.

16         THE COURT:  Pardon me?

17         MR. RUBIN:  Barton, the Ninth Circuit case on this.

18 It was very short.  But it didn't say that it wouldn't be

19 constitutional to prohibit them permanently per se, what it

20 said was --

21         THE COURT:  No.  That's what I said, not permanently.

22         MR. RUBIN:  Right.  Yes, Your Honor.

23         THE COURT:  And my question to you is would that same

24 reasoning apply in a case of prohibitions based on alcohol

25 abuse or counseling or treatment?

1          MR. RUBIN:  Under the state law then, Your Honor, I

2     take it?

3          THE COURT:  Yeah.

4          MR. RUBIN:  I guess I'm not sure.  Hawaii doesn't.

5          THE COURT:  Not under the state law but under the

6     Second Amendment.

7          MR. RUBIN:  Well, there's no claim in this case, Your

8     Honor, made by the plaintiff that even if these statutes are

9     correctly applied it would work in unconstitutional

10    deprivation.  Their claim is it's a Second Amendment violation,

11    but they're saying it's worked by misapplying the statute.  So

12    that would be a very different question than what --

13         THE COURT:  They're saying it's unconstitutional to

14    have a permanent prohibition under the Second Amendment.

15         MR. RUBIN:  Oh, no, Your Honor.  I'm not saying that

16    at all.

17         THE COURT:  No, I'm saying the plaintiff is.

18         MR. RUBIN:  He actually hasn't made that claim.  He's

19    made the claim, the claim in his brief is only that Hawaii has

20    misapplied 134-7, and by doing so, because he says he didn't

21    commit a crime of violence and, therefore, he doesn't fall

22    under the statute and because he doesn't fall under the statute

23    that violates the Second Amendment rights.

24         They actually -- and this is important because the

25    Hawaii Defense Foundation keeps calling this an as applied

1    challenge to the constitutionality, it's actually not.  The

2    plaintiff could have made that claim.  They could have said

3    even if the statute applies to Mr. Fisher, it would be

4    unconstitutional.  They didn't make that claim, and the

5    plaintiff is the master of his claim.  We haven't had briefing

6    on it.  We're very far into the case.  If the Hawaii Defense

7    Foundation or someone else wants to make that claim, then they

8    should file a case where they make it.

9         But this case has been much more narrowly focused.  I

10   have no idea what the reason, maybe there's a strategic reason

11   for that, but this is a statutory application, Your Honor.

12        THE COURT:  I want to get back to my question to you.

13        MR. RUBIN:  Yes, Your Honor.

14        THE COURT:  Cases have been cited that under, as far

15   as the drug users with respect to the Second Amendment that

16   they can be prohibited from having or possessing firearms, not

17   permanently, but they can be prohibited for a period of time.

18   My question to you is does the same reasoning hold true where

19   there's a prohibition because of alcohol or counseling for

20   alcohol or treatment as opposed to drugs?

21        MR. RUBIN:  I think it does, Your Honor.  And I hope

22   that I'm understanding your question correctly, but the way

23   that I see that is that both of those are worked as a function

24   of the statute.  It's actually not -- it's not a constitutional

25   question.  In Barton, the Ninth Circuit didn't address whether

1    the length of the deprivation was constitutional or not.  All

2    they said was the statute only prohibits someone who is

3    addicted since you could become not addicted at some point --

4           THE COURT:  Right.

5           MR. RUBIN:  -- to requalify.  Now, Hawaii it doesn't

6    allow --

7           THE COURT:  In fact, someone came up with this, I

8    guess Mr. Beck with his, I don't know, Illinois Supreme Court

9    case recently.  I don't know, have you seen that?

10          MR. RUBIN:  I have, yes, Your Honor.  I'm actually,

11   I'm very concerned about that case, and I'm glad that you

12   brought it up.  I had Mr. Beck's filing here, and he says in

13   his description of it that on September 12th, the Illinois

14   Supreme Court held in Coram v. The State of Illinois that as

15   applied to the plaintiff that the State of Illinois, 18 USC

16   922(g)(9) was unconstitutional.  That's a direct quote from his

17   statement.  Now I would like to quote from the case.

