```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3

 4   KIRK C. FISHER,              )   CV No. 11-00589 ACK-BMK
                                  )
 5              Plaintiff,        )   Honolulu, Hawaii
                                  )   June 16, 2014
 6       vs.                      )   10:06 a.m.
                                  )
 7   LOUIS KEALOHA, et al.        )   MOTIONS
                                  )
 8              Defendants.       )
     _____)
 9
                    TRANSCRIPT OF PROCEEDINGS
10             BEFORE THE HONORABLE ALAN C. KAY
                 UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff    TE-HINA TE-MOANA ICKES, ESQ.
13   Kirk C. Fisher:      DONALD L. WILKERSON, ESQ.
                          1003 Bishop Street, Suite 703
14                        Honolulu, Hawaii 96813

15   For Defendants       MARGUERITE S. NOZAKI, ESQ.
     City and County      Office of Corporation Counsel
16   of Honolulu and      530 South King Street, Suite 110
     Louis Kealoha:       Honolulu, Hawaii 96813
17
     Amicus-Brady         MARK M. MURAKAMI, ESQ.
18   Center to Prevent    Damon Key Leong Kupchak Hastert
     Gun Violence:        1003 Bishop Street, Suite 703
19                        Honolulu, Hawaii 96813

20                        JEFF KOSSEFF, ESQ. (via telephone)
                          Covington & Burling LLP
21                        1201 Pennsylvania Avenue NW
                          Washington, D.C. 20004-2401
22
     Per Diem Court       ANN B. MATSUMOTO, CSR 377
23   Reporter:           P.O. Box 235215
                          Honolulu, Hawaii 96823
24                        (808) 521-1877

25   Proceedings recorded by machine shorthand, transcript
     produced with computer-aided transcription (CAT).
```

```
 1  MONDAY, JUNE 16, 2014                    10:06 O'CLOCK A.M.

 2          COURTROOM MANAGER:  Calling the case of Civil

 3  11-00589 ACK-BMK, Kirk C. Fisher versus Louis Kealoha, et

 4  al.  This hearing has been called for Defendants City and

 5  County of Honolulu, Louis Kealoha, Paul Putzulu's motion

 6  for summary judgment or in the alternative, motion for

 7  reconsideration.  Counsel, appearances?

 8          MS. ICKES:  Good morning, your Honor.  Te-Hina

 9  Ickes and Don Wilkerson on behalf of Plaintiff Kirk

10  Fisher.

11          THE COURT:  Good morning.

12          MS. NOZAKI:  Good morning, your Honor.  Marguerite

13  Nozaki appearing for Louis Kealoha and City and County of

14  Honolulu.

15          THE COURT:  Good morning.

16          MR. MURAKAMI:  Good morning, your Honor.  Mark

17  Murakami and Jeffrey Kosseff, appearing by the phone on

18  behalf of advocates Brady Center to Prevent Gun Violence.

19          THE COURT:  Good morning.  So we don't have

20  Mr. Beck here?

21          MS. ICKES:  (Shakes head.)

22          THE COURT:  It's interesting.  He wanted to raise

23  all sorts of new issues, too.

24          Well, please be seated.

25          Before we start, though, I do want to ask
```

1    Ms. Ickes.

2            MS. ICKES:  Yes, Judge.

3            THE COURT:  May I call you Ms. Ickes or Te-Moana?

4            MS. ICKES:  Whatever the Court prefers.  Te-Hina

5    is my first name.  Ickes is the last name.

6            THE COURT:  Okay.  I think on Saturday you filed a

7    motion to file additional exhibits, including a

8    declaration from Dr. Tsai and the letter from police chief

9    to Dr. Tsai.  And I notice that in the letter there's no

10   reference to the applicant.

11           MS. ICKES:  Yes, Judge.  That's correct.  I

12   redacted -- well, when we got it from Dr. Tsai, it was

13   already redacted.  But if the Court --

14           THE COURT:  Pardon me?

15           MS. ICKES:  When we got that letter from Dr. Tsai,

16   it was already redacted.

17           THE COURT:  Redacted?

18           MS. ICKES:  The patient's name and the dates and

19   such, date of birth, were whited out.

20           THE COURT:  Slow down.  Slow down.  It doesn't

21   look redacted to me.  It just looks like the name was

22   never typed in.