18          THE COURT:  You would like to quote from?

19          MR. RUBIN:  From the Coram case, which I have right

20   here, Your Honor.

21          THE COURT:  Well, we're all in agreement with you.  It

22   seems to directly --

23          MR. BECK:  I -- I better stop where I'm at.

24          THE COURT:  You'll have an opportunity to speak later,

25   Mr. Beck.

1          MR. BECK:  Thank you, Judge Kay.  Sorry.

2          MR. RUBIN:  Your Honor, so I won't spend any time on

3    that particular point.  I actually felt this was a fascinating

4    case.  I don't think it's relevant to this case.  Because that

5    one was really about whether it would be possible to construe,

6    there's a federal requalification provision.  And it would be

7    about whether it would be possible to construe that provision

8    to be satisfied by a state requalification provision, and the

9    Court found that could be true.  And then, therefore, it didn't

10   have to test the constitutionality of the section.  That's a

11   very interesting question.

12         Hawaii has no such provision.  I believe Mr. Beck

13   tried to argue that that would be unconstitutional to not do

14   so, that that would violate the statute but the statute -- the

15   disqualification, I think, I don't have it in front of me, it

16   simply states that if a state has a way to reclaim your civil

17   rights then that would function to reclaim your right to

18   receive a firearm.

19         THE COURT:  Okay.  I want to ask you about the Hawaii

20   statute.

21         MR. RUBIN:  Yes, Your Honor.

22         THE COURT:  134-1.

23         MR. RUBIN:  Yes, Your Honor.

24         THE COURT:  How do you interpret the language as

25   defined in Title 37?

1          MR. RUBIN:  I think it's a limiting language, Your

2     Honor, because if you were to take that out, then it would

3     potentially include things like running a red light and causing

4     an injury.  And what they said instead was only within the

5     certain class of offenses.  So traffic offenses are not in

6     Title 37.  Title 37 is generally crimes against person or their

7     property.

8          THE COURT:  But doesn't that imply an elements based

9     approach?

10          MR. RUBIN:  No, Your Honor.  I think at the very least

11     that lends some ambiguity, but all it does, to us all it says

12     is that there is a limited area of statutes to which this

13     section applies.  If you -- you know, if you engaged in a crime

14     that was not defined in Title 37, even if it did involve

15     violence, you know, the factual background it definitely

16     involved violence, you know, according to this statute, the

17     language of it, that wouldn't fit the crime of violence

18     prohibition.

19          And if we think about it, the state was trying to

20     thread a very narrow needle here, Your Honor.  If they said any

21     crime where the elements show violence, like I mentioned

22     earlier, it would have eliminated all kinds.  They would have

23     had to rewrite half the criminal code to separate out the

24     subsections of different offenses to make sure that the

25     subsections that contained violence were always separate from

1    the ones that had a possible nonviolent element.  If they said

2    any crime where the factual background involved injury to

3    someone, well, then we would have car crashes, running a red

4    light and you injured someone leading to someone being

5    prohibited from bearing arms.

6          So what the legislature did, it seemed like they came

7    up with a very clever way to meet that in the middle and say,

8    well, we want to define this as injury or threat of injury to

9    the person of another, but we want to cabin it only to these

10   set of offenses that are personal and property crimes, the kind

11   of crimes that you would expect to relate to someone's future

12   propensity to commit violence.

13         THE COURT:  Looking to the elements.

14         MR. RUBIN:  Again, Your Honor, the statute, the

15   language of the statute and its purpose don't call for that.

16   If Hawaii wanted to limit it to the elements, Hawaii could

17   easily have said so and using the same --

18         THE COURT:  That hasn't happened on the federal side

19   either, has it?

20         MR. RUBIN:  Well, the federal side is much more clear,

21   and certainly under ACCA, most of the action under ACCA that's

22   led to the categorical approach has been this language about it

23   lists certain types of crimes and then it says or is burglary,

24   is blank, is blank.