23           MS. ICKES:  Oh, no, Judge.  I believe it was,

24   like, whited out rather than blacked out.  And if you look

25   at the Declaration of Dr. Tsai, what he explains is that

1    this letter is not specific with Kirk -- to Kirk Fisher.

2    He does not actually recall if anything came from HPD.

3           THE COURT:  He doesn't remember ever receiving a

4    letter regarding Mr. Fisher?

5           MS. ICKES:  Correct.  That's what he states in his

6    declaration.  But he explains that when HPD -- that he

7    commonly receives letters like this from HPD.  And if he

8    had received one with regards to Plaintiff Fisher, he

9    would have not have responded because the HPD does not

10   require a response, unless he has knowledge of some --

11          THE COURT:  You know, that part makes no sense.

12   The letter specifically says, "If there is any information

13   in your records or if you have personal knowledge which

14   might reflect on your patient's ability to safely own and

15   operate a firearm, please respond in writing."

16          How does he come up with a declaration saying he

17   doesn't have to respond?

18          MS. ICKES:  I believe that's how he interprets the

19   letter, Judge.

20          THE COURT:  Pardon me?

21          MS. ICKES:  He -- I believe that's Dr. Tsai's

22   interpretation of HPD's request.  If he's --

23          THE COURT:  How can he interpret something that's

24   in black and white like that?  It's not ambiguous.

25          MS. ICKES:  Because Dr. Tsai believes there is

 1  nothing that would impair Mr. Fisher's ability to carry a

 2  firearm.

 3          THE COURT:  And that's exactly what they say, "if

 4  you have any knowledge which might reflect on your

 5  patient's ability."  So if you want to help your patient

 6  possess a firearm, you'd better respond in writing.

 7  That's pretty obvious.

 8          MS. ICKES:  Well, it's my understanding that

 9  Dr. Tsai doesn't respond at all unless there's --

10          THE COURT:  I'm sorry for his patients.

11          MS. ICKES:  -- some sort of impairment.

12          THE COURT:  His patients are going to end up not

13  owning any firearm as a result of his misunderstanding of

14  the letter.

15          MS. ICKES:  Well, according to Dr. Tsai, that's

16  his common practice.

17          THE COURT:  Why did Dr. Tsai or whoever bother to

18  redact the name of the applicant?

19          MS. ICKES:  I believe in this case it -- it

20  probably wasn't Mr. Fisher's letter.  So it was for his

21  patient confidentiality.  Because again, as he states in

22  his declaration, he doesn't recall if he got one for Kirk

23  Fisher.

24          THE COURT:  So if he --

25          MS. ICKES:  If he had, he would not have responded

 1  because that's his common practice.

 2       THE COURT:  Well, apparently he redacted the date,

 3  too?

 4       MS. ICKES:  It appears that way, Judge, and maybe

 5  just in the abundance of caution, the date, the

 6  applicant's name, the date of birth.  But what's -- what

 7  we're not trying to argue here is that this letter is --

 8  is in reference to Mr. Fisher.  If it was, we certainly

 9  would not have redacted his name 'cause, you know, it

10  would have to do with Mr. Fisher.

11       So when we got this letter from Dr. Tsai, it's my

12  belief that he redacted the information because it did not

13  pertain to Mr. Fisher and it had to do with, you know,

14  doctor confidentiality issues.

15       THE COURT:  Now, you filed --

16       MS. ICKES:  Patient, rather.

17       THE COURT:  -- a declaration by Mr. Fisher saying

18  that the police -- he did file an application.  And then

19  the police called Dr. Tsai, and Dr. Tsai said -- contrary

20  to his declaration, apparently said that according to

21  Mr. Fisher's declaration that Mr. Tsai was well qualified

22  mentally and didn't have any addiction problems and that a

23  permit was -- a gun permit was issued to Mr. Fisher.

24       MS. ICKES:  Yes, Judge.  I'm looking at the

25  declaration now.  That was Mr. Fisher's understanding of

 1  what happened.  He gave Dr. Tsai as a medical reference,

 2  and he did get his permit.

 3          THE COURT:  Well, where's the permit?

 4          MS. ICKES:  Judge, I -- I don't know have the

 5  permit here.  I -- I don't have it.  I -- I haven't seen

 6  it.  According to HPD's apparent record or lack of record,

 7  they don't have anything from Dr. Tsai, according to the

 8  HPD's declaration.  They don't have anything from

 9  Mr. Fisher.

10          THE COURT:  This must be something that is very

11  precious to the heart of Mr. Fisher.  He's tried to get a

12  permit for many, many years, and he claims he got one.