25         THE COURT:  Or simple touching.

1          MR. RUBIN:  Well, under the federal, under ACCA?

2          THE COURT:  Under the state statute.

3          MR. RUBIN:  Under the state --

4          THE COURT:  For harassment.

5          MR. RUBIN:  Well, what I'm trying to say, Your Honor--

6          THE COURT:  I'm just saying that the state doesn't

7    seem to be that much different than the federal as you're

8    trying to distinguish them.

9          MR. RUBIN:  Well, that's the harassment statute, Your

10   Honor.  I'm only focused on the gun prohibition itself because

11   it can apply to a number of offenses, harassment being only one

12   of them, and in the event that it was merely an offensive

13   touching, then that would be the kind of thing that the police

14   could turn and say, well, that's not disqualifying.  We would

15   leave open that possibility.

16         We're saying that in this case the police have access

17   to facts, and it sort of brings, again, this sort of oh, come

18   on factor where the plaintiff himself won't even actually deny

19   on the record that he engaged in violence that night.  We have

20   deposition testimony showing that -- admitting that he shoved

21   his wife to the ground.  We have the police reports, and this

22   is a civil case.  This is not a criminal trial where we

23   couldn't expect the plaintiff to say anything.

24         THE COURT:  Immigration cases are civil also.

25         MR. RUBIN:  They are, Your Honor, although one of the

1    things, and this is mentioned in Nijhawan v. Holder, it was

2    essentially a BIS interpretation that led to using these kind

3    of cases in immigration cases that courts have gone along with.

4    I wasn't able to ever find any reasoning where they explicitly

5    explained why they would go along with it, but the BIS's

6    explanation was that immigration judges are not supposed to try

7    those kind of questions, and so they applied this approach.

8           So that seems very specific to immigration, Your

9    Honor.  And those hearings while they are technically civil,

10   they certainly have a very criminal feeling to them when

11   someone is facing deportation from the United States.

12          I think, Your Honor, that it's a very tough question,

13   but I think it's ultimately a Hawaii question.

14          THE COURT:  I would ask you also, and maybe you're not

15   prepared to cover this area, but the plaintiff has taken the

16   position that the city would be liable potentially if I were to

17   find that the city or Chief Kealoha or Chief Putzulu should

18   have allowed Mr. Fisher to regain possession of his guns

19   earlier.  They're claiming under the due process claim that you

20   should be entitled to money damages, notwithstanding that I've

21   already found that Chief Kealoha was entitled to qualified

22   immunity.  But they're claiming that nevertheless the city

23   could be held liable for that.

24          MR. RUBIN:  Your Honor, I'm only a little prepared to

25   discuss the liability element itself.  I'm very prepared to

1    discuss due process.  In terms of liability, I would have to

2    defer to the city's analysis on Monell and how that would apply

3    here.  But the one thing that I would say is that the, you

4    know, Mr. Beck described this broad discretion that's given to

5    the city to deny or grant permits left and right as they

6    choose, and that being the basis of the Monell liability.

7    They've essentially established the policy.

8            The one thing that the plaintiff and the defendant

9    agree on in this case and we agree also is that there's

10   actually not a lot of flexibility in this permitting regime.

11   If they meet the criteria specified in the statute, they get a

12   permit.  It's not a matter -- and there are states certainly

13   with concealed carry permits where there's a decision that's

14   made as to whether this person is the right kind of person to

15   have a concealed carry permit.  That's not this statute.  If

16   they meet the qualifications under 134-7 and the other relevant

17   qualifications, they paid their fee, they get their background

18   check, it comes back properly, then they get the permit.

19           And we know that this seems to be getting applied

20   exactly that way because they approve 99 percent of permits.

21   And when they deny the one percent, they can actually list,

22   it's in the attorney general's report that he puts out every

23   year, they list the specific reasons for the ones that they've

24   denied.  And that doesn't sound like broad discretion to me.

25   It sounds like they're simply applying the statute, and that's

1   sort of the limit of my analysis on liability itself, Your

2   Honor.  But that doesn't seem to lend itself to saying that

3   they were creating a policy that led to some kind of

4   deprivation.  It sounds like they were following a statute that

5   was passed by the legislature.