13  And now you can't find it?

14          MS. ICKES:  Judge, I just -- I didn't bring it.  I

15  haven't asked him for it.  I didn't attach it to any of

16  our documents.  It's just what -- you know, quite frankly,

17  Judge, it didn't occur to me to -- to attach it.

18          THE COURT:  I mean, but you got the reply of

19  the -- of the City saying that a permit was never issued.

20          MS. ICKES:  I did get the reply, which is why I --

21          THE COURT:  Didn't that cause you to then go to

22  Mr. Fisher and say, "Well, we need the permit"?

23          MS. ICKES:  The way I took that declaration was

24  that they -- it lacked some information and was -- the way

25  I read it, it was -- it was misleading, as though HPD

1    never reached out to Dr. Tsai, that in -- again, in

2    Dr. Tsai's common practice, he doesn't reply to these

3    letters unless there's some sort of mental or substance

4    abuse issue.

5           In HPD's declaration they say, "well, we don't

6    have any document medically clearing him."  But Plaintiff

7    submits, I submit, that the lack of the document after

8    submitting the -- this medical request to the medical

9    reference, in this case, Dr. Tsai, the lack of a response

10   from Dr. Tsai --

11          THE COURT:  Dr. Tsai says he never --

12          MS. ICKES:  -- is in fact a clearance.

13          THE COURT:  He never received a letter from the

14   police.

15          MS. ICKES:  He doesn't remember if -- I'm sorry.

16   He doesn't remember if he did or he did not --

17          THE COURT:  Yeah.

18          MS. ICKES:  -- regarding --

19          THE COURT:  Yeah.

20          MS. ICKES:  -- Kirk Fisher.

21          THE COURT:  Yeah.

22          MS. ICKES:  Well --

23          THE COURT:  Anyway, okay, I've heard from you.

24   Now I'll hear from Ms. Nozaki on this one particular

25   issue.

```
 1              MS. NOZAKI:  Good morning, your Honor.

 2              THE COURT:  Good morning.  What's your explanation

 3     of all of this?

 4              MS. NOZAKI:  HPD's position is --

 5              THE COURT:  Now, you're going to have to speak up

 6     and bring the mic closer to you.

 7              MS. NOZAKI:  Sure.  Defendants' position is that

 8     HPD never approved or -- Plaintiff's gun permit

 9     application in 2012.  Mr. Fisher's declaration is

10     completely devoid of any facts which would lead one to

11     conclude that he received a gun permit because there's no

12     date of when he received a permit.  There is no evidence

13     of Dr. Tsai having provided any clearance for Mr. Fisher.

14     And beside that, the more to the point is that the

15     Plaintiff had an affirmative duty or responsibility to

16     satisfy the terms of his probation, his conditions.  One

17     of which was to provide medical documentation, when

18     applying, that he has -- he is no longer affected or

19     adversely affected by substances.  Specifically,

20     intoxicating liquor.

21              HPD will submit that what Plaintiff claims he did

22     here, assuming he did do so, is not -- does not satisfy

23     the condition of probation.  And in any case, there is no

24     evidence that Dr. Tsai provided such clearance.

25              THE COURT:  There's no what?
```

1    MS. NOZAKI:  There's no indication, no evidence

2    that Dr. Tsai provided such clearance.

3    THE COURT:  Well, you came up with some

4    declaration that said that an application comes in; it

5    sits there for two weeks; and then somehow the applicants

6    have to pick it up in six days.  And Mr. Fisher never

7    picked it up, so the application was invalid and thrown

8    away or something.

9    MS. NOZAKI:  Correct.

10   THE COURT:  Sounds like a rather nonsensical

11   procedure.

12   MS. NOZAKI:  Well, your Honor, that's the

13   procedure that HPD follows.

14   THE COURT:  Pardon me?

15   MS. NOZAKI:  That is the procedure that HPD

16   follows.  And the application --

17   THE COURT:  Really?

18   MS. NOZAKI:  -- was void should the Plaintiff --

19   or the permit application.

20   THE COURT:  So are you saying that the application

21   was approved and then thrown away, or what?

22   MS. NOZAKI:  Not necessarily.  According to HPD's

23   records, the application is voided.  That is what they

24   reflect in their records.