6            I would very briefly, Your Honor, like to address the

7   procedural due process question.  Is that something that would

8   be a good use of your time, Your Honor?

9            THE COURT:  Three minutes.

10            MR. RUBIN:  Yes, Your Honor.  I'll be very, very short

11   on this.  What I really want to hit on is the way that the

12   Heller cases created what I'll refer to as a disqualification

13   framework.  And the Supreme Court, of course, Heller identified

14   a individual right to bear arms, but then the Supreme Court was

15   very careful to say this right is not unlimited.  There are

16   specific limits.  They identified two right off the bat, felons

17   and the mentally ill, and then dropped footnote 26 in Heller

18   which says this list is not the only set of criteria.  They say

19   that this list did not purport to be exhaustive.

20            And what we've had now is that the circuit courts have

21   been dealing with what that means.  Now the Ninth Circuit has

22   already looked at the language in Heller, and there's a really

23   important language at the end of the case where the Court is

24   talking about Mr. Heller and what happens to his status as a

25   gun owner.  And the Court said that he gets a gun permit unless

1   he was, "disqualified from the exercise of Second Amendment

2   rights."

3            The Ninth Circuit in three cases involving felons,

4   Smith, Bansa [phonetic], and Small has used language showing

5   that if you are in the category of disqualified persons, you

6   don't have a Second Amendment right, you lack the right.

7            And then we have other cases such as Dugan, the drug

8   case that we've been discussing, Your Honor, that showed that

9   there are categories that fit in with it, and those categories

10   extend felons, mentally ill, and then we know in the Ninth

11   Circuit, habitual drug users.  We also know Eastern District of

12   California has already addressed the domestic violence

13   provision, and then the Third Circuit has given a really good

14   way to analyze this based on the Supreme Court's analysis in

15   Heller.  It's not that Heller froze gun regulations in stone

16   that only if a category of persons were historically prohibited

17   could they be prohibited now.  That would be a very strange

18   doctrine in American law that only if they identified the

19   problem 200 years ago could we address it.

20            What they said is that based on the historical

21   documents, the state legislative hearings that were looked at

22   in Heller, the common theme is that states could always

23   restrict people who are likely to use guns to commit violent

24   crimes.  And as time goes on and we figure out better who those

25   people are, regulations that are consistent with that were

1    constitutional and those people were not just able to be

2    prohibited, but they were actually disqualified.

3         And in this case certainly a prohibition on violent

4    misdemeanor, this is exactly that kind.  And we have these

5    studies who have shown that these people are more likely to

6    engage in violent crimes, and that's what the legislature was

7    going after.  So Mr. Fisher by committing this offense was

8    actually disqualified from Second Amendment rights.

9         And that's -- and I know I said I would talk about

10   procedural due process.  It's crucial because in order to have

11   a procedural due process claim, you have to have a liberty or

12   property interest that's protected by the Constitution.  If he

13   doesn't have a Second Amendment right, he doesn't have a

14   liberty interest that's protected by the Constitution.  That

15   ties this very closely to the first issue in this case, but if

16   he lacks that liberty interest, the procedural due process

17   question becomes a much, much shorter question to address.

18        THE COURT:  Thank you.

19        MR. RUBIN:  Thank you.  Is there anything else that I

20   can answer today, Your Honor?

21        THE COURT:  I would like to hear from Mr. Dodd,

22   though, on that city liability issue.

23        MR. RUBIN:  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        MR. DODD:  Thank you, Your Honor.  As the Court is

1   well aware, there is no respondeat superior liability under

2   Section 1983.  Municipality can be liable under three general

3   methods, one is a failure to train, the other is what's called

4   a Monell type claim, and the other is a ratification type

5   claim.  We do not believe that the plaintiff has adduced

6   evidence of -- to establish that the city is liable under any

7   of those theories.