25   THE COURT:  So two weeks goes by.  And then what

1    happens ordinarily, in the ordinary case?

2         MS. NOZAKI:  In an ordinary case, they'll go and

3    review the submissions and make sure that whatever the

4    applicant is required to submit is submitted, and approve

5    or deny.  And according to their records, it says that

6    Mr. Fisher's application was voided.

7         THE COURT:  Does it say that the police called

8    Dr. Tsai?

9         MS. NOZAKI:  It -- it does not reflect that.

10        THE COURT:  Why not?

11        MS. NOZAKI:  And there's no record of that.

12        THE COURT:  Why didn't they?

13        MS. NOZAKI:  What HPD does is submit a form letter

14   to the physicians, the physician that's identified in the

15   applicant's forms, similar to the one that was submitted

16   by Plaintiff's counsel here.  And in order for HPD to be

17   satisfied that there is no hindrance or impediment to --

18   regarding mental disability for the applicant, the doctor

19   will then submit something to them clearing the applicant.

20   And in this case, that didn't occur.

21        THE COURT:  Well, now, Ms. Ickes has filed this

22   Declaration of Dr. Tsai.  Where does that leave us today?

23        MS. NOZAKI:  Well, your Honor, Dr. Tsai does not

24   recall that they ever received Mr. Fisher's letter.

25        THE COURT:  No, but he's filed a declaration

1   dated, I don't know, June 14th of this year, saying that

2   Mr. Fisher is his patient and he has no addiction and he's

3   not mentally unsound.

4         MS. NOZAKI:  Defendants submit that despite

5   Dr. Tsai's declaration, such -- the declaration was not in

6   existence back when he had applied.

7         THE COURT:  What?

8         MS. NOZAKI:  Dr. Tsai -- Plaintiff, rather, did

9   not submit medical documentation clearing him at a time of

10  his application in 2009.  And that is when he says --

11        THE COURT:  No, but --

12        MS. NOZAKI:  -- the violation occurred.

13        THE COURT:  -- what's before me now, you know, in

14  considering whether or not 134-7(c) has been satisfied,

15  what's before me now is a declaration of Dr. Tsai.

16        MS. NOZAKI:  If your Honor believes the

17  Declaration of Dr. Tsai to be medical documentation

18  satisfying the probation condition, then it is now that

19  Plaintiff, if your Honor believes may have clearance,

20  medical documentation clearance, if that's how your Honor

21  reads the declaration.

22        THE COURT:  So, I mean, do you have any objection

23  to Dr. Tsai's declaration?

24        MS. NOZAKI:  Well, your Honor, frankly, I haven't

25  had an opportunity really look into this issue because of

 1    the untimely filing.

 2            THE COURT:  How much more do you need to look into

 3    it?

 4            MS. NOZAKI:  I'd have to go back and speak with

 5    HPD and Dr. Tsai.

 6            THE COURT:  We seem to have his opinion as to this

 7    patient not having a problem; isn't that right?

 8            MS. NOZAKI:  That is what his declaration states,

 9    correct.

10            THE COURT:  Okay.  Well, that's one issue we have

11    before us.  So I'd like you to know, file this motion for

12    reconsideration of our earlier order or in the alternative

13    motion -- I guess it's the other way around, a motion for

14    summary judgment or in the alternative, a motion for

15    reconsideration.  So I'd like you to proceed with that.

16            MS. NOZAKI:  Thank you, your Honor.

17            The thrust of Defendants' motion for

18    reconsideration --

19            THE COURT:  You'd better bring the microphone

20    closer to you.

21            MS. NOZAKI:  Is this better?

22            Yes, your Honor, Defendants' motion is premised on

23    intervening change of law, specifically, United States

24    Supreme Court decision in United States versus Castleman.

25    This case resolves the question of what degree of physical

1    force is required for a conviction to constitute a

2    misdemeanor crime of violence under the Lautenberg

3    Amendment, 18 USC 922(g)(9).  In particular, Castleman

4    resolves the issue of whether the prescribed conduct in

5    Hawaii's harassment statute qualifies as a misdemeanor

6    crime of violence to come within the Lautenberg limit.

7    Castleman resolved this issue in Defendants' favor.

8         Under the Lautenberg Amendment, any person who has

9    been convicted of any -- by any court of a misdemeanor

10   crime of violence is prohibited from owning firearms.  A

11   misdemeanor crime of violence (indiscernible) requirement

12   constitutes a misdemeanor under state law and has as an

13   element the use or attempted use of physical force against

14   a category of persons, including current or former

15   spouses.