8           THE COURT:  Or a policy.

9           MR. DODD:  Or a policy, Monell.  Right.  Under Monell,

10  you have the custom or policy language, but as the Court is

11  aware, you need to show that there is a custom and policy that

12  is the moving force behind the violation.  There's no -- the

13  record is devoid of any evidence of that.  As Mr. Rubin just

14  stated, what we have is an argument that the police department

15  was or the city was applying the statute, not a policy.  It

16  was, if plaintiff had evidence that they -- even though there's

17  a statute but they -- the city had a policy of denying people

18  permits even if they didn't commit any violence or something

19  like that, I mean there would be something to argue, but

20  there's nothing to argue.

21          THE COURT:  But I think they claim, going back a year,

22  that there was a policy to base it on police reports.

23          MR. DODD:  Even if there is, Your Honor, I don't see

24  the -- not only would you have to have evidence of what the

25  policy is, you still have to show that that is the moving force

1    behind the violation.  I don't believe that they have shown

2    that.

3              And I believe that the Court also has to, there would

4    have to be evidence of repeated instances of constitutional

5    deprivation not being remedied, things of that nature.  I do

6    not believe they've met the standard under any of the

7    categories of municipal liability, nor under Monell.

8              THE COURT:  Okay.  Thank you.

9              MR. DODD:  Thank you, Your Honor.

10             THE COURT:  Ms. Ickes, anything more?

11             MS. ICKES:  Just one thing to point out on that last

12   issue, Judge, when the city defendants are talking about custom

13   and policy, I just want to point out the declaration attached

14   to the -- their memo in opp to our motions, specifically the

15   declaration of Police Officer Thomas Nitta, where he does admit

16   that it is the city's policy, custom, to review police reports

17   when it comes to someone applying for a permit who has

18   previously been convicted for harassment.  Also, unless the

19   Court has any further questions, I know I took up a lot of time

20   earlier, I don't have anything further.

21             THE COURT:  Thank you.

22             MS. ICKES:  Thank you, Judge.

23             THE COURT:  Mr. Beck, anything more?

24             MR. BECK:  Yes, absolutely.  Everything Mr. Rubin just

25   said states that HRS 134-7 is unconstitutional as applied to

1   Mr. Fisher.  Mr. Fisher asked for a permit to acquire --

2           THE COURT:  I think you may have raised that as an

3   amici, but, you know, that's not going to be applied by the

4   Court.

5           MR. BECK:  Your Honor, in the prayer for relief, he

6   simply asked for a permit to acquire.  Accordingly, if he is

7   disqualified under HRS 134-7, and as they pled, Mr. Fisher pled

8   that he simply wanted some means to get a permit to acquire,

9   then every single statute within HRS 134 has to be looked at to

10  determine whether he is qualified to have a, you know, a permit

11  to acquire.  I mean it's simply, it's simply the case when they

12  pled that HRS 134 needs to give him a permit to acquire.

13          So what both the amicus and the city have failed to do

14  is, as applied to Mr. Fisher, give even an imported government

15  interest as to why Mr. Fisher is disqualified from Second

16  Amendment rights.  And quite frankly, I mean, they have a --

17  well, originally they attempted to make the argument that at

18  the common law of 1791, a simple, what today we consider a

19  misdemeanor assault were to disqualify you from Second

20  Amendment rights is simply attempting to rewrite American

21  history quite frankly, sir.

22          And after failing to address plaintiff's case law in

23  the circuit they actually practice law in, you know, I'm

24  referring to the Schrader case, mind you, they've gone on to

25  simply state that the Constitution simply needs to be, you

1    know, amended based upon whatever living document that, you

2    know, that we don't need to look to history at the time of

3    ratification of the Second Amendment to see what the

4    disqualification was.  And disqualification only referred to

5    the nine enumerated felonies and a number of other provisions

6    which simply are not applicable in this case and make the

7    argument that the Second Amendment now needs to conform to

8    whatever modern day morality that they wish to apply to our

9    constitutional rights.