16        So Castleman recognized that there has been a deep

17   split of authority amongst the Courts of Appeals on the

18   degree of physical force necessary for a crime to come

19   within the Lautenberg Amendment, especially where assault

20   and battery laws under which domestic abusers are

21   routinely prosecuted fall into two categories, generally,

22   those states that prohibit both offensive touching and the

23   causation of bodily injury and the states that prohibit

24   only the latter.

25        The court in Castleman resolved the split in

1   authority by clarifying that the requirement of physical

2   force is satisfied, for purposes of Section 922(g)(9), by

3   the degree of force that supports a common law battery

4   conviction.  Hawaii's harassment statute -- that's HRS

5   711-1106 -- states that a person commits the offense of

6   harassment if, with the intent to harass, annoy, or alarm

7   any other person, that person does any of the acts set

8   forth in subparts (a) through (f).  And 1(a) includes

9   strikes, shoves, kicks, or other offensive touching.  And

10  the comment, as your court -- this court pointed out in

11  its September 30th order, the comment provides that 1(a)

12  is a restatement of the common law crime of battery, which

13  was committed by any slight touching of another person.

14          Accordingly, because Hawaii's harassment statute

15  is defined broadly and includes a de minimis touching in

16  its prescribed conduct and it is patterned after the

17  common law battery crime, Plaintiff's harassment

18  conviction prescribes the same conduct as a misdemeanor

19  crime of violence defined in the Lautenberg Amendment.  It

20  categorically qualifies as a misdemeanor crime of

21  violence, thus barring Plaintiff from owning and

22  possessing firearms.  And so the Court should find as a

23  matter of law that HPD's denial of Plaintiff's 2009

24  firearms permit was proper.

25          Does the Court have any questions for me?

```
 1          THE COURT:  Well, Mr. Beck raised the issue of the

 2   constitutionality of 922(g)(9) and the Chovan 2013 Ninth

 3   Circuit decision, which neither you nor Ms. Ickes

 4   addressed.  And apparently -- I know you feel that it was

 5   never raised by the Plaintiff; and therefore, it's

 6   inappropriate for the amicus to raise an issue that hadn't

 7   previously been raised by the parties.

 8          What's your position on Chovan?

 9          MS. NOZAKI:  Your Honor, Defendants -- if the

10   Court is going to entertain or consider amicus --

11          THE COURT:  Pardon me?

12          MS. NOZAKI:  If this Court is going to address

13   amicus's supplemental brief and discussion on Chovan,

14   Defendants would request an opportunity to further brief

15   that matter.  But the Defendants' position remains that

16   these issues are new issues that were not raised.

17   Plaintiff's only opposition, or thrust of the opposition

18   to this motion in particular, is the argument that there

19   is a predicate element of the domestic relationship, and

20   that is the extent of the opposition.

21          THE COURT:  So you're not prepared to discuss

22   Chovan today?

23          MS. NOZAKI:  No, your Honor.  I think Defendants

24   would require -- it would require a little bit more

25   briefing and research as this is a new issue that has not
```

 1   been addressed.

 2        THE COURT:  Do you feel that that's something that

 3   should be considered since this -- you know, whether or

 4   not the statute is constitutional does impact on

 5   Mr. Fisher's rights as well as a concern as to whether the

 6   City's -- the state has an appropriate relief from 922?

 7        MS. NOZAKI:  Your Honor, Defendants have never

 8   addressed this issue.  This issue has never been in front

 9   of the Court, and there has been no briefing on it.

10        THE COURT:  I'm sorry?

11        MS. NOZAKI:  This issue is a new issue that has

12   never been addressed by this Court or raised in any of the

13   pleadings.  And Defendants would submit that it is not

14   appropriate to address this issue.  Should the Court

15   choose do address it, of course, Defendants would be

16   willing to provide some briefs on the issue.

17        THE COURT:  Thank you.

18        MS. NOZAKI:  Thank you.

19        THE COURT:  Ms. Ickes?

20        MS. ICKES:  Thank you, Judge.

21        I just want to start off by clarifying some --

22   something that the state -- or the City referred to over

23   and over as Castleman addresses misdemeanor crimes of

24   violence.  In fact, Castleman addresses misdemeanor crimes

25   of domestic violence.  Castleman is a case of domestic

1   violence.  It's a domestic violence case.