10          And it's quite apparent that a conviction 15 years ago

11   of harassment is perhaps arguably a crime of violence simply

12   does not fit any historical analysis.  I have no historical

13   analysis, Your Honor, to establish that they are, that this in

14   any shape, way, or form comports to power a decision which

15   simply stated that those persons that were not a member of what

16   was referred to as the virtuous citizenry, i.e., those persons

17   that were contributing members to society.  And they note drug

18   addicts, drug addicts obviously are not members of virtuous

19   citizenry, you know, it's simply prima facie.

20          On the other hand, a person that was 15 years ago, you

21   know, convicted of a harassment statute, that simply shows that

22   he continues to not be through some evidence that they have

23   failed to produce disqualified from being an individual that is

24   an American, that supports the standard warrants of what we

25   consider to be a contributing member of American body of

1   politics.

2           Respectfully under Monell, it is not simply through

3   custom that the city is liable.  That is simply a complete

4   misapplication of the law, and as I earlier stated, under HRS

5   91, the city has broad discretion to promulgate standards to

6   address these various issues.  They have failed to do so.

7   Neither the city defendants nor the amicus has addressed the

8   fact that the Hawaii legislature has literally put in an entire

9   chapter of the HRS to allow the city to put in policies before

10  the United States Constitution when the Supreme Court or the

11  higher appellate court simply has managed to, you know,

12  actually state what the Constitution actually says.  And,

13  briefly, I'm going to address the study that they've attempted

14  to come into the record.

15          It is incredibly flawed methodology.  They, for one

16  thing, individuals that are involved, who are involved in the

17  study simply are not in any shape, way, or form, any way, you

18  know, even analogous to Mr. Fisher.  These people were

19  convicted of fairly severe assaults, and on top of that, I

20  believe it was 938 people that they tracked, under California

21  law, I'm the only person here who's a California attorney,

22  these people are -- those laws are -- involved crimes of

23  violence, to use a term of art.  They are much more serious

24  crimes than what Mr. Fisher was convicted of.

25          And that sample size, you know, simply is not

1    applicable to Mr. Fisher, and even assuming it was, it was not

2    a peer-reviewed study.  They published this through a

3    government agency that simply stated that we are not taking a

4    viewpoint on this, on whether this is an appropriate government

5    study to be used.  We simply are publishing this as a, you

6    know, just simply for, you know, the public discourse.  There's

7    been no peer review.  The sample size is horribly small.  It

8    failed any, you know, basic tenets of social science

9    methodology.  I'm fairly sure that I'm the only person that has

10   a background in this and, you know.

11            THE COURT:  I'll give you one more minute, Mr. Beck.

12            MR. BECK:  Sorry.  My point is, is that as applied to

13   Mr. Fisher, the city and amicus have yet to give an important

14   or compelling government interest as to why he should not be

15   given firearms rights.  There's no historical basis for him to

16   simply be disqualified from firearms rights.  They have

17   produced none.

18            And finally, they simply, it's -- finally, it's simply

19   insurmountable evidence that the fact that he has owned

20   firearms for, you know, I want to say eight or nine years -- I

21   can't remember off the top of my head -- that he is fully

22   qualified to own a firearm and he hasn't displayed any sort of

23   tendencies to use those in a way that doesn't comport with, you

24   know, constitutional tenets, and as I know the Court wants me

25   to finish it up, I'll leave it there.

1          THE COURT:  Thank you.  It's been almost two hours, I

2    think everyone is exhausted.  Anything more?

3          MS. ICKES:  Nothing from plaintiff unless the Court

4    has questions.  Thank you.

5          MR. DODD:  Nothing further, Your Honor.

6          THE COURT:  Thank you.  We'll take this under

7    advisement and issue a written order.  There are many

8    interesting and challenging issues here.  Thank you.

9    (The proceedings concluded at 11:53 a.m., September 17, 2013.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA R. OTT, Official Court Reporter, United

4    States District Court, District of Hawaii, Honolulu, Hawaii, do

5    hereby certify that the foregoing is a true, complete and

6    correct transcript of the proceedings had in connection with

7    the above-entitled matter.

8
          DATED at Honolulu, Hawaii, September 25, 2013.
9

10

11                         _____/s/ CYNTHIA R. OTT_____
                           CYNTHIA R. OTT, RMR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25