2        Throughout the entire case Justice Sotomayor talks

3   about the issue of domestic violence in our country,

4   battered women and such.  And I put in some quotes in our

5   opposition papers.  The long and short of it is Castleman

6   is a domestic violence case.  So the question, Plaintiff

7   submits, is whether this case is a domestic violence case.

8        If I could just back up a second to point out that

9   in Castleman Mr. Castleman was being charged with -- he

10  was being prosecuted for, I believe, violations under

11  federal law of having a firearm in violation of the

12  Lautenberg Amendment; again, because he had previously

13  been convicted of a Tennessee crime of intentionally or

14  knowingly causing bodily injury to the mother of his

15  child.  So clearly, Plaintiff submits, Castleman is a

16  crime -- or is a case about domestic violence.

17       So Plaintiff further submits that this case should

18  be narrowly construed to crimes of domestic violence.

19  Again, Castleman was charged and convicted with this crime

20  against the mother of his child, and that's what the -- I

21  guess the reliable court record in Mr. Castleman's state

22  case showed, that that's what he was charged with and

23  that's what he was convicted of.

24       In this case, as set forth in our opposition

25  papers, you know, Castleman says what it says about

1  redefining or defining the -- excuse me.  I don't want to

2  misquote -- of redefining the definition of "physical

3  force."  You know, Castleman holds that the requirement of

4  physical force is satisfied by the degree of force that

5  supports a common law battery conviction.  But again, I

6  hate to sound like a broken record here, but the Castleman

7  court clearly focuses on misdemeanor crimes of domestic

8  violence.

9       In the present case, Mr. Fisher's conviction in

10  1997 or 19 -- back in the late '90s, I believe it was

11  1988, he pled guilty as charged to the crime of

12  harassment.  And the harassment statute that he was

13  charged under and was convicted under is set forth in our

14  opposition papers, and it does not identify who the

15  complainants were.

16       Yeah, in the charging -- the complaint, I

17  believe -- it was a complaint.  The criminal complaint

18  identifies the names of the complaining witnesses, but

19  they don't put a status on who those complaining witnesses

20  are, the complainants are.  We have names.  They do not

21  put any status on whether or not it's a spouse, current

22  spouse, parent, guardian, as required by the Lautenberg

23  Amendment -- Lautenberg Amendment -- or, I'm sorry, as

24  defined by the Lautenberg Amendment.  That's the

25  definition of "domestic relationship."  And that

1     just doesn't exist here.

2          If we're looking at the reliable court record,

3     from back when Mr. Fisher pled guilty to the state

4     harassment charge in 1998, it just doesn't support the

5     fact that it was a crime of -- a misdemeanor crime of

6     domestic violence.

7          THE COURT:  Yes, but the court decision is a --

8     it's a matter of fact whether it was domestic violence,

9     not whether it was the predicate element.  And in your

10    pleadings, you admit that it was a domestic relationship.

11    And in his deposition, Mr. Fisher admits that, too.

12         MS. ICKES:  Well, I understand that, your Honor,

13    and I -- I knew the Court was going to bring that up

14    because that is obviously true.  In his deposition he does

15    say that Collette Fisher and Nicole Fisher were his wife

16    and daughter, are his wife and daughter.  But again,

17    looking at just the reliable court records from back then,

18    in 1988, at the time he pled, nowhere in the court record,

19    in the reliable documents, does it show us or tell us.

20    The record back then is silent as to exactly who Collette

21    and Nicole Fisher are.

22         So that being the case, admissions now by the

23    attorneys in pleadings by Mr. Fisher at his deposition

24    really don't have anything to do, Plaintiff submits, with

25    what the 1998 conviction was based on.  That's Plaintiff's

1    submission, your Honor.

2         THE COURT:  I think the United States Supreme

3    Court in Hayes disagrees with you, though, as far as the

4    facts of the matter.

5         MS. ICKES:  With the facts of Mr. Fisher's case?

6         THE COURT:  Yes, the fact that he has admitted it,

7    both in pleadings and deposition.

8         MS. ICKES:  Your Honor, I believe -- I believe

9    that prior ruling by this -- by this Court, albeit on a

10   different issue, whether or not -- you know, the physical

11   force issue, this Court discussed the fact that certain

12   reliable judicial records can be consulted to determine

13   whether or not in this case Mr. Fisher's conviction in

14   1998 wasn't in fact a crime of violence.

15        Plaintiff submits that the Court should use that

16   same understanding of that modified categorical approach,

17   or the categorical approach.  Well, the categorical

18   approach only looks at the charging document, as the Court

19   is aware.  The modified approach, Plaintiff submits that

20   pleadings now, depositions now, more than ten years later,

21   declarations now have no bearing on that '98 conviction

22   because these current filings, pleadings, depositions do

23   not -- they're not considered -- Plaintiff submits they

24   should not be considered reliable judicial records to

25   determine whether or not these people were --

```
 1              THE COURT:  You can't rely on his admission?

 2              MS. ICKES:  Excuse me?

 3              THE COURT:  You can't rely on his own admission?

 4              MS. ICKES:  Well, Judge, if the Court remembers in

 5    previous filings, and the Court is in -- has Mr. Fisher's

 6    deposition transcript where he admits to or he says in the

 7    deposition that he pushed his wife down.  And the Court

 8    decided that that admission, if you want to call it an

 9    admission, would not satisfy whether or not this crime was

10    in fact a crime of violence against his wife.  So using

11    that same analysis that the Court -- that this Court used

12    regarding that issue, Plaintiff submits that that same

13    analysis should be used here, that it's not a reliable

14    judicial record -- document.

15              THE COURT:  The Supreme Court in Hayes says it

16    suffices that a prior conviction was in fact for an

17    offense committed by the Defendant against a spouse or

18    domestic victim.  In fact.

19              MS. ICKES:  I'm sorry.  I -- I don't have the case

20    right here in front of me.  And I hear what the Court just

21    said, but I'm not sure what the Hayes court -- or what

22    that quote that your Honor just gave me, what preceded it,

23    if it was in fact a deposition.  Like I said, I don't have

24    the case right here in front of me.  And I'm not sure if I

25    can respond to that, that quote, without having a better
```

1    context of --

2           I'm obviously familiar with the Hayes case.  I

3    know the City cited it in its response.  But again, I just

4    don't have the case in front of me, and I can't recall

5    what documents the -- the Hayes court relied on.

6           But in any case, Plaintiff's position here is that

7    if City is going to rely on Castleman, a case that is

8    defining physical force, it has to be looked at in the

9    context of a domestic violence situation because that's

10   what Castleman is about.  That was a domestic case.

11   Clearly, it was a domestic case because he was charged

12   with and convicted of bodily injury against the mother of

13   his child.  It's spelled out there.  We don't even know

14   her name.  It's -- the relationship is clear.  So that's

15   Plaintiff's position in terms of this new controlling case

16   that the City presents -- well, this Castleman case that

17   the City presents as controlling.

18          Plaintiff's position is that if we're looking at

19   Castleman to control here, we got to look at the whole

20   Castleman case.  And Castleman is -- has to do with a

21   misdemeanor crime of domestic violence.  And when we look

22   at the relationship, domestic relationship, again, present

23   or former spouse, parent or guardian.  And although that

24   may be the case, those facts may support that relationship

25   now despite -- or although the facts may support that

1   relationship now, as we stand here, in 1998, we did not

2   know who those -- the relationships of those parties then.

3          So that's Plaintiff's position with regard to

4   Castleman, that it should be narrowly construed for crimes

5   of domestic violence, misdemeanor crimes of domestic

6   violence, and the harassment statute under which

7   Mr. Fisher was convicted.  Plaintiff submits that that is

8   not the case.

9          Unless the Court has any further questions, I

10   don't think the -- the City went any further in their oral

11   argument this morning.  Do you want me to address the --

12   I -- the case that Mr. Beck addressed in --

13          THE COURT:  Well, that would be helpful, yes.

14          MS. ICKES:  Well, you know, Judge, again, I don't

15   have a copy of -- and I know Mr. Beck, I didn't notice

16   that he was going to be appearing by phone at all.  So I

17   didn't expect to have to argue this point either.

18          THE COURT:  It's not an issue you raised, is it?

19          MS. ICKES:  It's not an issue I raised, the long

20   and short of it.  I mean, it's a good issue for us, but it

21   was not raised by us in our briefs.  The constitutionality

22   and -- I believe it was a California case.  It was not

23   raised.  It was not raised in our opposition brief, no.

24          THE COURT:  Thank you.

25          MS. ICKES:  Thank you, Judge.

```
 1           THE COURT:  Ms. Nozaki?

 2           Well, before Ms. Nozaki, I guess if any of our

 3    amicus want to say anything, I know the -- Mr. Murakami

 4    and Mr. Kosseff didn't get around to filing anything.  I

 5    don't know if they want to say anything or if they're

 6    entitled to.  Do you want to comment?

 7           MR. KOSSEFF:  Your Honor?

 8           MR. MURAKAMI:  Mr. Kosseff's on the phone, your

 9    Honor, and I think he's ready to respond.

10           THE COURT:  All right.

11           MR. KOSSEFF:  Yeah, I very much appreciate you

12    allowing us to participate by phone in this hearing.  I'll

13    keep it very brief.

14           First, the Brady Center completely agrees with the

15    Defendants' arguments, both in the brief and that were

16    just raised in argument today.  And I would also just say

17    that I share your reading of the Hayes case.  I don't see

18    it being as limited as the Plaintiff's counsel is saying

19    to the -- to reliable judicial documents at the time of

20    the charging.  I'm looking at the case right now, and I

21    don't see that limitation in there.

22           And just in terms of the discussion of Castleman

23    being focused specifically on domestic assault -- or

24    crimes of domestic violence, I would say that the state

25    crime in Castleman was Tennessee Code 3913-111, which did
```

1    cover domestic relationships with spouses; but also, it

2    had six categories of coverage, one of which is adults or

3    minors related by blood or adoption, adults or minors who

4    are related informally or related by marriage.

5         So Castleman didn't really go into the details of

6    how it affects whether -- whether there was a domestic

7    relationship.  But the -- the underlying statute was a bit

8    broader than specifically what would be required under

9    92-1.  So that suggests that the -- that in Castleman,

10   additionally, they did look at additional facts to make

11   the determination of whether a domestic relationship

12   exists.  So, I mean, that -- those are the primary points

13   that I just wanted to stress.  Again, we fully agree with

14   the issues that Defendants raise as well as your -- your

15   understanding of Hayes.

16        THE COURT:  Thank you.  Ms. Nozaki?

17        MS. NOZAKI:  Your Honor, just briefly.  As your

18   Honor pointed out, Castleman does not create as an element

19   domestic relationship that's -- it doesn't discuss it.  It

20   doesn't overturn anything iterated by the Court in U.S. v.

21   Hayes.  And Plaintiff's argument, as I understand it,

22   which is to create somehow a requirement that there be a

23   domestic relationship despite the clear facts in this

24   case, is not supported by any case law.

25        And, your Honor, Defendants submit that it is --

1    there can be no dispute that Plaintiff, Mr. Fisher, did

2    have a domestic relationship with his wife at the time,

3    who -- which is the subject of this conviction of

4    harassment.  And as Plaintiff's counsel just pointed out,

5    it's obviously true.

6                THE COURT:  Pardon me?

7                MS. NOZAKI:  It's obviously true that there was a

8    domestic relationship, in fact a domestic relationship.

9    And there is no requirement that it be established as an

10   element.

11               THE COURT:  Be established as what?

12               MS. NOZAKI:  An element.

13               THE COURT:  Anything else?

14               MS. NOZAKI:  No, your Honor.

15               THE COURT:  Thank you.

16               All right.  I do want to give this further

17   consideration.  There are some additional cases I want to

18   look at, and I may or may not ask the parties to brief

19   Chovan's.  Ms. Nozaki mentioned that they would like --

20   Defendant would like to brief, if the Court's going to

21   consider Mr. Beck's raising of an issue that the parties

22   have not raised.  So I will take this under advisement.

23   Thank you.

24               COURT CLERK:  All rise.

25               (Concluded at 10:45 a.m.)

1

2                   COURT REPORTER'S CERTIFICATE

3          I, Ann B. Matsumoto, Per Diem Court Reporter,

4    United States District Court, District of Hawaii, do

5    hereby certify that pursuant to 28 U.S.C. Sec. 753 the

6    foregoing is a complete, true, and correct transcript of

7    the stenographically recorded proceedings held in the

8    above-entitled matter and that the transcript page format

9    is in conformance with the regulations of the Judicial

10   Conference of the United States.

11         DATED at Honolulu, Hawaii, October 8, 2014.

12

13

14
                         /s/ Ann B. Matsumoto
15                       ANN B. MATSUMOTO
                         RPR, CSR
16

17

18

19

20

21

22

23

24

25